IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------ x
AMERICAN HOME MORTGAGE              : Civil Action
INVESTMENT CORP.,                   : No. 08-484 (JJF)
                                    :
                      Appellants,   :
          v.                        :
                                    :
LEHMAN BROTHERS INC. and LEHMAN     :
COMMERCIAL PAPER INC.,              :
                                    :
                      Appellees.    :
------------------------------------ x
```

**REQUEST OF AMERICAN HOME MORTGAGE INVESTMENT CORPORATION, PURSUANT TO 11 U.S.C. § 105(a), 28 U.S.C. § 158(d)(2) AND FED. R. BANKR. P. 8001(f), FOR CERTIFICATION FOR DIRECT APPEAL TO UNITED STATES COURT OF APPEALS FOR THIRD CIRCUIT OF ORDER DISMISSING IN PART WITH PREJUDICE AND IN PART WITHOUT PREJUDICE COMPLAINT AGAINST LEHMAN BROTHERS INC. AND LEHMAN COMMERCIAL PAPER INC. (AS AMENDED) AND MOTION TO STAY ACTION PENDING ADJUDICATION OF CERTIFICATION REQUEST**

American Home Mortgage Investment Corporation ("AHMIC") hereby (a) requests (the "Certification Request"), pursuant to section 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), 28 U.S.C. § 158(d)(2), and Rule 8001(f) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the entry of an order certifying its appeal of the Order Dismissing In Part With Prejudice And In Part Without Prejudice The Complaint Against Lehman Brothers Inc. And Lehman Commercial Paper Inc., dated May 23, 2008 (the "Original Order") as amended,[1] issued by the United States Bankruptcy Court

---

[1]   The Original Order incorporates the Bankruptcy Court's Memorandum Opinion, dated May 23, 2008 (Docket No. 23) (the "Opinion") and was amended pursuant to the Order Granting

for the District of Delaware, for direct appeal to the United States Court of Appeals for the Third Circuit (the "Third Circuit"), and (b) moves to stay the instant action pending the Court's adjudication of the Certification Request.

1.    AHMIC refers to and incorporates by reference the Brief Of American Home Mortgage Investment Corporation In Support Of Its Request, Pursuant To 11 U.S.C. § 105(a), 28 U.S.C. § 158(d)(2) And Fed. R. Bankr. P. 8001(f), For Certification For Direct Appeal To United States Court Of Appeals For Third Circuit Of Order Dismissing In Part With Prejudice And In Part Without Prejudice Complaint Against Lehman Brothers, Inc. And Lehman Commercial Paper, Inc. (As Amended), And AHMIC'S Motion To Stay Action Pending Adjudication Of Certification Request (the "Brief In Support").

2.    The Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 158 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. § 1409.  The statutory predicates for relief requested herein are 28 U.S.C. § 158(d)(2), 11 U.S.C. § 105(a), and Rule 8001(f) of the Federal Rules of Bankruptcy Procedure.

---

Motion, Pursuant To Federal Rules Of Bankruptcy Procedure 7052 And 9023 And 11 U.S.C. § 105(a), To Alter And Amend Bankruptcy Court Decision, dated June 30, 2008 (Docket No. 34) (the "Amendment Order").  The Original Order, the Opinion, and the Amendment Order, copies of which are attached to the Brief In Support as Exhibits A1, A2, and A3, respectively, shall be referred to collectively as the "Bankruptcy Court Decision."

3.    On July 10, 2008, AHMIC filed a Notice of Appeal from the Bankruptcy Court Decision (the "Appeal").  As set forth more fully in the Brief In Support, AHMIC respectfully requests that the Court certify AHMIC's Appeal from the Bankruptcy Court Decision for direct appeal to the United States Court of Appeals for the Third Circuit (the "Third Circuit") and stay the Appeal before this Court pending its decision on the Certification Request.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, for the reasons set forth in the Brief In Support, AHMIC respectfully requests that the Court enter an order, substantially in the form attached hereto as Exhibit A, (i) granting the Certification Request, (ii) certifying the Appeal for direct appeal to the Third Circuit, (iii) staying the Appeal before this Court pending its decision on the Certification Request, and (iv) granting AHMIC such further relief as it considers just and appropriate.

Respectfully submitted,

Dated:    Wilmington, Delaware
          August 18, 2008

**YOUNG, CONAWAY,
STARGATT & TAYLOR, LLP**

John T. Dorsey (No. 2988)
Erin D. Edwards (No. 4392)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

-and-

**QUINN, EMANUEL, URQUHART,
OLIVER & HEDGES, LLP**
Susheel Kirpalani
James C. Tecce
Robert K. Dakis
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7199
Facsimile: (212) 849-7100

*Counsel to American Home
Mortgage Investment Corp.*

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------ x
AMERICAN HOME MORTGAGE            : Civil Action
INVESTMENT CORP.,                 : No. 08-484 (JJF)
                                  :
                    Appellants,   :
          v.                      :
                                  :
LEHMAN BROTHERS INC. and LEHMAN   :
COMMERCIAL PAPER INC.,            :
                                  :
                    Appellees.    :
------------------------------------ x
```

CERTIFICATION TO THIRD CIRCUIT COURT OF APPEALS
OF APPEAL FROM ORDER DISMISSING IN PART WITH PREJUDICE AND IN
PART WITHOUT PREJUDICE COMPLAINT AGAINST LEHMAN BROTHERS INC. AND
LEHMAN COMMERCIAL PAPER INC. (AS AMENDED) AND MOTION TO STAY
ACTION PENDING ADJUDICATION OF CERTIFICATION REQUEST

A notice of appeal having been timely filed in the above-captioned adversary proceeding on July 10, 2008 by American Home Mortgage Investment Corp. ("AHMIC") appealing (I) the Bankruptcy Court's findings of fact and conclusions of law as set forth in the May 23, 2008 Opinion (Docket No. 23) (the "Opinion"), a copy of which is attached hereto as Exhibit A, and (II) the Bankruptcy Court's judgment as set forth the Bankruptcy Court's Order dated May 23, 2008 (Docket No. 24) (the "Original Order"), a copy of which is attached hereto as Exhibit B, as amended by the Bankruptcy Court's Order dated June 30, 2008 (the "June 30 Order," and, together with the Opinion and the Original Order, the "Final Order"), copy of which is attached hereto as Exhibit C; and for the reasons set forth in AHMIC's Request Pursuant To

11 U.S.C. § 105(A), 28 U.S.C. § 158(D)(2) And Fed. R. Bankr. P. 8001(F), For Certification For Direct Appeal To United States Court Of Appeals For Third Circuit Of Order Dismissing In Part With Prejudice And In Part Without Prejudice Complaint Against Lehman Brothers Inc. And Lehman Commercial Paper Inc. (As Amended) and Motion To Stay Action Pending Adjudication Of Certification Request;

IT IS HEREBY FOUND that this certification arises from a timely appeal from a final judgment, order, or decree of the United States Bankruptcy Court for the District of Delaware; and

IT IS FURTHER FOUND that the Final Order involves a question of law as to which there is no controlling decision of the United States Court of Appeals for the Third Circuit (the "Third Circuit") or of the Supreme Court of the United States; and

IT IS FURTHER FOUND that the Final Order involves a matter of public importance; and

IT IS FURTHER FOUND that an immediate appeal from the Final Order to the Third Circuit will materially advance the progress of this adversary proceeding as well as AHMIC's and American Home's chapter 11 cases; and thus

IT IS HERBY ORDERED that, pursuant to 28 U.S.C. § 158(d)(2) and Interim Bankruptcy Rule 8001(f), AHMIC's appeal of the Final Order is hereby CERTIFIED for direct review appeal to the Third Circuit.

Wilmington, Delaware
_____, 2008

_____
Hon. Joseph J. Farnan, Jr.
United States District Judge

**EXHIBIT A**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERICAN HOME MORTGAGE, | ) Case No. 07-11047 (CSS) |
| HOLDINGS, INC., a Delaware Corporation, | ) Jointly Administered |
| et al., | ) |
| | ) |
| Debtors. | ) |
| | ) |
| AMERICAN HOME MORTGAGE | ) |
| INVESTMENT CORP., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Proc. No. 07-51739 (CSS) |
| | ) |
| LEHMAN BROTHERS INC., and LEHMAN | ) |
| COMMERCIAL PAPER INC., | ) |
| | ) |
| Defendants. | ) |

## <u>OPINION</u>[1]

William P. Bowden
Amanda M. Winfree
Benjamin W. Keenan
Ashby & Geddes, P.A.
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE  19899

- and -

Robert J. Rosenberg  (Argued)
Noreen A. Kelly-Najah
George Royle
Michael J. Riela
Latham & Watkins, LLP

John T.  Dorsey
Erin D. Edwards
Young, Conaway, Stargatt
Taylor, LLP
The Brandywine Building
1000 West Street, 17th Street
Wilmington, DE  19801

- and -

Susheel Kirpalani
James C. Tecce (Argued)
Harrison Denman
Quinn, Emanuel, Urquhart,
Oliver & Hedges, LLP

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, pursuant to Federal Rule of Bankruptcy Procedure 7052.

885 Third Avenue, Suite 1000          51 Madison Avenue, 22nd Floor
New York, New York  10022             New York, New York  10010

Attorneys for Defendants Lehman       Counsel to American Home
Brothers, Inc. and Lehman Commercial  Mortgage Investment Corp.
Paper Inc.

Dated:  May 23, 2008

Sontchi, J. _____

## INTRODUCTION

Before the Court is a motion to dismiss the bulk of the complaint filed by

American Home Mortgage Investment Corp. against Lehman Brothers Inc. and

Lehman Commercial Paper Inc.  The complaint contains five counts, including

five requests for declaratory judgment contained in the fifth count.  The first

three requests for declaratory judgment center on whether the "safe harbor"

protections of section 559 and 555 of the Bankruptcy Code apply to the

transaction in question.  The Court finds that the transaction in question is a

"repurchase agreement" under the statute and the safe harbor provisions of

sections 559 and 555 of the Bankruptcy Code are applicable.

Consequently, the Court further finds that the relevant defendant did not

violate the automatic stay imposed by section 362(a) of the Bankruptcy Code

when it exercised its rights under an *ipso facto* clause.  Furthermore, the Court

finds that the relevant defendant was not constrained by Article 9 of the Uniform

Commercial Code when it exercised its rights under the *ipso facto* clause.  Thus,

the Court will dismiss four of the five requests for declaratory judgment contained in the fifth count. [2]

Finally, the Court will dismiss Counts I through IV of the complaint. For the reasons set forth below, each of these counts fails to state a claim upon which relief can be granted. [3]

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (G) and (O).

## STATEMENT OF FACTS

### I. Procedural Background

American Home Mortgage Investment Corp. ("AHMIC" or "Plaintiff"), a debtor in possession in the above-captioned chapter 11 cases, commenced this adversary proceeding by filing a complaint ("Complaint") against Lehman Brothers Inc. and Lehman Commercial Paper Inc. (collectively "Lehman" or "Defendants"). [4] In the Complaint, AHMIC puts forward five counts: breach of contract, turnover of property of the estate, conversion, unjust enrichment, and declaratory judgment.

---

[2] The Defendants do not seek to dismiss the Plaintiff's fifth request for declaratory judgment.

[3] The Court will dismiss without prejudice the portion of Count I of the complaint asserting a pre-petition breach of contract to allow the Plaintiff an opportunity to plead with more specificity its claim of damages.

[4] [Docket Entry 1].

In response to the Complaint, the Defendants filed a motion to dismiss the bulk of the Complaint and a supporting brief (collectively, "Motion to Dismiss).[5] The Defendants request that the Court dismiss the Plaintiff's claims for breach of contract, turnover of property of the estate, conversion, and unjust enrichment. The Defendants also request that the Court dismiss the first four claims for declaratory judgment contained in the fifth count.

The Plaintiff filed an answering brief in opposition to the Motion to Dismiss ("Plaintiff's Answer").[6]  The Defendants subsequently filed a response ("Defendants' Response").[7]  The Court heard oral argument on March 13, 2008. This matter is now ripe for decision.

## II.  Facts[8]

The facts relevant to this dispute center on a structured finance transaction involving AHMIC, Lehman Brothers Inc. ("Lehman Brothers") and Lehman Commercial Paper Inc.

AHMIC was engaged in the business of originating residential mortgage loans.[9]  To fund its business of originating loans, AMHIC sold mortgage loans to special-purpose entities ("SPE's").[10]  The SPE's issued commercial paper and

---

[5] [Docket Entries 5 and 6].

[6] [Docket Entry 16].

[7] [Docket Entry 18].

[8] The facts set forth herein are derived from the Complaint.

[9] Complaint, ¶ 9.

[10] Id.

subordinated debt to raise funds to purchase the mortgage loans from AHMIC.[11]

One such SPE, Broadhollow Funding LLC ("Broadhollow"), issued commercial

paper in the form of secured liquidity notes and subordinated notes.[12]  Both the

commercial paper and the subordinated notes were secured by liens on the

mortgage loans it purchased from AHMIC.[13]  Relevant to this dispute are the

subordinated notes known as Series 2004-A Notes and Series 2005-A Notes.[14]

Standard & Poor's rated the Subordinated Notes "BBB," and Moody's rated the

Subordinated Notes "Baa2."[15]

　　　　In June, 2005, AHMIC purchased the Series 2005-A Notes from Lehman in

the aggregate principal face amount of $53,125,000.  In July, 2007, AHMIC

purchased the Series 2004-A Notes in the aggregate principal face amount of

$31,000,000.[16]  Lehman agreed to finance both note purchases under the parties'

pre-existing master repurchase agreement ("MRA").[17]

　　　　Later, in July, 2007, AHMIC and Lehman entered into a transaction under

the MRA (the "Subordinated Notes Transaction").  Under the Subordinated

Notes Transaction, AHMIC sold the Series 2004-A Notes and Series 2005-A Notes

---

[11] *Id.*

[12] *Id.,* ¶12.

[13] *Id.*

[14] *Id.*

[15] *Id.,* ¶13.  Neither rating agency took any action with respect to these notes until August 6, 2007. *Id.*

[16] *Id.,* ¶ 15.

[17] AHMIC, Lehman Brothers Inc. and Lehman Commercial Paper Inc. are parties to the MRA which was executed on November 4, 2003.  *Id.,* ¶ 16.

(collectively "Subordinated Notes" or "Notes") to Lehman pursuant to the MRA.[18]   Under the terms of the MRA, AHMIC was the "Seller" of the Subordinated Notes and one or more entities comprising or affiliated with Lehman was the "Buyer" of the Notes. [19]

After the initial sale of the Subordinated Notes, the MRA entitled Lehman to make margin calls when the market value of the Notes, as determined by a "generally recognized source," fell below a certain amount.[20]   If Lehman made a margin call, AHMIC was required to transfer to Lehman cash or additional securities, so that the value of the cash or additional securities or both combined with the aggregate value of the Subordinated Notes equaled or exceeded the aggregate Buyer's Margin Amount.[21]

Throughout July 2007, Lehman asserted that the market value of the Notes had dropped to 91 percent of their market value.[22]   Then on July, 23, 2007,

---

[18] *Id.,* ¶ 18.   Lehman Brothers Inc. and Lehman Commercial Paper Inc. use the word "sold" to describe this element of the transaction.  AHMIC, however, disputes that the Subordinated Notes were sold.  The Court uses the word "sold" as a convenient way to describe the transaction.

[19] *Id.,* ¶ 18.

[20] *Id.,* ¶ 19.

[21] *Id.,* ¶ 19.   The Buyer's Margin Amount is defined by the MRA as the Repurchase Price of the Subordinated Notes multiplied by a "Buyer's Margin Percentage." *Id.,* Ex. A, p. 2 (§ 2(c)).   The Buyer's Margin Percentage is a percentage either agreed to by the parties to the MRA or, "in the absence of any such agreement, the percentage obtained by dividing the Market Value of the [Subordinated Notes] on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction." *Id.,* Ex. A, p. 2 (§ 2(d)).

[22] *Id.,* ¶¶ 23 – 28.

Lehman made a margin call.[23]    While AHMIC disagreed with Lehman's characterization of the Notes' value, it satisfied this margin call.[24]

On July 26, 2007, Lehman asserted that the value of the Subordinated Notes had fallen to 80 percent of their face value and that this drop entitled Lehman to make a second margin call.[25]    AHMIC did not satisfy this margin call.[26]

On August 1, 2007, Lehman sent notice ("Pre-Petition Default Notice") to AHMIC stating that its failure to pay the latest margin constituted an event of default and that Lehman reserved all of its rights under the MRA.[27]    AHMIC and its affiliated debtors and debtors in possession sought protection under chapter 11 on August 6, 2007.[28]    Subsequently, on August 27, Lehman issued the Post-Petition Foreclosure Notice in which it notified AMHIC that "it had terminated the MRA and that it either had foreclosed or intended to foreclose on the [Subordinated Notes] in lieu of selling them to a third party."[29]    In addition, Lehman notified AHMIC that the market value of the Notes was 68.25 percent of

---

[23] _Id._, ¶ 27.   In the Complaint, AHMIC refers to the July 23, 2007 margin call as the "First Margin Call," despite the fact that Lehman made a previous margin call on March 16, 2007.

[24] _Id._, ¶ 28.

[25] _Id._, ¶¶ 30 – 32.   Again, AHMIC refers to the July 26, 2007 margin call as the "Second Margin Call" despite the March 16 and July 23, 2007 margin calls.

[26] _Id._, ¶ 33.

[27] _Id._, ¶ 36.

[28] _Id._, ¶ 40.

[29] _Id._, ¶ 41.

face value.[30]    After these events, "Lehman held itself out to third parties, including the Indenture Trustee with respect to the Subordinated Notes, as the owner of the [Notes.]"[31]

## LEGAL DISCUSSION

### I.  The Standard for Evaluating a Motion to Dismiss

A motion under Rule 12(b)(6) serves to test the sufficiency of the factual allegations in the plaintiff's complaint.[32]  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level."[33]  In deciding a motion to dismiss, the Court must "accept all factual allegations in the complaint as true."[34]  In addition, the Court will "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."[35]  Furthermore, "[t]he issue is not whether a plaintiff will ultimately prevail but whether he or she is entitled to offer evidence to support the claims."[36]

---

[30] *Id.*, ¶ 42.

[31] *Id.*, ¶ 43.

[32] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

[33] *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-1965 (2007).

[34] *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007).

[35] *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) (*quoting Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n. 7 (3d Cir. 2002)).

[36] *Ballentine v. U.S.*, 486 F.3d 806, 810 (3d Cir. 2007) (*quoting Oatway v. Am. Int'l Group, Inc.*, 325 F.3d 184, 187 (3d Cir. 2003)).

## II.  The Master Repurchase Agreement In This Case Is A "Repurchase Agreement" Under The Statute And The "Safe Harbor" Provisions Of Sections 559 And 555 Of The Bankruptcy Code Are Applicable.

### a.  Background

In *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer S&L Ass'n.*, the Third Circuit succinctly described the nature of the agreement before the Court:

> A standard repurchase agreement, commonly called a "repo," consists of a two-part transaction. The first part is the transfer of specified securities by one party, the dealer, to another party, the purchaser, in exchange for cash. The second part consists of a contemporaneous agreement by the dealer to repurchase the securities at the original price, plus an agreed upon additional amount on a specified future date. A "reverse repo" is the identical transaction viewed from the perspective of the dealer who purchases securities with an agreement to resell.[37]

As this Court recently discussed in *Calyon N.Y. Branch v. Am. Home Mortg. Corp.*, the market for repurchase agreements is a critical component of, not only the U.S. financial market, but global financial markets as well.[38]  To protect the liquidity of repurchase agreements, the Bankruptcy Code provides special protections to non-debtor counterparties.  Without these special protections, or safe harbors as they are known, the bankruptcy of a counterparty to a repurchase agreement would impair the liquidity of the repurchase agreement and possibly lead to the bankruptcy of the non-debtor counterparties.

---

[37] *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer S&L Ass'n. (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.)*, 878 F.2d 742, 743 (3d Cir. 1989).

[38] *Calyon N.Y. Branch v. Am. Home Mortg. Corp. (In re Am. Home Mortg., Inc.)*, 379 B.R. 503, 512 (Bankr. D. Del. 2008).

One such special protection applies to *ipso facto* clauses.  *Ipso facto* clauses are found in many contracts and allow one party to terminate the contract because the other party files for bankruptcy.  The Bankruptcy Code generally prohibits non-debtor counterparties from enforcing an *ipso facto* clause.[39]  Section 559 of the Bankruptcy Code provides an exception to this general rule and allows a non-debtor counterparty to a "repurchase agreement" (as defined by section 101(47) of the Bankruptcy Code) to exercise its contractual right under an *ipso facto* clause to liquidate, terminate or accelerate the repurchase agreement.[40] Section 555 provides a similar protection for the non-debtor counterparty to a "securities contract" (as defined by section 741 of the Bankruptcy Code).[41]  Thus, if the provisions of either section 559 or 555 are satisfied, enforcement of the non-debtor counterparty's rights under an *ipso facto* clause is not prohibited by section 365(e) or section 362(a) of the Bankruptcy Code.

The MRA contains such an *ipso facto* clause.  Specifically, the MRA provides that upon an "Event of Default," the nondefaulting party may:

> [I]mmediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder, or . . . elect . . . to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date,

---

[39] 11 U.S.C. § 365(e); *see also In re Am. Home Mortg., Inc.*, 379 B.R. at 513.

[40] 11 U.S.C. §559.

[41] 11 U.S.C. §§ 555 and 741.

> obtained from a generally recognized source . . . against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder . . .[42]

Under the MRA an "Event of Default" includes an "Act of Insolvency," which is defined by the MRA to include, "[t]he commencement by such party as debtor of any case or proceeding under any bankruptcy . . . law . . ."[43]  Therefore, on August 6, 2007, when AHMIC filed for bankruptcy, an Event of Default occurred under the MRA.  Simultaneously, the appropriate Lehman counterparty to the Subordinated Notes Transaction ("Lehman Counterparty") became entitled to exercise it rights under the MRA's *ipso facto* clause.

Turning to Defendants' Motion to Dismiss, if the MRA is a "repurchase agreement," the Court must dismiss the Plaintiff's request for a declaration that, "the MRA is not a 'repurchase agreement' as defined in section 101(47) . . ."[44]  If the Court finds that the MRA is a "securities contract," the Court must dismiss the Plaintiff's request for a declaration that, "Lehman is not entitled to the 'securities contract' safe harbor of section 555 . ."[45]  Finally, if the Court finds that the MRA is either a "securities contract" or a "repurchase agreement" or both, the Court must dismiss the Plaintiff's request for a declaration that, "Lehman violated the automatic stay imposed under section 362(a) of the Bankruptcy

---

[42] Complaint, Ex. A, p. 8 (§ 11(d)(i)).

[43] *Id.*, Ex. A, p. 1 (§ 2(a)).

[44] *Id.*, p. 16.

[45] *Id.*.

Code by terminating the MRA and foreclosing on and/or liquidating the AHMIC-Owned Notes…"[46]

### b. Section 559 of the Bankruptcy Code Applies to the MRA

In the Complaint, the Plaintiff seeks a declaration that:

> [T]he MRA is not a "repurchase agreement" as defined in section 101(47) of the Bankruptcy Code because the Subordinated Notes do not meet the definition of "mortgage related securities (as defined in section 3 of the Securities and Exchange Act of 1934)" when they were rated "BBB" by Standard & Poor's and "Baa2" by Moody's.[47]

The Defendants argue that the Lehman Counterparty is entitled to the safe harbor protections of section 559 because the MRA is a "repurchase agreement."[48]   Accordingly, the Court must determine whether the MRA is a "repurchase agreement."

Section 101(47) of the Bankruptcy Code, in relevant part, defines "repurchase agreement" as:

> [A]n agreement, including related terms, which provides for the transfer of one or more… mortgage related securities (as defined in section 3 of the Securities Exchange Act of 1934), mortgage loans, interests in mortgage related securities or mortgage loans… against the transfer of funds by the transferee of such… mortgage loans, or interests, with a simultaneous agreement by such transferee to transfer to the transferor thereof… mortgage loans, or interests of the kind as described in this clause, at a date certain not later than 1 year after such transfer or on demand, against the transfer of funds . . .[49]

---

[46] _Id._.

[47] _Id._.

[48] Motion to Dismiss, p. 11.

[49] 11 U.S.C. § 101(47).  An agreement to transfer various other financial instruments may also be a "repurchase agreement."  However, as no party argued that the Subordinated Notes were one of these other financial instruments,  the Court will not address them in its analysis.

No other criteria are set forth in the statute for a contract to be considered a repurchase agreement under the Bankruptcy Code.

To determine whether the MRA is a "repurchase agreement" the Court must make a two-part inquiry. First, the Court must determine if the Subordinated Notes qualify as either mortgage related securities, mortgage loans, interests in mortgage related securities or interests in mortgage loans. Second, the Court must determine if the structure of the MRA follows the structure of a "repurchase agreement" as defined by the Bankruptcy Code.

### i. The Subordinated Notes are Interests in Mortgage Loans

Having addressed the requirements of a "repurchase agreement" under the Bankruptcy Code, the Court turns to the first step in its inquiry, i.e., whether the Subordinated Notes qualify as mortgage related securities, mortgage loans, interests in mortgage related securities or interests in mortgage loans.

The Bankruptcy Code defines the term "mortgage related securities" by incorporating the definition of the term contained in section 3 of the Securities Exchange Act of 1934.[50] The Securities Exchange Act of 1934 defines "mortgage related securities," in relevant part, as "a security that is rated in one of the two highest rating categories by at least one nationally recognized statistical rating organization…"[51]

---

[50] 11 U.S.C. § 101(47)(A)(i).

[51] Securities and Exchange Act of 1934, 15 U.S.C. § 78c.

As discussed above, after Broadhollow issued the Subordinated Notes, the notes were rated by Standard and Poor's as "BBB" and by Moody's as "Baa2."[52] Standard and Poor's and Moody's provide, among many other services, nationally recognized credit ratings for various debt instruments. Standard and Poor's system of credit evaluation rates default risk on a scale of from AAA to D, with intermediate ratings of AA, A, BBB, BB, B, CCC, CC, and C.[53] Moody's system of credit evaluation rates default risk on a scale of from Aaa to C, with intermediate ratings of Aa, A, Baa, Ba, B, Caa and Ca (1s, 2s or 3s are added within each category to indicate the high, middle or low end of the range).[54]

Accordingly, the Subordinated Notes are not "mortgage related securities" because neither Standard and Poor's nor Moody's gave the Subordinated Notes one of their two highest ratings. Thus, in order to qualify as a "repurchase transaction," the Subordinated Notes must qualify as mortgage loans, interests in mortgage related securities or interests in mortgage loans.[55] The Court's analysis of these three terms is complicated by the fact that none are defined by the Bankruptcy Code.

---

[52] *Id.*, ¶ 13.

[53] http://www2.standardandpoors.com/portal/site/sp/en/us/page.article/2,1,1,4,1204834067208.html#ID213

[54] James M. Peaslee and David Z. Nirenberg, *Distinguishing Sales from Financings and Debt from Equity*, 791 PLI/Tax 9, *165 (2007).

[55] *See* 11 U.S.C. § 101(47)(A).

To determine the meaning of each of these terms, the Court must begin by giving the language of each its ordinary meaning.[56]   As the Supreme Court recently observed in *Hartford Underwriters Ins. Co. v. Union Planters Bank*, "when a statute's language is plain, the sole function of the courts, at least where the disposition by the text is not absurd, is to enforce it according to its terms."[57] With this principle in mind, the Court turns to the analysis of whether the Subordinated Notes qualify as mortgage loans, interests in mortgage related securities or interests in mortgage loans.

The Court will first examine the term "interests in mortgage related securities."  While the Bankruptcy Code does not define "interests in mortgage related securities," the Code does define the term "mortgage related securities." From a plain reading of the statute, it is clear that "interests in mortgage related securities" must be some interest in "mortgage related securities."  The term "interest" in this context means "a financial share or stake in something: the relation of being one of the owners or beneficiaries of an asset, company, etc."[58]

---

[56] *In re Am. Home Mortg., Inc.*, 379 B.R. at 514-15.  *See also* Hon. Thomas F. Waldron and Neil M. Berman, *Principled Principles of Statutory Interpretation: A Judicial Perspective After Two Years of BAPCPA*, 81 AM. BANKR. L.J. 195, 211 (2007).

[57] *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S. Ct. 1942, 147 L. Ed. 2d 1 (2000). *See also United States v. Ron Pair Enters.*, 489 U.S. 235, 240, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1989); *Caminetti v. United States*, 242 U.S. 470, 485, 37 S. Ct. 192, 61 L. Ed. 442 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms.").

[58] I SHORTER OXFORD ENGLISH DICTIONARY, p. 1408 (6th ed. 2007).

Thus, the term "interests in mortgage related securities" means a financial share or stake in "mortgage related securities."

The Subordinated Notes are not "mortgage related securities" because of the ratings they received from Standard and Poor's and Moody's. It follows that, since the Subordinated Notes are not "mortgage related securities," they cannot constitute an "interest" in mortgage related securities. Therefore, the Defendants are left with two options: the Subordinated Notes must either be "mortgage loans" or "interests in mortgage loans."

The Defendants argue that the Subordinated Notes are "interests in mortgage loans" because the Notes are secured by the mortgage loans Broadhollow purchased from one or more of the Debtors.[59]   The Plaintiff, however, disagrees with this reading of the term "interests in mortgage loans."

As discussed earlier, the 1934 Act requires that "mortgage related securities" receive one of the two highest credit ratings. The 1934 Act also has a second criteria, and one way securities can meet this criteria is if the securities are secured by mortgage loans. The Plaintiff argues that it was not Congress' intent for notes which fail to meet the first element of the 1934 Act's definition of "mortgage related securities," but meet the second element, to nonetheless qualify as "interests in mortgage loans." For the Plaintiff, such a reading "eviscerates the 'mortgage related securities' definition, and . . . its reference to

---

[59] Motion to Dismiss, p. 13.

the 1934 Act."[60]   And, "[i]f Congress had intended this result, it could simply have eliminated the requirement that 'mortgage related securities' satisfy the 1934 Act."[61]

The Plaintiff's reading, however, leads to a different, but equally troubling, result.  The Plaintiff argues essentially that the 1934 Act's rating requirement must be read into the definition of "interests in mortgage loans."  If Congress intended such a result it easily could have required that "interests in mortgage loans" also achieve one of the two highest credit ratings.  It did not. Congress specifically provided that the 1934 Act's requirements would only apply to "mortgage related securities."

The Court agrees with the Defendants that the Subordinated Notes are "interests in mortgage loans."   The Subordinated Notes were issued by Broadhollow and secured by mortgage loans owned by Broadhollow.[62]   Clearly, the mortgage loans owned by Broadhollow would qualify as "mortgage loans" as the term is used in section 101(47)(A).  The Subordinated Notes, however, are not "mortgage loans."   Rather, they are a payment obligation secured by Broadhollow's mortgage loans.  The Bankruptcy Code defines "security interest" to mean a "lien created by an agreement."[63]   Thus, a holder of the Subordinated

---

[60] Plaintiffs' Answer, p. 27.

[61] Id., p. 28.

[62] Complaint, ¶ 12 ("Broadhollow also issued certain subordinated notes (the 'Subordinated Notes'), which were likewise secured by the mortgage loans.").

[63] 11 U.S.C. § 101(51).

Notes holds a lien on the mortgage loans owned by Broadhollow. "Lien" is defined by the Bankruptcy Code as a "charge against **or interest in property** to secure payment of a debt or performance of an obligation."[64]  Therefore, a holder of the Subordinated Notes holds an interest in the mortgage loans owned by Broadhollow, or, more simply put, an interest in mortgage loans.  Accordingly, the Subordinated Notes are "interests in mortgage loans" as the term is used in section 101(47)(A).

### ii.  The MRA is a Repurchase Agreement

Since the Subordinated Notes are interests in mortgage loans under the Bankruptcy Code, the MRA will qualify as a repurchase agreement if the MRA (i) provides for the transfer of one or more interests in mortgage loans; (ii) against the transfer of funds by the transferee of such interests in mortgage loans; (iii) with a simultaneous agreement by such transferee to transfer to the transferor thereof interests in mortgage loans; (iv) at a date certain not later than 1 year after such transfer or on demand; and (v) against the transfer of funds.[65]

The terms of the MRA which are relevant to this analysis provide that:

> From time to time the parties hereto may enter into transactions in which one party ("Seller") agrees to transfer to the other ("Buyer") securities or other assets ("Securities") against the transfer of funds by Buyer, with a simultaneous agreement by Buyer to transfer to Seller such Securities at a date certain or on demand, against the transfer of funds by Seller.[66]

---

[64] 11 U.S.C. § 101(37) (emphasis added).

[65] *See In re Am. Home Mortg., Inc.,* 379 B.R. at 518 (applying 11 U.S.C. § 101(47)).

[66] <u>Complaint, Exhibit A. p. 1</u>.

The Court concludes that the terms of the MRA satisfy the elements of a "repurchase agreement."

First, the MRA provides for the transfer of one or more interests in mortgage loans.

Second, the transfer of one or more interests in mortgage loans from the Seller to the Buyer is against the transfer of funds from the Buyer to the Seller.

Third, the MRA contains a simultaneous agreement by the Buyer to transfer the interest in mortgage loans to the Seller.

Fourth, the transfer of interests in mortgage loans from Buyer to the Sellers occurs at a date certain or on demand.

Fifth, the transfer of the interests in mortgage loans from the Buyer to the Seller is against the transfer of funds by the Seller to the Buyer.

The Court concludes that section 559 of the Bankruptcy Code is applicable, as the sale and repurchase of the Subordinated Notes under the MRA is a repurchase agreement.  No further criteria must be met.[67] Accordingly, the Court will dismiss the Plaintiff's second request for declaratory judgment.[68]

---

[67] *In re Am. Home Mortg., Inc.*, 379 B.R. at 518.

[68] <u>Complaint, p. 16</u>.

c. **Section 555 of the Bankruptcy Code Applies to the MRA**

In the Complaint, the Plaintiff seeks a declaration that:

Lehman is not entitled to the "securities contract" safe harbor of section 555 of the Bankruptcy Code because the Lehman entity that was counterparty to the MRA and the relevant transactions relating to the Subordinated Notes is not a "stockbroker, financial institution, financial participant, or securities clearing agency . . .[69]

The Defendants argue that Lehman Brothers is entitled to the safe harbor protections of section 555 because the MRA is a "securities contract" and Lehman Brothers, the sole Lehman Counterparty to the Subordinated Notes Transaction, is a "stockbroker" as the terms are defined by the Bankruptcy Code.[70] Accordingly, the Court must determine whether Lehman Brothers is the sole Lehman Counterparty and, if so, whether the MRA is "securities contract" and Lehman Brothers is a "stockbroker."

i. **Lehman Brothers is the Sole Lehman Counterparty to the Subordinated Notes Transaction.**

As discussed above, both Lehman Brothers and Lehman Commercial Paper were parties to the MRA with AHMIC.  But, under the terms of the MRA, "[u]pon agreeing to enter into a Transaction hereunder, Buyer or Seller (or both), as shall be agreed, shall promptly deliver to the other party a written confirmation of each Transaction ('a Confirmation').  The Confirmation shall…

---

[69] *Id.*

[70] Motion to Dismiss, p. 8.  The Defendants also argue that Lehman Brothers is entitled to the protections of section 555 because Lehman Brothers is a "financial participant."  As the Court finds that Lehman Brothers is a "stockbroker," an analysis of whether Lehman Brothers is a "financial participant" is unnecessary.

identify Buyer and Seller…"[71]    Thus, the MRA anticipated that transactions occurring under it might involve Lehman Brothers and not Lehman Commercial Paper, and vice versa.

With respect to the Subordinated Notes Transaction at the center of this dispute, the Plaintiff argues that it is not clear whether Lehman Commercial Paper or Lehman Brothers or both were the Lehman Counterparty to the Subordinated Notes Transaction.[72]    Therefore, the Plaintiff argues, given the procedural posture of this proceeding, it would be inappropriate for the Court to decide what Lehman entity or entities were the Lehman Counterparty to the Subordinated Notes Transaction.  Thus, the Plaintiff continues, its third request for a declaratory judgment should survive the Defendants' Motion to Dismiss. The Defendants attempt to refute this argument by drawing the Court's attention to two trading confirmations ("Trading Confirmations").

The Defendants included the Trading Confirmations in an affidavit in support of their Response.  Typically, courts deciding a motion to dismiss only consider allegations contained in the complaint and exhibits attached to the complaint.[73]    Therefore, as an initial matter, the question arises as to whether the Court may consider the Trading Confirmations on a motion to dismiss.

---

[71] Complaint, Exhibit A, p. 3.

[72] Plaintiffs' Answering Brief, p. 30.

[73] *Pension Benefit Guar. Corp. v. White Consol. Ind., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

In the Third Circuit, when evaluating a motion to dismiss courts may considered a document which is not part of the complaint if that document is "'**integral to or explicitly relied upon** in the complaint.'"[74]   According to the MRA, the terms of the MRA combined with trading confirmations make up the terms of each individual transaction under the MRA.[75]   As the terms of the MRA and the Subordinated Notes Transaction are central to the Plaintiff's Complaint, therefore, so too are the Trading Confirmations.   Thus, the Trading Confirmations meet the standard of "'document **integral to or explicitly relied upon** in the complaint.'"[76]   Accordingly, the Court will consider the Trading Confirmations in evaluating the Motion to Dismiss.

As discussed above, the trading confirmations, *inter alia*, identify the buyer and seller to each transaction under the MRA.  The Trading Confirmations provided by the Defendants show that Lehman Brothers was the sole Lehman Counterparty to the Subordinated Notes Transaction.[77]   Therefore, in evaluating the Plaintiff's third request for declaratory judgment, the Court need only determine whether Lehman Brothers qualifies for the safe harbor protections of section 555.

---

[74] *In re Rockefeller Center Properties, Inc. Securities Litigation*, 184 F.3d 280, 287 (3d Cir. 1999) (*quoting In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)) (emphasis in original).

[75] Complaint, Exhibit A, p. 3 ("The Confirmation, together with this Agreement [i.e., the MRA], shall constitute conclusive evidence of the terms agreed between Buyer and Seller with respect to the Transaction to which the Confirmation relates… .")

[76] *In re Rockefeller Center Properties, Inc. Securities Litigation*, 184 F.3d 280, 287 (3d Cir. 1999) (*quoting In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)) (emphasis in original).

[77] Rosenberg Affidavit II, Exhibit A., pp. 1-2.  Specifically, the Trading Confirmations state "Lehman Brothers Inc. as principal we bought from you:"

The safe harbor protections of section 555 of the Bankruptcy Code extend to a stockbroker, financial institution, financial participant, or securities clearing agency which seeks to exercise its contractual right to cause the liquidation, termination, or acceleration of a securities contract.[78]   Therefore, Lehman Brothers will qualify for the safe harbor protections of section 555 if [1] the MRA is a "securities contract," and [2] Lehman Brothers is either a "stockbroker," "financial institution," "financial participant," or "securities clearing agency," as the terms are defined by the Bankruptcy Code.

### ii.   The MRA is a Securities Contract

The term "securities contract" is defined in section 741 of the Bankruptcy Code as "a contract for the purchase, sale, or loan of a . . . mortgage loan, [or] any interest in a mortgage loan . . . and including any repurchase or reverse repurchase transaction on any such . . . mortgage loan, [or] interest [in a mortgage loan] . . . (whether or not such repurchase or reverse repurchase transaction is a 'repurchase agreement', as defined in section 101)."[79]   As the Court has already determined that the MRA is a "repurchase agreement" and that the Subordinated Notes are "interests in mortgage loans," the MRA therefore is a "securities contract."

---

[78] *See* 11 U.S.C. § 555.

[79] 11 U.S.C. § 741(7)(A)(i).  A "securities contract" is also a master agreement that provides for an agreement or transaction referred to in § 741(A)(i).  11 U.S.C. § 741(A)(x).

### iii. Lehman Brothers is a Stockbroker

The term "stockbroker" is defined in section 101(53A) of the Bankruptcy Code as a "person, with respect to which there is a customer, as defined in section 741 of this title; and that is engaged in the business of effecting transactions in securities for the account of others; or with members of the general public, from or for such person's own account."[80] Therefore, for the Court to find that Lehman Brothers is a stockbroker, it must find that, [1] Lehman Brothers is in the business of effecting securities transactions for itself, others or the general public; and that [2] Lehman Brothers has "customers," as the term is defined in section 741 of the Bankruptcy Code. The Defendants attempt to support their argument that Lehman Brothers meets the first element by attaching to their Response the Form 10-Q for Lehman Brothers Holdings, Inc.[81]

As discussed earlier, when evaluating a motion to dismiss courts may considered a document which is not part of the complaint if that document is "'**integral to or explicitly relied upon** in the complaint.'"[82] As the Form 10-Q for Lehman Brothers Holdings is not part of the Complaint, the Court will, therefore, turn to whether the Form 10-Q for Lehman Brothers Holdings, Inc. meets this standard.

---

[80] 11 U.S.C. § 101(53A). The term "person" as used in the section 101(53A) is also defined by the Bankruptcy Code and includes an individual, partnership and corporation. 11 U.S.C. § 101(41).

[81] Lehman Brothers Inc. is a subsidiary of Lehman Brothers Holdings, Inc.

[82] *In re Rockefeller Center Properties, Inc. Securities Litigation*, 184 F.3d 280, 287 (3d Cir. 1999) (*quoting In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)) (emphasis in original).

In the Complaint, the Plaintiff seeks a declaration that "Lehman [i.e., Lehman Brothers and Lehman Commercial Paper] is not entitled to the 'securities contract' safe harbor of section 555 of the Bankruptcy Code because the Lehman entity that was counterparty the relevant transactions relating to the Subordinated Notes is not a 'stockbroker, financial institution, financial participant, or securities clearing agency . . .'" Thus, the Plaintiff's argument depends on the Bankruptcy Code's definition of these terms.

If one looks at the these definitions, it is clear that the Form 10-Q for Lehman Brothers Holdings, Inc. is one, if not the only, source for the information the Court requires in order to determine whether Lehman Brothers is a "'stockbroker," "financial institution," "financial participant," or "securities clearing agency."[83] For example, the definition of "financial participant"

---

[83] 11 U.S.C. § 101(53A) - The term "stockbroker" means person—

    (A) with respect to which there is a customer, as defined in section 741 of this title; and

    (B) that is engaged in the business of effecting transactions in securities—

        (i) for the account of others; or

        (ii) with members of the general public, from or for such person's own account.

11 U.S.C. § 101(22) - The term "financial institution" means—

    (A) a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity and, when any such Federal reserve bank, receiver, liquidating agent, conservator or entity is acting as agent or custodian for a customer (whether or not a "customer", as defined in section 741) in connection with a securities contract (as defined in section 741) such customer; or

    (B) in connection with a securities contract (as defined in section 741) an investment company registered under the Investment Company Act of 1940.

11 U.S.C. §101(22A) - The term "financial participant" means—

    (A) an entity that, at the time it enters into a securities contract, commodity contract, swap agreement, repurchase agreement, or forward contract, or at the time of the date of

requires that an entity have one or more various agreements or transactions with the debtor or any other entity (other than an affiliate) of a total gross dollar value of not less than $1 billion. The definition of "financial institution" requires a court to inquire into whether an entity is a "is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity . . ." Finally, the definition of "securities clearing agency" requires a court to determine whether an entity is "registered as a clearing agency under section 17A of the Securities Exchange Act of 1934 . . ."

Therefore, the Form 10-Q of Lehman Brothers Holdings, Inc., is certainly integral to the Plaintiff's request for a declaratory judgment that "the Lehman entity that was counterparty to the MRA and the relevant transactions relating to the Subordinated Notes is not a 'stockbroker, financial institution, financial

---

the filing of the petition, has one or more agreements or transactions described in paragraph (1), (2), (3), (4), (5), or (6) of section 561 (a) with the debtor or any other entity (other than an affiliate) of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding (aggregated across counterparties) at such time or on any day during the 15-month period preceding the date of the filing of the petition, or has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements or transactions with the debtor or any other entity (other than an affiliate) at such time or on any day during the 15-month period preceding the date of the filing of the petition; or

(B) a clearing organization (as defined in section 402 of the Federal Deposit Insurance Corporation Improvement Act of 1991).

11 U.S.C. §101(48) - The term "securities clearing agency" means person that is registered as a clearing agency under section 17A of the Securities Exchange Act of 1934, or exempt from such registration under such section pursuant to an order of the Securities and Exchange Commission, or whose business is confined to the performance of functions of a clearing agency with respect to exempted securities, as defined in section 3(a)(12) of such Act for the purposes of such section 17A.

participant, or securities clearing agency . . .'"[84]  Accordingly, in deciding the Motion to Dismiss, the Court will consider the 10-Q of Lehman Brothers Holdings, Inc. contained in the Affidavit attached to the Defendants' Response.

Turning back to the analysis of whether Lehman Brothers is a "stockbroker," the Court begins with whether Lehman Brothers meets the first requirement of the "stockbroker" definition, i.e., whether Lehman Brothers is in the business of effecting securities transactions.   The 10-Q contained in the Defendants' Affidavit demonstrates that Lehman Brothers is a U.S. registered broker-dealer.[85]   The Securities and Exchange Act of 1934, which governs U.S. brokers and dealers, defines "broker" and "dealer."   As defined, a "broker" is "any person engaged in the business of effecting transactions in securities for the account of others;" and the term "dealer" is defined as "any person engaged in the business of buying and selling securities for such person's own account, through a broker or otherwise."[86]   As a registered broker-dealer, Lehman Brothers in the ordinary course of its business engages in effectuating transactions in securities for the account of others, with the general public, and for its own account.   Thus, Lehman Brothers meets the first element of a "stockbroker."

---

[84] Complaint, p. 16.  *See also In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 293 (3d Cir. 1999).

[85] Rosenberg Affidavit II, Exhibit B, p. 10.

[86] Securities and Exchange Act of 1934, 15 U.S.C. § 78c.

In addition to being in the business of effecting securities transactions, in order for Lehman Brothers to qualify as a "stockbroker" it must have "customers," as the term is defined in section 741.[87]   Courts interpreting the definition of "customer" have held that, "[a]n investor qualifies as a customer when the investor deposits money or securities with the [stockbroker] with the expectation that the [stockbroker] purchase stock or trade securities."[88]   As a registered broker-dealer, by definition, Lehman Brothers has "customers." Therefore, Lehman Brothers meets the second element of the definition of "stockbroker."

As the Court concludes that the MRA is a securities contract and Lehman Brothers is a stockbroker, section 555 of the Bankruptcy Code applies to the

---

[87] 11 U.S.C. § 741(2)

"customer" includes—

> (A) entity with whom a person deals as principal or agent and that has a claim against such person on account of a security received, acquired, or held by such person in the ordinary course of such person's business as a stockbroker, from or for the securities account or accounts of such entity—

>> (i) for safekeeping;

>> (ii) with a view to sale;

>> (iii) to cover a consummated sale;

>> (iv) pursuant to a purchase;

>> (v) as collateral under a security agreement; or

>> (vi) for the purpose of effecting registration of transfer.

[88] *WesBanco Bank Barnesville v. Rafoth (In re Baker & Getty Financial Services, Inc.)*, 106 F.3d 1255, 1260 (6th Cir. 1997); *see also Johnson v. Neilson (In re Slatkin)*, ___ F.3d ___, 2008 WL 1946739, *8 (9th Cir. May 6, 2008); *Wider v. Wooton*, 907 F.3d 570, 572-73 (5th Cir. 1990); *Tew v. Resource Mgmt (In re ESM Gov't Sec. Inc.)*, 812 F.2d 1374, 1376 (11th Cir. 1987); *see also* S.Rep. No. 989, 95th Cong., 2d Sess. 100 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5886 (The definition of customer in Section 741 is intended to "include anybody that interacts with the [stockbroker] in a capacity that concerns security transactions.").

28

MRA.   Accordingly, the Court will dismiss the Plaintiff's third request for declaratory judgment.[89]

> **d.  As the Safe Harbor Protections of Section 559 and 555 Apply to the MRA, Lehman Brothers Did Not Violate the Automatic Stay Imposed By Section 362(a) of the Bankruptcy Code When It Exercised Its Rights Under the MRA**

Under the Subordinated Notes Transaction, the MRA deemed AHMIC as the "Seller" and Lehman Brothers as the "Buyer."  The MRA further provided that if the "Seller" defaults, the "Buyer" may immediately sell the "Purchased Securities" (i.e., the Subordinated Notes) and apply the proceeds from that sale to any amounts which the "Seller" owes, or elect to credit the amount owing in an amount equal to the price of the "Purchased Securities."[90]  The MRA outlined the circumstances under which a party would be in default; the MRA defined these circumstances as "Events of Default."[91]  One such "Event of Default" was the commencement of a bankruptcy proceeding.  Therefore, under the terms of the MRA, an "Event of Default" occurred when AHMIC filed its bankruptcy petition in August, 2007.   Thus, Lehman Brothers, as the "Buyer" in the Subordinated Notes Transaction, became entitled to, and did exercise its rights under the MRA's *ipso facto* clause.

The automatic stay imposed by section 362(a) of the Bankruptcy Code generally prohibits a party from enforcing an *ipso facto* clause.  Accordingly, in

---

[89] Complaint, p. 16.

[90] *Id.*, Ex. A, p. 8 (§11(d)(i)).

[91] *Id.*, Ex. A, p. 8 (§11).

the Complaint, the Plaintiff seeks a declaration that, "Lehman violated the automatic stay imposed under section 362(a) of the Bankruptcy Code by terminating the MRA and foreclosing on and/or liquidating the AHMIC-Owned Notes . . ."[92]  However, as discussed earlier, the Bankruptcy Code provides exceptions to this general rule.   As the Court has decided that the Subordinated Notes Transaction under MRA is "repurchase agreement," and that the MRA is a "securities contract" and Lehman Brothers is a "stockbroker," the safe harbor protections of sections 559 and 555 apply.  Thus, Lehman Brothers may enforce its rights under the MRA triggered by a condition of the kind specified in section 365(e)(1) of the Bankruptcy Code.  As the MRA's *ipso facto* clause is of a kind specified in section 365(e)(1), the Defendants did not violate the automatic stay by foreclosing on and/or liquidating the Subordinated Notes.  Accordingly, the Court will dismiss the Plaintiff's first request for declaratory relief.

### III.  Applicability of Article 9 to the MRA

In the Plaintiff's fourth request for declaratory relief the Plaintiff seeks a declaration that:

> (i) Lehman's foreclosure and/or liquidation of the AHMIC-Owned Notes, is governed by Article 9 of the N.Y.U.C.C., § 901, *et seq*., and, at all times Lehman was required to act in a commercially reasonable manner and (ii) any damages AHMIC incurred as a consequence of Lehman's failure to comply with those standards and Article 9 shall be determined in accordance with section 562 of the Bankruptcy Code . . .[93]

---

[92] *Id.*, p. 16.

[93] *Id.*.

Article 9 of the Uniform Commercial Code has a definitive scope, and, in order for the Subordinated Notes Transaction to be governed by Article 9, it must fall somewhere within that scope.  The Plaintiff represents that the MRA creates a security interest in the Subordinated Notes.[94]  Alternatively, if the MRA is found to be a purchase and sale agreement, the Plaintiff argues that Article 9 applies, nonetheless, because the Subordinated Notes qualify as both "promissory notes" and "payment intangibles" and Article 9 applies to the sale of "promissory notes" or "payments intangibles."[95]

**a.     The Intent Of The Parties To The MRA Is Relevant To This Court's Consideration Of Whether Article 9 of the Uniform Commercial Code Applies To The MRA**

Article 9 applies to a transaction "regardless of its form, that creates a security interest in personal property or fixtures by contract . . ."[96]  The Plaintiff argues that the Section 6 of the MRA creates a security interest in Purchased Securities, i.e., the Subordinated Notes.  Section 6 of the MRA, entitled "Security Interest," provides:

> Although the parties intend that all Transactions hereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, Seller shall be deemed to have pledged to Buyer as security for the performance by Seller of its obligations

---

[94] Plaintiff's Answer, pp. 14-15.

[95] *Id.,* p. 18.  The Plaintiff also argues that because the MRA uses the term "commercial reasonableness" to describe the standard by which Lehman must liquidate Purchased Securities, the parties agreed to the specific commercial reasonableness standard under Article 9.  The Court is not persuaded that a reference to "commercial reasonableness," without any evidence that the reference is to Article 9's commercial reasonableness standard, implies that the parties agreed to Article 9's standard.

[96] N.Y. U.C.C. Rev. § 9-109(a)(1) (McKinney 2001).

under each such Transaction, and shall be deemed to have granted
to Buyer a security interest in, all of the Purchased Securities with
respect to all Transactions hereunder and all Income thereon and
other proceeds thereof.[97]

While it appears from an initial reading of this section that the parties to the

MRA did not intend to create a security interest in the Subordinated Notes, the

Plaintiff represents that this section creates a security interest in the Notes

nonetheless.

The Plaintiff first argues, quite simply, that, under the MRA, AHMIC

granted Lehman a security interest in Purchased Securities.[98]   To support this,

the Plaintiff emphasizes that Article 9 applies to a transaction, "**regardless of its**

**form, that creates a security interest in personal property or fixtures by**

**contract**."[99]   The Plaintiff reads the phrase "regardless of its form" to allow this

Court to ignore the stated intent of the parties and focus on the portion of Section

6 of the MRA, which provides for a security interest.

To further support this argument, the Plaintiff contrasts Former Section 9-

102(1) with its replacement, Revised Section 9-109(a)(1).   As discussed above,

Revised Section 9-109(a)(1) provides that Article 9 applies to "a transaction,

regardless of its form, that creates a security interest in personal property or

fixtures by contract . . ."   Former Section 9-102(1) provided that Article 9 applies

"to any transaction (regardless of its form) which is intended to create a security

---

[97] Complaint, Ex. A, p. 5 (§ 6).

[98] Plaintiff's Answer, p. 14.

[99] Id., p. 14. (emphasis in original).

interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts . . ."[100]  The Plaintiff interprets the deletion of the phrase "which is intended to create a security interest" as evidence that intent is no longer relevant to a court's consideration of whether a transaction creates a security interest.[101]  Thus, the Plaintiff concludes, this Court may ignore the parties stated intent in Section 6 of the MRA.

The Plaintiff is correct that Revised Section 9-109(a)(1) replaced Former Section 9-102(1).  Furthermore, the Plaintiff is correct that Former Section 9-102(1) provided that Article 9 applies "to any transaction (regardless of its form) which is intended to create a security interest . . ." and that Revised Section 9-109(a)(1) now states that Article 9 applies to "a transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract . . ." However, the Court disagrees that this change eliminated the intent requirement from Former Section 9-102(1).  Official Comment 2 to N.Y. U.C.C. § 9-109 expressly states that "Subsection (a)(1) derives from former Section 9-102(1) and (2).  These subsections have been combined and shortened.  **No change in meaning is intended**."[102]  Thus, while the drafters deleted from the phrase "intended to create a security interest" in order to shorten the section, they did not intend to change the meaning of Former Section 9-102(1).  Moreover, the

---

[100] N.Y. U.C.C. Former § 9-102(a)(1) (McKinney 1990).

[101] Plaintiff's Answer, p. 16.

[102] Official Comment 2 to N.Y. U.C.C. Rev. § 9-109.  (McKinney 2001) (emphasis added).

Plaintiff's reading of the Revised Section 9-109(a)(1) conflicts with the principal of New York law that the intention of the contracting parties controls the interpretation of their contract.[103]

The Plaintiff also provides a second, related argument. The Plaintiff argues that Article 9 still applies to the MRA even if Section 6 of the MRA creates a security interest that is contingent upon a court deeming a Transaction to be a loan.[104] To support this, the Plaintiff reads Section 9-109(a)(1) to include such a "contingent" security interest because the section states Article 9 applies to "a transaction, regardless of its form, that creates a security interest." As discussed below, the Court finds that the MRA is a purchase and sale agreement and not a loan. Therefore, this "contingent" security interests does not arise in this case, and Article 9 does not apply. Furthermore, the MRA cannot be simultaneously a purchase and sale agreement and an agreement which creates a security interest. Therefore, the simple existence of a "contingent" security interest, whether or not the contingency ever occurs, also does not give rise to Article 9 applicability.

---

[103] *Excess Ins. Co. Ltd. v. Factory Mut. Ins.*, 822 N.E.2d 768, 770-71 (N.Y. 2004) ("In resolving the issue before us, we are mindful that in interpreting reinsurance agreements, as with all contracts, the intention of the parties should control. To discern the parties' intentions, the court should construe the agreements so as to give full meaning and effect to the material provisions.") *see also Breed v. Insurance Co. of N. Am.*, 385 N.E.2d 1280, 1282 (N.Y. 1978) ("It is axiomatic that a contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed") (*quoting Morlee Sales Corp. v. Manufacturers Trust Co.*, 172 N.E.2d 280, 282 (N.Y. 1961)).

[104] Plaintiff's Answer, p. 15.

**b. The MRA Provides For the Purchase And Sale of Securities Such As The Subordinated Notes Rather Than A Security Interest In The Securities**

As stated above, under New York law, the intention of contracting parties controls a court's interpretation of their contract. Therefore, "[w]hen interpreting a contract, the court should arrive at a construction which will give fair meaning to all of the language employed by the parties to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized."[105]  Courts have applied this rule when interpreting repurchase agreements.[106]  Furthermore, if a contract is clear, a court will not look beyond the four corners of the document for evidence of meaning.[107]  As the relevant terms of the MRA are clear and unambiguous, their meaning is an issue of law, which the Court may considered in the context of a motion to dismiss.[108]

Turning to the four corners of the MRA, the Court notes that the parties expressed their intent, and that intent was "that all Transactions hereunder be sales and purchases and not loans."[109]  However, the MRA further states that "in

---

[105] *Joseph v. Creek & Pines*, 217 A.D.2d 534, 535 (2d Dep't 1995).

[106] *In re Criimi Mae, Inc.*, 251 B.R. 796, 801 (Bankr. D. Md. 2000) and *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 300 (S.D.N.Y. 1998).

[107] *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir. 1994) ("When parties have entered into an unambiguous contract, the court should look to the terms expressed in the contract itself rather than to 'extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable.'").

[108] *Retail Brand Alliance, Inc. v. Rockvale Outlet Center, LP*,  2007 WL 403885, *2 (E.D. Pa. Jan. 31, 2007) ("Courts can resolve contract disputes on a motion to dismiss 'if the claims under which the plaintiff seeks relief are barred by the unambiguous terms of a contract attached to the pleading, because the interpretation of an unambiguous contract is a matter of law for the court.'") (*quoting Jaskey Finance & Leasing v. Display Data Corp.*, 564 F.Supp. 160, 163 (E.D. Pa. 1983)).

[109] Complaint, Ex. A, p. 5 (§ 6).

the event any such Transactions are deemed to be loans, Seller shall be deemed . . . to have granted to Buyer a security interest in all of the Purchased Securities with respect to all Transactions hereunder and all Income thereon and other proceeds thereof."[110]   Therefore, if the Court determines that the Subordinated Notes Transaction is a loan, then, and only then, will the Buyer be deemed to have granted the Seller a security interest in the Subordinated Notes.

It is clear, however, from the unambiguous terms of the MRA that the Subordinated Notes Transaction is a sale and purchase agreements and not a loan.  First, the MRA denominated the parties "Buyer" and "Seller" rather than lender and borrow or secured creditor and debtor.[111]   The terms of the MRA provide that the Seller agrees to transfer to the Buyer securities or other assets against the transfer of funds by the Buyer.[112]   The MRA defines these securities or other assets as "Purchased Securities."[113]   The date on which the Purchased Securities are transferred by the Seller to the Buyer is defined by the MRA as the "Purchase Date."[114]   Also, the price at which the Purchased Securities are transferred by Seller to the Buyer is defined as the "Purchase Price."[115] Furthermore, the "Repurchase Price" is the price at which Purchased Securities

---

[110] *Id.*, Ex. A, p. 5 (§ 6).

[111] *Id.*, Ex. A, p. 1 (§ 1).

[112] *Id.*, Ex. A, p. 1 (§ 1).

[113] *Id.*, Ex. A, p. 3 (§ 2(p)).

[114] *Id.*, Ex. A, p. 2 (§ 2(n)).

[115] *Id.*, Ex. A, p. 3 (§ 2(o)).

are to be transferred from Buyer to Seller.[116]    The date on which the Seller is to repurchase the Purchased Securities from the Buyer is defined by the MRA as "Repurchase Date."[117]    Furthermore, the Trading Confirmations state that "Lehman Brothers Inc., as principal we bought from you [i.e., AHMIC] . . ."[118] Considering both the stated intent of the parties and the operative provisions of the MRA, the Court concludes that the MRA is a purchase and sale agreement.

Nevertheless, because Article 9 applies to certain purchase and sale agreements, Article 9 may still apply to the MRA.  Specifically, Article 9 applies to the sale of accounts, chattel paper, payment intangibles, and promissory notes, as the terms are defined by Article 9.[119]    The Plaintiff argues that the Subordinated Notes qualify as both "promissory notes" and "payment intangibles."[120]

However, while Article 9 does apply to purchases and sales of "promissory notes" and "payment intangibles," *the Article 9 commercial reasonableness standard that the Plaintiff seeks to impose on the Defendants is limited in that context.* Specifically, 9-610 outlines the standards applicable to post-default collateral dispositions, including commercial reasonableness.[121]   Section 9-601(g), provides, however, that "this part imposes no duties upon a secured party that is a

---

[116] *Id.*, Ex. A, p. 3 (§ 2(r)).

[117] *Id.*, Ex. A, p. 3 (§ 2(q)).

[118] Rosenberg Affidavit II, Exhibit A., pp. 1-2

[119] N.Y. U.C.C. § 9-109(a)(3) (McKinney 2001).

[120] Plaintiff's Answer, p. 18.

[121] N.Y. U.C.C. §9-610(b) (McKinney 2001).

consignor or is a buyer of accounts, chattel paper, payment intangibles, or promissory notes."[122]    Official Comment 9 to N.Y. U.C.C. § 9-601 further provides that:

> Subsection (g) provides that, except as provided in Section 9-607(c), the duties imposed on secured parties do not apply to buyers of accounts, chattel paper, payment intangibles, or promissory notes. Although denominated "secured parties," these buyers own the entire interest in the property sold and so may enforce their rights without regard to the seller ("debtor") or the seller's creditors. Likewise, a true consignor may enforce its ownership interest under other law without regard to the duties that this Part imposes on secured parties.[123]

As the MRA is a purchase and sale agreement, the commercial reasonableness standard of Article 9 does not apply whether or not the Subordinated Notes are "promissory notes" or "payment intangibles." Therefore, Lehman Brothers' foreclosure and/or liquidation of the Subordinated Notes is not governed by Article 9.  Accordingly, the Court will dismiss the Plaintiff's fourth request for declaratory judgment.

## IV.  Count I Alleging Breach of Contract is Dismissed

In the Complaint, the Plaintiff alleges that Lehman's conduct, both pre-petition and post-petition, breached the MRA.[124]  Specifically, the Plaintiff argues that Lehman wrongly triggered the July 26, 2007 margin call by "misrepresenting the existence of, or overstating the Margin Deficit and . . . ascribing an overly

---

[122] N.Y. U.C.C. § 9-601(g) (McKinney 2001).

[123] Official Comment 9 to N.Y. U.C.C. § 9-601.  Furthermore, section 9-607(c) is not applicable.

[124] Complaint, ¶¶ 46-55.

depressed Market Value to the Subordinated Notes."[125]    Furthermore, the Plaintiff alleges "[t]o the extent Lehman maintains that . . . it is a 'generally recognized source' as a market maker with respect to the Subordinated Notes, Lehman failed to . . . act in good faith, without conflicts of interest, and in a commercially reasonable manner in calculating Market Value."[126]    Also, the Plaintiff alleges that "Lehman was not entitled to issue either the Pre-Petition Default Notice or the Post-Petition Foreclosure Notice, because (a) AHMIC . . . complied with its obligations under the MRA and (b) and Event of Default . . . had not occurred."[127]    Finally, the Plaintiff alleges that Lehman "has not complied with or approached the applicable standards of commercial reasonableness."[128]   The Plaintiff argues that Lehman's actions damaged them in an amount "not less than $84,125,000, less amounts advanced by Lehman, plus costs and attorneys fees."[129]

Under New York law,[130] to state a claim for breach of contract AHMIC must allege: "(1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages

---

[125] *Id.*, ¶ 50.

[126] *Id.*, ¶ 51.

[127] *Id.*, ¶ 52.

[128] *Id.*, ¶ 53.

[129] *Id.*, ¶ 55.

[130] New York law controls the MRA.  *Id.*, Ex. A, p. 10 (§ 16).

resulting from the breach."[131]   As the Court has decided that an "Event of Default" occurred under the MRA when AHMIC filed its bankruptcy petition in August, 2007, Lehman Brothers properly exercised its right to foreclosure or liquidate the Subordinated Notes post-petition.   Therefore, Lehman Brothers' actions post-petition did not breach the MRA.   Accordingly, the Plaintiff cannot prove the Defendants breached the MRA post-petition and the portion of Count I asserting a post-petition breach of contract will be dismissed.

Since Lehman Brothers' post-petition actions were not a breach of the MRA, the Plaintiff must show how the alleged pre-petition breaches damaged it in order to support its breach of contract claim.   However, it is not clear from the Complaint how the pre-petition breaches damaged the Plaintiff differently from the alleged post-petition breaches.   Accordingly, the Plaintiff must specify with more particularity how it was damaged by the alleged pre-petition breaches. Since the Plaintiffs' pre-petition breach of contract claim satisfies three of the four required elements, if the Plaintiff had pled the damages element with more particularity it may have survived the Defendants' Motion to Dismiss.   Thus, the Court will dismiss *without prejudice* the portion of Count I asserting a pre-petition breach of contract to allow the Plaintiff an opportunity to plead with more specificity its claim of damages.

---

[131] *K.Bell & Associates, Inc. v. Lloyd's Underwriters*, 827 F.Supp. 985, 988 (S.D.N.Y. 1993) (citations omitted).

**V.  Plaintiff's Claim for Turnover of Property of the Estate Under 11 U.S.C. § 542 Is Dismissed Because It Is Premature**

In Count II of the Complaint, the Plaintiff argues that "Lehman should be directed to turnover either (a) the AHMIC-Owned Notes to AHMIC's estate or (b) in the event that the safe harbor provisions of the Bankruptcy Code apply, the debt owed by Lehman for damages arising from Lehman's termination of the MRA and foreclosure and/or liquidation of the AHMIC-Owned Notes."[132]  As the Court has determined that sections 555 and 559 apply to the MRA, the Court's analysis will focus on the second aspect of the Plaintiff's claim for turnover of property of the estate.

The Defendants argue that the Court must dismiss the Plaintiff's turnover claim because it seeks the turnover of a debt which is in dispute.  In support of this argument, the Defendants cite *American Business Financial Services.* [133]

The debtor in *American Business Financial Services* was in the business of originating and servicing mortgage loans.  The debtor raised capital by selling pools of mortgage loans to special purpose entities, which in turn sold the mortgage loans to mortgage loan trusts.  The mortgage loan trusts raised the funds needed to purchase the mortgage loans by selling notes and trust certificates.  The notes and trust certificates were secured by the mortgage loans. In exchange for the loans sold to the special purpose entities (and subsequently

---

[132] Complaint, ¶ 61.

[133] *Miller v. Greenwich Capital Fin. Prods. (In re American. Bus. Fin. Servs.),* 361 B.R. 747, 761 (Bankr. D. Del. 2007).

resold to the mortgage loan trusts), the debtor received cash and beneficial interests in the mortgage loan trusts (known as I/O Strips) entitling the debtor to certain cash flows from the mortgage loan trusts.

The debtor filed for relief under Chapter 11, and subsequently obtained DIP financing. The terms of the DIP financing gave the DIP lender a security interest in substantially all of the debtor's assets, including the I/O Strips. A few months into the reorganization process, the debtor publically announced that reorganization was not possible. The DIP lender subsequently declared a default on the DIP loan, and, as a result, the case converted to a Chapter 7 and a trustee was appointed. Thereafter, the DIP lender foreclosed on the I/O Strips and sold them at public auction under Article 9 of the UCC. In connection with this foreclosure, the chapter 7 trustee filed a complaint which contained multiple claims, including turnover under section 542, conversion and breach of contract. Before Chief Judge Walrath was the DIP lender's motion to dismiss the entire complaint.

The trustee's turnover claim specifically sought turnover of the allegedly converted I/O Strips, and various fees, interest and penalties collected by the DIP lender after the alleged conversion. The trustee argued that the I/O Strips were "indisputably the Debtor's and [were] held as collateral by [the DIP lender].[134] The Court found that the DIP lender properly exercised its right to foreclose on the collateral upon default. With respect to the various fees,

---

[134] *Id.* at 761.

interests and penalties for which the trustee sought a turnover, the Court held that the trustee could not claim title to this property. Rather, the trustee's right to turnover of the fees, interests and penalties was dependant on validity of the various other counts in its complaint. Thus, the Court held "[b]ecause title to the property is in dispute, a claim for turnover cannot arise at this stage" and the Court dismissed the trustee's turnover claim.[135]

The debtor's claim for turnover of the various fees, interests and penalties in *American Business Financial Services* mirrors the Plaintiff's claim for turnover of the "debt owed by Lehman for damages arising from Lehman's termination of the MRA and foreclosure and/or liquidation of the AHMIC-Owned Notes."[136] In *American Business Financial Services*, the Court held that the fees, interests and penalties were not property which trustee could claim title to, but rather needed a judgment to collect. Here, the "debt" the Plaintiff refers to is not actually "debt," but damages which are dependant on various other counts in the Plaintiff's Complaint. Thus, title to this "debt" is in dispute and an action for turnover is premature.[137]

Accordingly, the Court will dismiss the Plaintiff's turnover claim.

---

[135] *Id.*

[136] Complaint, ¶ 61.

[137] *In* re American Bus. Fin. Servs., 361 B.R. at 761; *see, e.g., Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*, 335 B.R. 539, 554 (D. Del. 2005) ("[I]n order to state a claim for turnover of property under § 542, a plaintiff must allege that transfer of the property has already been avoided or that the property is otherwise the **undisputed property of the bankruptcy estate**. Here, the Trustee has not made, and cannot make that allegation.") (emphasis added); and *Hechinger Inv. Co. of De. Inc., v. Allfirst Bank (In re Hechinger Inv. Co. of De. Inc.)*, 282 B.R. 149, 161 (Bankr. D. Del. 2002).

## VI.  Count III Alleging Conversion is Dismissed

In Count III of the Complaint, the Plaintiff alleges that Lehman has converted the Plaintiff's interest in the Subordinated Notes.  Specifically, the Plaintiff argues that under the MRA "AHMIC provided Lehman with a limited interest in the [Subordinated Notes] for the sole purpose of their serving as collateral with respect to AHMIC's obligations to repay the funds Lehman advanced under that agreement . . . [and this limited interest] was at all times subject to AHMIC's right to retake possession of those notes in exchange for the principal loan borrowed by AHMIC."[138]  The Plaintiff further alleges that the Defendants are liable for conversion because they have confiscated the Subordinated Notes and, as a result, the Plaintiff has, and will continue to suffer damages.[139]

Under New York law, the "tort of conversion is the 'exercise of unauthorized dominion over the property of another in interference with a plaintiff's legal title or superior right of possession.'"[140]  In addition, in order for a conversion claim to succeed in the context of a contract dispute, as the Plaintiff attempts to accomplish, "a plaintiff must allege acts that are unlawful or wrongful as distinguished from acts that are a mere violation of contractual

---

[138] Complaint, ¶¶ 63-64.

[139] Id., ¶¶ 66-67.

[140] Briarpatch LTD. L.P. v. Geisler Roberdeau, Inc. 148 F.Supp.2d 321, 328 (S.D.N.Y. 2001) (quoting Lopresti v. Terwilliger, 126 F.3d 34, 41 (2d Cir. 1997)).

rights."[141]    The Defendants argue the Plaintiff fails to meet this second requirement.[142]

Specifically, the Defendants argue that the Plaintiff's conversion claim is a recharacterization of its breach of contract claim because the Plaintiff "does nothing more than recite allegations that [Lehman Brothers] breached its obligations under the MRA."[143]  The Plaintiff argues in return that its conversion claim does not duplicate its breach of contract claim because it rests on different facts "*inter alia*, interference with AHMIC's possessory interests (i.e., illegal foreclosure and confiscation of the notes) and fabrication of the Market Values (in connection with an improvident margin call)."[144]  The Court agrees with the Defendants.

> In the Complaint, the Plaintiff argues in its conversion claim that:
>
> Under the MRA, AHMIC provided Lehman with a limited interest in the AHMIC-Owned Notes for the sole purpose of their serving as collateral with respect to AHMIC's obligations to repay the funds Lehman advanced under that agreement.  [This] limited interest in the AHMIC-Owned Notes was at all times subject to AHMIC's right to retake possession of those notes . . .
>
> Lehman has interfered with AHMIC's right to possess the AHMIC-Owned Notes, will not deliver possession of those notes to AHMIC, and wrongly claims an ownership interest with respect to the

---

[141] *Fraser v. Doubleday & Co., Inc.*, 587 F.Supp. 1284, 1288 (S.D.N.Y. 1984); and *Briarpatch LTD. L.P. v. Geisler Roberdeau, Inc.* 148 F.Supp.2d 321, 328 (S.D.N.Y. 2001).

[142] <u>Motion to Dismiss, p. 20</u>.

[143] <u>*Id.*, p. 21</u>.

[144] <u>Plaintiff's Answer, pp. 24-25</u>.

AHMIC-Owned Notes.  As a direct and proximate result . . . AHMIC has suffered, and will continue to suffer damages.[145]

This is a recharacterization of the Plaintiff's breach of contract claim.  In the breach of contract claim, the Plaintiff alleges that Lehman unjustly issued the Post-Petition Foreclosure Notice, i.e., the notice that Lehman "foreclosed or intended to foreclose on the AHMIC-Owned Notes."[146]  In its conversion claim, the Plaintiff alleges that "Lehman has interfered with AHMIC's right to possess the AHMIC-Owned Notes . . ."[147]  The Plaintiff states that its right to possess the Notes was provided by the MRA.[148]  Therefore, both claims are based on the MRA and an argument that Lehman has unjustly taken the Subordinated Notes.

Furthermore, the Court disagrees that the conversion claim rests on different facts than the breach of contract claim.  The Plaintiff states that its conversion claim rests on the "fabrication of the Market Values (in connection with an improvident margin call)."[149]  The Plaintiff's breach of contract claim also alleges that Lehman breached the MRA in its calculation of the Market Value.  Specifically, in its breach of contract claim the Plaintiff alleges that:

Lehman did not calculate Market Value in accordance with the MRA with respect to the Second Margin Call and wrongfully triggered that margin call by, *inter alia*, (a) misrepresenting the existence of, or overstating the Margin Deficit and (b) ascribing an overly depressed Market Value to the Subordinated Notes.

---

[145] Complaint, ¶¶ 63-66.

[146] *Id.*, ¶¶ 41 and 52.

[147] *Id.*, ¶ 65.

[148] *Id.*, ¶ 63.

[149] Plaintiff's Answer, pp. 24-25.

To the extent Lehman maintains that it (i.e., Lehman) is a 'generally recognized source' as a market maker with respect to the Subordinated Notes, Lehman failed to satisfy its obligation to act in good faith, without conflicts of interest, and in a commercially reasonable manner in calculating Market Value.[150]

Also, the Plaintiff states that its conversion claim rests on the "interference with AHMIC's possessory interests (i.e., illegal foreclosure and confiscation of the notes)." However, in the Plaintiff's breach of contract claim it alleges "Lehman was not entitled to issue . . . the Post-Petition Foreclosure Notice, because (a) AHMIC at all relevant times complied with its obligations under the MRA and (b) an Event of Default (as defined therein) had not occurred."[151]

The Court sees no substantive difference between the acts which support the Plaintiff's conversion claim and those that support its breach of contract claim. Therefore, the Plaintiff does not "allege acts that are unlawful or wrongful as distinguished from acts that are a mere violation of contractual rights."[152] Accordingly, the Court will dismiss the Plaintiff's conversion claim.

**VII.  Count IV Alleging Unjust Enrichment is Dismissed**

In Count IV of the Complaint, the Plaintiff brings a claim for unjust enrichment.[153] "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's

---

[150] Complaint, ¶¶ 50-51.

[151] *Id.*, ¶ 52.

[152] *Fraser v. Doubleday & Co., Inc.*, 587 F.Supp. 1284, 1288 (S.D.N.Y. 1984).

[153] Complaint, ¶¶ 68-76.

expense; and (3) that equity and good conscience require restitution."[154]    In

support of its unjust enrichment claim, the Plaintiff argues that:

> Lehman did not look to a "generally recognized source" [as
> required by the MRA] when assessing the Market Value of the
> Subordinated Notes, instead manufacturing its own Market Value
> and a corresponding Margin Deficit as part of a scheme to deprive
> AHMIC of the true value of the AHMIC-Owned Notes.
>
> Lehman has been unjustly enriched at AHMIC's expense by
> wrongfully foreclosing upon and/or liquidating for itself the
> AHMIC-Owned Notes that (a) AHMIC was entitled to take
> repossession of at the conclusion of the MRA and (b) had a higher
> Market Value than the amounts Lehman represented in connection
> with the Second Margin Call.  As a direct and proximate result of
> Lehman's unjust enrichment, AHMIC has suffered and will
> continue to suffer damages.[155]

In addition to the three elements described above, an unjust enrichment claim is

a quasi-contract claim.[156]  Therefore, "[t]he existence of a valid and enforceable

written contract governing a particular subject matter ordinarily precludes

recovery in quasi contract for events arising out of the same subject matter."[157]

The Defendants argue that the Plaintiff's unjust enrichment claim is a

recharacterization of their breach of contract claim.[158]  And, as such, the Plaintiff

may not bring this quasi-contract claim because the MRA is a valid and

---

[154] *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*  448 F.3d 573, 586 (2d Cir. 2006).

[155] Complaint, ¶¶ 71, 75 and 76.

[156] *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*  448 F.3d 573, 586 (2d Cir. 2006).

[157] *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*  448 F.3d 573, 587 (2d Cir. 2006) (*quoting Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 388-89, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987)).

[158] Motion to Dismiss, p. 21.

enforceable contract.[159]   The Plaintiff presents two counterarguments for why this is not the correct result.

First, the Plaintiff argues that an unjust enrichment claim may stand in the presence of an existing contract when the scope of the contract does not cover the dispute between the parties.[160]   To support this argument, the Plaintiff alleges that the Defendants have been unjustly enriched by benefits they received beyond the scope of the MRA, i.e., post-foreclosure, the Subordinated Notes have appreciated beyond the amount the Defendants are owed.[161]

Second, the Plaintiff argues that the Defendants themselves admit that the MRA was terminated post-petition by virtue of the bankruptcy filing.[162]   The Court believes this is an attempt to argue that the unjust enrichment claim may stand because there is not a valid and enforceable contract governing the dispute.

The Court agrees with the Defendants.   The MRA is a valid and enforceable contract. And, under New York law, the quasi-contract theory of unjust enrichment is unavailable when there is a valid and enforceable agreement.[163]   Thus, unjust enrichment is not available to the Plaintiff.

Furthermore, the Plaintiff's two counter-arguments do not alter this conclusion.   First, the Court disagrees with the Plaintiff's argument that the MRA

---

[159] _Id._, p. 20.

[160] Plaintiff's Answer, p. 22.

[161] _Id._, p. 22.

[162] _Id._, p. 22.

[163] _Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc._  448 F.3d 573, 586 (2d Cir. 2006).

does not cover the post-foreclosure appreciation of the Subordinated Notes. Section 11(d)(i)) of the MRA deals with post-foreclosure appreciation and provides, in relevant part, that the non-defaulting party may:

> [I]mmediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and **apply the proceeds thereof to the aggregate unpaid Repurchase Prices** and any other amounts owing by the defaulting party hereunder, **or... elect, in lieu of selling all or a portion of such Purchased Securities, to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source** . . . against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder . . .[164]

Therefore, any post-foreclosure appreciation received by the Defendants is covered by the MRA.

Second, it is irrelevant to the Court's analysis whether or not the Defendants terminated the MRA. To support a claim for unjust enrichment, the Plaintiff must show that the Defendants were unjustly enriched. The Plaintiff premises its unjust enrichment claim on the argument that "Lehman has been unjustly enriched at AHMIC's expense by wrongfully foreclosing upon and/or liquidating for itself the AHMIC-Owned Notes."[165] As the Court has decided that an "Event of Default" occurred under the MRA when AHMIC filed for bankruptcy, Lehman Brothers properly exercised its rights under the MRA's *ipso*

---

[164] Complaint, Ex. A, p. 8 (§ 11(d)(i)) (emphasis added).

[165] *Id.*, ¶ 75.

*facto* clause, and, accordingly, was not unjustly enriched its foreclosure and/or liquidation of the Subordinated Notes.

However, if the Defendants had terminated the MRA after the liquidation of the Subordinated Notes, from that point forward the Plaintiff may bring an unjust enrichment claim.  Claims for unjust enrichment may lie in the situation where a valid and enforceable contract is rescinded or abrogated, and a party is unjustly enriched thereafter.[166]    Thus, if the MRA was terminated post-liquidation, in order to support a claim for unjust enrichment the Plaintiff must put forward some evidence which shows that the Defendants were unjustly enriched after the Defendants terminated the MRA.  However, the only unjust enrichment the Plaintiff alleges stems from the alleged wrongful foreclosure and/or liquidation of the Subordinated Notes.  Therefore, it is irrelevant whether or not the Defendants terminated the MRA post-foreclosure because the Plaintiff has not alleged any grounds for unjust enrichment besides the liquidation of the Subordinated Notes.

Accordingly, the Court will dismiss the Plaintiff's unjust enrichment claim.

---

[166] *Waldman v. Englishtown Sportswear, Ltd.*, 92 A.D.2d 833, 836 (N.Y.A.D. 1 Dept. 1983).

## <u>CONCLUSION</u>

For the foregoing reasons the Motion to Dismiss is granted.  Specifically, the Court will dismiss Counts I, II, III, IV, and the first four claims for declaratory judgment in Count V of the Complaint.[167]   An order will be issued.

---

[167] The Court will dismiss without prejudice the portion of Count I of the complaint asserting a pre-petition breach of contract to allow the plaintiff an opportunity to plead with more specificity its claim of damages.

**<u>EXHIBIT B</u>**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERICAN HOME MORTGAGE, | ) Case No. 07-11047 (CSS) |
| HOLDINGS, INC., a Delaware Corporation, | ) Jointly Administered |
| et al., | ) |
| | ) |
|     Debtors. | ) |
| _____ | ) |
| AMERICAN HOME MORTGAGE | ) |
| INVESTMENT CORP., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) Adv. Proc. No. 07-51739 (CSS) |
| | ) |
| LEHMAN BROTHERS INC., and LEHMAN | ) |
| COMMERCIAL PAPER INC., | ) |
| | ) |
|     Defendants. | ) |

## <u>ORDER</u>

For the reasons set forth in this Court's Opinion[1] dated May 23, 2008,

which is incorporated by reference as if set forth in full herein:

IT IS HEREBY ORDERED that Counts I, II, III, IV, and the first four claims

for declaratory judgment in Count V of the Complaint are DISMISSED WITH

PREJUDICE, provided, however, that the portion of Count I of the complaint

asserting a pre-petition breach of contract is DISMISSED WITHOUT PREJUDICE

---

[1] The Opinion constitutes the Court's findings of fact and conclusions of law, pursuant to Federal
Rule of Bankruptcy Procedure 7052.

to allow the plaintiff an opportunity to plead with more specificity its claim of

damages, which Plaintiff shall file and serve by no later than June 30, 2008.

_____
Christopher S. Sontchi
United States Bankruptcy Judge

Dated: May 23, 2008

2

**EXHIBIT C**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------x
In re:                              :  Chapter 11 Case
                                    :  No. 07-11047 (CSS)
                                    :
AMERICAN HOME                       :  (Jointly
MORTGAGE INVESTMENT CORP., et al.,  :  Administered)
                                    :
                       Debtors.     :
------------------------------------x
AMERICAN HOME MORTGAGE              :  Adversary
INVESTMENT CORP.,                   :  Proceeding
                                    :  No. 07-51739 (CSS)
                                    :
      Plaintiff,                    :
                                    :
           v.                       :
                                    :
LEHMAN BROTHERS INC. and LEHMAN     :
COMMERCIAL PAPER INC.,              :
                                    :
                                    :
      Defendants.                   :
------------------------------------x
```

### ORDER GRANTING MOTION, PURSUANT TO FEDERAL RULES OF BANKRUPTCY PROCEDURE 7052 AND 9023 AND 11 U.S.C. § 105(a), TO ALTER AND AMEND MAY 23 ORDER

For the reasons set forth in this Court's Opinion[1] dated May 23, 2008 (the "Opinion," and the Order entered in connection therewith, the "May 23 Order"), which Opinion is incorporated by reference as if set forth in full herein, and upon consideration of the Motion Of American Home Mortgage Investment Corporation, Pursuant To Federal Rules Of Bankruptcy Procedure 7052 And 9023,

---

[1]   The Opinion constitutes the Court's findings of fact and conclusions of law, pursuant to Federal Rule of Bankruptcy Procedure 7052.

And 11 U.S.C. S.105(a), To Alter And Amend May 23 Order (collectively, with the briefs submitted in support thereof, the "Motion"):

IT IS HEREBY FOUND that for the reasons enunciated in the Motion, there is no just reason to delay entry of the May 23 Order or any order relating to the Opinion as a final judgment as provided in Fed. R. Civ. P. 54(b); and

IT IS HEREBY ORDERED that the Motion is granted; and

IT IS FURTHER ORDERED that Counts I, II, III, IV and the first four claims for declaratory judgment in Count V of the Complaint are DISMISSED WITH PREJUDICE, provided however, that the portion of Count I of the complaint asserting a pre-petition breach of contract is DISMISSED WITHOUT PREJUDICE to allow Plaintiff an opportunity to plead with more specificity its claim of damages, which Plaintiff may file and serve by no later than June 30, 2008 if it seeks to preserve such claim; and

IT IS FURTHER ORDERED that, pursuant to Fed. R. Civ. P. 54(b), this Order constitutes a final judgment.

Hon. Christopher S. Sontchi
United States Bankruptcy Judge

June **30**, 2008

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AMERICAN HOME MORTGAGE<br>INVESTMENT CORPORATION,<br><br>          Appellant,<br><br>    v.<br><br>LEHMAN BROTHERS INC. and LEHMAN<br>COMMERCIAL PAPER INC.,<br><br>          Appellees. | Civil Action No. 08-484 (JJF) |

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2008, I caused a true and correct copy of the **REQUEST OF AMERICAN HOME MORTGAGE INVESTMENT CORPORATION, PURSUANT TO 11 U.S.C. § 105(a), 28 U.S.C. § 158(d)(2) AND FED. R. BANKR. P. 8001(f), FOR CERTIFICATION FOR DIRECT APPEAL TO UNITED STATES COURT OF APPEALS FOR THIRD CIRCUIT OF ORDER DISMISSING IN PART WITH PREJUDICE AND IN PART WITHOUT PREJUDICE COMPLAINT AGAINST LEHMAN BROTHERS INC. AND LEHMAN COMMERCIAL PAPER INC. (AS AMENDED) AND MOTION TO STAY ACTION PENDING ADJUDICATION OF CERTIFICATION REQUEST** to be filed with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Amanda Maria Winfree (awinfree@ashby-geddes.com)

I further certify that on August 18, 2008, I caused a true and correct copy of the **REQUEST OF AMERICAN HOME MORTGAGE INVESTMENT CORPORATION, PURSUANT TO 11 U.S.C. § 105(a), 28 U.S.C. § 158(d)(2) AND FED. R. BANKR. P. 8001(f), FOR CERTIFICATION FOR DIRECT APPEAL TO UNITED STATES COURT OF APPEALS FOR THIRD CIRCUIT OF ORDER DISMISSING IN PART WITH PREJUDICE AND IN PART WITHOUT PREJUDICE COMPLAINT AGAINST LEHMAN BROTHERS INC. AND LEHMAN COMMERCIAL PAPER INC. (AS AMENDED) AND MOTION TO STAY ACTION PENDING ADJUDICATION OF CERTIFICATION REQUEST** to be served as indicated upon the following parties:

William P. Bowden, Esq.
Amanda M. Winfree, Esq.
Don Beskrone, Esq.
Benjamin W. Keenan, Esq.
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(Lehman Bros.)
*Hand Delivery*

Mark Indelicato, Esq.
Mark Power, Esq.
Jeffrey L. Schwartz, Esq.
Edward L. Schnitzer, Esq.
Hahn & Hessen LLP
488 Madison Avenue, 14th and 15th Floor
New York, NY 10022
(Official Committee of Unsecured Creditors)
*First Class Mail*

Robert J. Rosenberg, Esq.
Noreen A. Kelly-Najah, Esq.
George Royle, Esq.
Michael J. Riela, Esq.
Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, NY 10022
(Lehman Bros.)
*First Class Mail*

Bonnie Glantz Fatell, Esq.
David W. Carickhoff, Esq.
Blank Rome LLP
1201 Market Street, Suite 800
Wilmington, DE 19801
(Official Committee of Unsecured Creditors)
*Hand Delivery*

Joseph M. McMahon, Esq.
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207 - Lockbox #35
Wilmington, DE 19801
*Hand Delivery*

Erin Edwards (No. 4392)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: eedwards@ycst.com
*Counsel to American Home Mortgage*
*Investment Corporation*

066585.1001