IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------ x
AMERICAN HOME MORTGAGE            : Civil Action
INVESTMENT CORP.,                 : No. 08-484 (JJF)
                                  :
                    Appellants,   :
          v.                      :
                                  :
LEHMAN BROTHERS INC. and LEHMAN   :
COMMERCIAL PAPER INC.,            :
                                  :
                    Appellees.    :
------------------------------------ x
```

**BRIEF OF AMERICAN HOME MORTGAGE INVESTMENT CORPORATION IN SUPPORT OF ITS REQUEST, PURSUANT TO 11 U.S.C. § 105(a), 28 U.S.C. § 158(d)(2) AND FED. R. BANKR. P. 8001(f), FOR CERTIFICATION FOR DIRECT APPEAL TO UNITED STATES COURT OF APPEALS FOR THIRD CIRCUIT OF ORDER DISMISSING IN PART WITH PREJUDICE AND IN PART WITHOUT PREJUDICE COMPLAINT AGAINST LEHMAN BROTHERS INC. AND LEHMAN COMMERCIAL PAPER INC. (AS AMENDED), AND AHMIC'S MOTION TO STAY ACTION PENDING ADJUDICATION OF CERTIFICATION REQUEST**

## TABLE OF CONTENTS

Page

I.   PRELIMINARY STATEMENT ...................................... 2

II.  FACTUAL BACKGROUND ......................................... 8

     A.   AMERICAN HOME'S BUSINESSES AND BANKRUPTCY CASES .............. 8

     B.   FACTUAL ALLEGATIONS AGAINST LEHMAN IN COMPLAINT .............. 9

     C.   PROCEDURAL HISTORY ....................................... 14

III. RELIEF REQUESTED .......................................... 16

IV.  ARGUMENT .................................................. 16

     A.   CERTIFICATION IS MANDATORY IF ANY SINGLE CIRCUMSTANCE OF
          THOSE ENUMERATED IN 28 U.S.C. § 158(D)(2)(A) EXISTS ....... 16

     B.   BANKRUPTCY COURT DECISION RESOLVED ISSUES OF FIRST IMPRESSION
          FOR WHICH THERE ARE NO CONTROLLING THIRD CIRCUIT OR UNITED
          STATES SUPREME COURT DECISIONS ........................... 18

     C.   BANKRUPTCY COURT DECISION INVOLVES A MATTER OF "PUBLIC
          IMPORTANCE" CONCERNING CORNERSTONE OF FINANCIAL MARKETS ....... 20

     D.   DIRECT APPEAL TO THIRD CIRCUIT WILL MATERIALLY ADVANCE
          INSTANT PROCEEDING AND AMERICAN HOME'S CHAPTER 11 CASES ....... 22

     E.   INSTANT APPEAL SHOULD BE STAYED PENDING DECISION ON AHMIC'S
          CERTIFICATION REQUEST .................................... 23

V.   CONCLUSION ................................................ 25

## TABLE OF AUTHORITIES

### Cases

Ad Hoc Group of Timber Noteholders v. The Pacific Lumber Company
(In re Scotia Pacific Company LLC),
  508 F.3d 214 (5th Cir. 2007) ...............................19

Bevill, Bresler & Schulman v. Spenser Sav. Ass'n,
  878 F.2d 742 (3d Cir. 1989) .........................2, 18

Cheyney State College Faculty v. Hufstedler,
  703 F.3d 732 (3d Cir. 1983) ................................3

Frye v. Excelsior College,
  2008 WL 1850627 (9th Cir. BAP Apr. 10, 2008) ...............15

Pegasus Dev. Corp. v. Direct TV,
  2003 WL 21105073 (D. Del. May 14, 2003) .....................3

Perlin v. Hitachi Capital America Corp.,
  497 F.3d 364 (3d Cir. 2007) ...............................20

In re Ransom,
  380 B.R. 809 (9th Cir. BAP 2007) ..........................20

Simon & Schuster, Inc. v. Advanced Marketing Servs., Inc.,
  360 B.R. 429 (Bankr. D. Del. 2007) ........................17

Tidewater Finance Company v. Kenney,
  2008 WL 2514194 (4th Cir. June 25, 2008) ..................19

In re Virissimo,
  332 B.R. 208 (Bankr. D. Nev. 2005) ........................20

Weber v. United States,
  484 F.3d 154 (2d Cir. 2007) .........................2, 19

### Statutes

11 U.S.C. § 101(47)...........................................2

11 U.S.C. § 105(a).....................................1, 14, 15

28 U.S.C. § 158(d)(2)...............1, 5, 6, 14, 15, 16, 17, 20

Fed. R. Bankr. P. 8001(f).......................1, 3, 6, 14, 15

American Home Mortgage Investment Corporation ("AHMIC") hereby (a) requests (the "Certification Request"), pursuant to section 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), 28 U.S.C. § 158(d)(2), and Rule 8001(f) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the entry of an order certifying its appeal of the Order Dismissing In Part With Prejudice And In Part Without Prejudice The Complaint Against Lehman Brothers Inc. And Lehman Commercial Paper Inc., dated May 23, 2008 (the "Original Order") as amended,[1] entered by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), for direct appeal to the United States Court of Appeals for the Third Circuit (the "Third Circuit"), and (b) moves to stay the instant action pending the Court's adjudication of the Certification Request, and, in support thereof, respectfully states as follows:

---

[1]    The Original Order incorporates the Bankruptcy Court's Memorandum Opinion dated May 23, 2008 (Docket No. 23) (the "Opinion") and was amended pursuant to the Order Granting Motion, Pursuant To Federal Rules Of Bankruptcy Procedure 7052 And 9023 And 11 U.S.C. § 105(a), To Alter And Amend Bankruptcy Court Decision, dated June 30, 2008 (Docket No. 34) (the "Amendment Order"). The Original Order, the Opinion, and the Amendment Order, copies of which are attached hereto as Exhibits A1, A2, and A3, respectively, shall be referred to collectively as the "Bankruptcy Court Decision." Lehman Brothers, Inc. and Lehman Commercial Paper, Inc. shall be referred to collectively herein as "Lehman."

## I.    **PRELIMINARY STATEMENT**

***Decision Of Transcendent Importance.***  Congress has recognized that "repurchase agreements" (as defined under the Bankruptcy Code)[2] are a critical component of both U.S. and global financial markets.  It consequently crafted certain "safe-harbor" provisions in the Bankruptcy Code to avoid "ripple effects" through financial markets that might be occasioned by the bankruptcy filing of a single repurchase-agreement participant.[3]

The Bankruptcy Court Decision examined a repurchase agreement between AHMIC and Lehman that, like most repurchase agreements, provided that a bankruptcy filing by the repurchase-

---

[2]  See 11 U.S.C. § 101(47) (Bankruptcy Code provision defining "repurchase agreement" as "an agreement ... which provides for the transfer of one or more ... mortgage related securities ... against the transfer of funds by the transferee of such ... securities ... with a simultaneous agreement by such transferee to transfer to the transferor thereof ... securities ... at a date certain not later than 1 year after such transfer on demand, against the transfer of funds").

[3]  See, e.g., Bevill, Bresler & Schulman v. Spenser Sav. Ass'n, 878 F.2d 742, 745-48 (3d Cir. 1989) ("The repo market is used by the Federal Reserve System to help execute monetary policy .... Congress came to the decision that the effective functioning of the repo market can only be assured if repo investors will be protected against open-ended market loss arising from the insolvency of a dealer or other counter-party in the repo market.  The repo market is as complex as it is critical.  A collapse of one institution involved in a repo transaction could start a chain reaction, putting at risk hundreds of billions of dollars and threatening the solvency of many additional institutions").

agreement borrower (AHMIC) entitled the counterparty (Lehman) to terminate the agreement.  As a general matter, the Bankruptcy Code limits a party's ability to terminate an executory contract simply because its counter-party seeks bankruptcy protection. Such bankruptcy (or "ipso facto") terminations typically are not enforceable.[4]  Congress determined that with respect to repurchase agreements, however, the prohibition against ipso facto terminations does not apply.  Congress codified that determination in the Bankruptcy Code's safe-harbor provisions (e.g., 11 U.S.C. §§ 555, 559).

AHMIC initiated an action against Lehman after Lehman terminated the parties' repurchase agreement and liquidated the underlying securities to Lehman's affiliates.  AHMIC's five-count complaint asserted, inter alia, that Lehman engaged in an improper scheme to foreclose on the valuable securities that were the subject of the agreement (i.e., "purchased and sold" under

---

[4]    See, e.g., 11 U.S.C. § 365(e)(1) (Bankruptcy Code provision prohibiting enforcement of ipso facto provisions: "Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of a case solely because of a provision in such contract or lease conditioned on -- (A) the insolvency or financial condition of the debtor at any time before the closing of the case; (B) the commencement of a case under this title; or (C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement").

the agreement) and to extinguish AHMIC's residual interest in those securities -- instead keeping them for Lehman's own benefit.  The Bankruptcy Court Decision, which dismissed AHMIC's complaint, tackled issues of first impression concerning the respective rights and obligations of repurchase agreement counterparties, including the interplay between the Bankruptcy Code's safe-harbor provisions, on the one hand, and agreed-upon contractual rights, implied contractual obligations, and non-bankruptcy law, on the other hand.  Notwithstanding the Bankruptcy Court Decision's significant impact on AHMIC's litigation against Lehman (i.e., it ended it) and American Home's bankruptcy cases, its transcendent importance cannot be underestimated.

*Statement Of Issues.*  Generally stated, the issues for the Court's consideration relate to the extent of the rights of a repurchase-agreement lender when its counterparty seeks bankruptcy protection, i.e., following an ipso facto termination of the repurchase agreement, including the standards and parameters applicable to its liquidation of the underlying securities that are the subject of the repurchase agreement. More specifically, the issues the Bankruptcy Court Decision addressed (and that should be reviewed on appeal) include the following:

- whether restrictions or standards apply to a repurchase-agreement lender in its performance of a repurchase agreement and in its exercising remedies under that agreement (e.g., foreclosing and liquidating the securities it purchased under the repurchase agreement following an ipso facto termination), including standards (a) expressly contained in the repurchase agreement (e.g., language requiring commercial reasonableness); (b) inherent in the repurchase agreement (e.g., an implied covenant of good faith and fair dealing) or (c) imposed under non-bankruptcy law (e.g., Article 9 of the Uniform Commercial Code (the "U.C.C."));

- whether a repurchase-agreement borrower can state a claim upon which relief can be granted for the lender's breach of that agreement when the agreement terminates after the borrower's bankruptcy filing, including a breach of a provision requiring that the repurchase-agreement lender liquidate the underlying collateral following an event of default in a commercially reasonable manner, a breach of the implied covenant of good faith and fair dealing, and/or a breach of standards of commercial reasonableness under the UCC;

- whether an ipso facto termination of a repurchase agreement extinguishes any residual interest the repurchase-agreement borrower has in the underlying collateral, including the entitlement of a repurchase-agreement borrower to its residual interest in securities it sold under a repurchase agreement after repaying amounts the borrower owes thereunder, under section 559 of the Bankruptcy Code or otherwise;

- whether the residual interest of a repurchase-agreement borrower in securities it sold under a repurchase agreement (after repaying amounts the borrower owes thereunder) constitutes property of that borrower's bankruptcy estate pursuant to section 559 of the Bankruptcy Code that is subject to turnover; and

- the scope of the phrases "interests in mortgage loans" and "mortgage related securities" in the "repurchase agreement" definition found in section 101(47) of the Bankruptcy Code.

*Section 158(d)(2) Mandates Certification.* AHMIC appealed the Bankruptcy Court Decision and hereby requests that its appeal proceed directly to the Third Circuit pursuant to section 28 U.S.C. § 158(d)(2) and Bankruptcy Rule 8001(f). These newly-enacted provisions mandate certification *either* (1) in the absence of a controlling Third Circuit or U.S. Supreme Court decision on the legal questions presented, (2) when the issues presented involve a "matter of public importance," *or* (3) when an immediate appeal will materially advance the progress of the case or proceeding.[5] Notably, section 158(d)(2) lists the relevant factors *disjunctively*, i.e., the satisfaction of any single factor mandates certification. Nonetheless, each of the factors identified in section 158(d)(2) provides an independent basis upon which to certify AHMIC's appeal.

*First*, neither the Third Circuit nor the U.S. Supreme Court has spoken to the legal issues of first impression decided in the Bankruptcy Court Decision (and Lehman has never disputed this point). With no controlling decision, certification is mandatory. Here, certification is not a drastic remedy because Congress believed appeals like AHMIC's, involving legal questions

---

[5]     See 28 U.S.C. § 158(d)(2)(A). A fourth factor which also demands certification, i.e., that the order involves a question of law requiring resolution of conflicting decisions (28 U.S.C. § 158(d)(2)(A)(ii)), is not applicable. Instead, the Bankruptcy Court Decision was one of first impression, i.e., there are no conflicting decisions.

concerning the Bankruptcy Code's safe-harbor provisions, are the most appropriate for direct appeal.

*Second*, the Bankruptcy Court Decision involves legal questions of critical public importance because it significantly affects repurchase agreements (and hence both U.S. and global financial markets) as well as other repurchase-agreement borrowers that become debtors in possession.

*Third*, to the extent the Bankruptcy Court Decision affects the multi-millions of dollars of claims AHMIC and its affiliated debtors and debtors in possession are evaluating against their other repurchase-agreement counterparties and lenders, and to the extent those causes of action will provide a major source of recovery for creditors, a direct appeal will materially advance both this litigation and American Home's chapter 11 cases. Accordingly, AHMIC respectfully submits certification for direct appeal to the Third Circuit is appropriate.

*Stay Is Warranted Pending Decision.*  Lastly, AHMIC requests that the Court the inherent power to control its own docket by staying the instant appeal pending a decision on the Certification Request.  While the Certification Request is <u>sub judice</u>, initiating the instant appeal before the District Court may result in needless costs should AHMIC's appeal proceed directly to the Third Circuit.  To that end, certification presents a "gating" question that should be determined first.

## II.  **FACTUAL BACKGROUND**

### A.  AMERICAN HOME'S BUSINESSES AND BANKRUPTCY CASES

AHMIC and its affiliated debtors and debtors in possession (collectively, "American Home") currently are subject to chapter 11 cases (the "Bankruptcy Cases") pending before the Bankruptcy Court.[6]  Before filing the Bankruptcy Cases on August 6, 2007 (the "Petition Date"), American Home's business primarily entailed originating, servicing and selling mortgage loans as well as investing in mortgage-backed securities resulting from the securitization of residential mortgage loans.[7]  American Home offered an array of mortgage products primarily to borrowers with good credit profiles.  It originated approximately $58.9 billion in the aggregate principal amount of loans in 2006 and, for the third quarter of 2006, was ranked as the nation's 10th largest residential mortgage lender, according to National Mortgage News.[8]

---

[6]  The chapter 11 cases bear the caption In re American Home Mortgage Investment Corp., et al., No. 07-11047 (CSS) (Bankr. D. Del.).

[7]  Most of American Home's investment portfolio consisted of securitized adjustable-rate mortgage (ARM) loans of "prime" and "alternate A" quality.  As of December 31, 2006, American Home held a leveraged portfolio of mortgage loans and mortgage-backed securities in the amount of approximately $15.6 billion.

[8]  A large component of American Home's business also consisted of servicing loans, i.e., collecting mortgage payments, administering tax and insurance escrows, responding to borrower inquiries, and maintaining control over collection and default mitigation processes.  As of December 31, 2006, American Home serviced approximately 197,000 loans with an

In the summer of 2007, disruptions in the credit markets caused major write-downs in American Home's loan and security portfolios and negatively impacted mortgage originators and investors in mortgage-backed securities.  In the case of American Home, the write-downs led to significant margin calls with respect to its credit facilities (including repurchase agreements).  When American Home's warehouse lenders, i.e., the financial institutions that provide short-term credit facilities used by the Debtors to originate and purchase mortgage loans) began to exercise purported remedies against American Home, it sought alternative funding sources and capital infusions and engaged in efforts to sell its businesses and assets. Unfortunately, in the short time available, and facing severe financial pressures, American Home was unsuccessful in its efforts to resolve its liquidity crisis outside the bankruptcy forum and filed for bankruptcy protection.

**B.    FACTUAL ALLEGATIONS AGAINST LEHMAN IN COMPLAINT[9]**

American Home funded a portion of its mortgage-loan origination through structured financing techniques, including a warehouse securitization program Lehman developed for two non-debtor special-purpose entities affiliated with American Home,

---

aggregate principal amount of approximately $46.3 billion. It sold the servicing business in October 2007.

[9]    The allegations set forth herein are contained in, and derived from AHMIC's Complaint against Lehman, dated October 24, 2007 (the "Complaint"), a copy of which is attached hereto as Exhibit B.

Broadhollow Funding LLC ("Broadhollow") and Melville Funding, LLC ("Melville").  Lehman was the architect of American Home's warehouse securitization program for Broadhollow and Melville.[10]

Broadhollow financed its acquisition of American Home-originated mortgage loans by issuing both highly-rated commercial paper and lower-rated subordinated notes (hereinafter, the "Broadhollow Notes").[11]  AHMIC invested in mortgage-backed securities issued by its affiliates, including the private-label Broadhollow Notes.  AHMIC purchased certain of the Broadhollow Notes (the "AHMIC-Owned Notes"), financing that acquisition through its Master Repurchase Agreement with Lehman, dated November 4, 2003 (the "MRA"),[12] i.e., raising funds to purchase the Broadhollow Notes by selling Lehman the Broadhollow Notes under the MRA subject to AHMIC's obligation (and right) to repurchase them.

The MRA entitled Lehman to make a margin call if the purchased securities' "Market Value" (as defined therein) determined by a "generally recognized source" fell below their value on the initial purchase date.[13]  It also entitled Lehman, following AHMIC's default, to "immediately sell, in a recognized market (*or otherwise in a commercially reasonable manner*)" the

---

[10]    See Ex. B (Compl. p. 4 (¶¶ 9-10)).

[11]    See Ex. B (Compl. p. 4 (¶¶ 9-10)).

[12]    A copy of the MRA appears attached to the Complaint as Exhibit A.

[13]    Ex. B (MRA, p. 4 (§ 4)).

purchased securities and to apply the proceeds to the aggregate outstanding purchase price.[14]

After a series of margin calls that AHMIC disputed (but met) between March 2007 and July 2007, Lehman demanded that AHMIC provide as additional margin approximately $6.9 million on July 26, 2007.[15] When AHMIC did not meet the July 26 margin call, Lehman declared AHMIC in default and terminated the MRA. Shortly after American Home filed their chapter 11 cases, Lehman advised AHMIC that it had foreclosed or intended to foreclose on the AHMIC-Owned Notes in lieu of selling them to a third party.[16]

As the architect of the Broadhollow warehouse securitization program, Lehman had an intimate understanding of the value of the AHMIC-Owned Notes. It knew full well that the AHMIC-Owned Notes were valuable and foreclosed against them as part of a scheme to keep the "money good" notes for Lehman's benefit.[17]

On October 24, 2007, AHMIC filed the five-count Complaint against Lehman in the Bankruptcy Court, where AHMIC's chapter 11 cases are pending.[18] The Complaint alleges, among other things,

---

[14]  Ex. B (MRA, p. 8 (§ 11(d)) (emphasis added)). The MRA also grants Lehman a contingent security interest in the event the purchase and sale transactions are re-characterized into loan transactions. See Ex. B (MRA, p. 5 (§ 6)).

[15]  See Ex. B (Compl., pp. 7-10 (¶¶ 22-35)).

[16]  See Ex. B (Compl., pp. 10-11 (¶¶ 36-45)).

[17]  See Ex. B (Compl., pp. 1-2 (¶ 1-4); pp. 4-6 (¶ 9-14)).

[18]  Specifically, it commenced an adversary proceeding against Lehman bearing the caption American Home Mortgage Investment Corp. v. Lehman Brothers Inc. and Lehman Commercial Paper,

that Lehman unjustifiably defaulted AHMIC under the MRA as part of a scheme to foreclose on the valuable AHMIC-Owned Notes and to extinguish AHMIC's residual interest in them.  After the parties briefed Lehman's motion to dismiss, and following oral argument on March 13, 2008, the Bankruptcy Court issued the Original Order and Opinion.  Therein, the Bankruptcy Court dismissed nearly all the Complaint's counts and sub-counts -- save a single orphan sub-count requesting declaratory judgment on the narrow issue of damage calculation for the dismissed counts (hereinafter, the "Damage Calculation Sub-count"), finding as follows:

> • **Breach Of Contract (Count I).**  AHMIC alleged Lehman breached the express terms of the MRA by, inter alia, making improvident margin calls, fabricating Market Value determinations, and failing to liquidate the AHMIC-Owned Notes in a commercially reasonable manner after AHMIC's alleged default.  AHMIC also alleged Lehman breached the implied covenant of good faith and fair dealing applicable to the MRA as well as all applicable standards of commercial reasonableness.  The Bankruptcy Court dismissed AHMIC's breach of contract claims, finding that under the Bankruptcy Code, American Home's bankruptcy filing (a) entitled Lehman to terminate the MRA and liquidate the AHMIC-Owned Notes and (b) precluded AHMIC from proving that Lehman breached the MRA post-petition.  While the Bankruptcy Court dismissed the post-petition breach claims with prejudice, it dismissed the pre-petition breach claims without prejudice to AHMIC's right to re-plead them and specify the damage allegations.[19]

---

Inc. (In re American Home Mortgage Investment Corp., et al.), Adv. Proc. No. 07-51739 (CSS) (Bankr. D. Del.).

[19]  See Bankruptcy Court Decision, pp. 38-40.  AHMIC did not re-plead the pre-petition breach of contract claims.

- *Turnover Of Property Of The Estate (Count II).* AHMIC alleged its residual interests in the AHM-Owned Notes, after repaying its obligations under the MRA, constitute property of AHMIC's bankruptcy estate (*i.e.,* the estate created when American Home commenced its bankruptcy cases). The Bankruptcy Court dismissed this Count with prejudice, finding the claim prematurely requested the turnover of a debt that was in dispute, *i.e.,* damages dependent on the Complaint's other counts.[20]

- *Conversion (Count III).* AHMIC alleged Lehman improperly interfered with AHMIC's right to possess the AHMIC-Owned Notes and AHMIC's residual interest in the notes.  The Bankruptcy Court dismissed this Count, styling it as a re-characterized breach of contract claim.[21]

- *Unjust Enrichment (Count IV).* AHMIC alleged Lehman was unjustly enriched by any appreciation in the AHMIC-Owned Notes' value (which would have been realized by AHMIC through its residual interest).  The Bankruptcy Court also considered this Count a re-characterized breach of contract claim and dismissed it.[22]

- *Declaratory Judgment (Count V).* AHMIC requested five forms of declaratory relief, specifically declarations that (a) Lehman violated the automatic stay by terminating the MRA and foreclosing; (b) the MRA does not satisfy the Bankruptcy Code's "repurchase agreement" definition; (c) Lehman is not entitled to the "securities contract" safe harbor of section 555 of the Bankruptcy Code; and (d) Article 9 governed Lehman's liquidation of the AHMIC-Owned notes, requiring it to liquidate them in a commercially reasonable manner.[23]  The Bankruptcy Court denied these requests for declaratory relief, finding (i) Article 9 does not apply to the MRA;[24] (ii) the MRA is a "repurchase agreement" and a "securities contract" as

---

[20]    See Ex. A2 (Opinion, pp. 41-43).

[21]    See Ex. A2 (Opinion, pp. 44-47).

[22]    See Ex. A2 (Opinion, pp. 47-51).

[23]    AHMIC also asserted the Damages Calculation Sub-count, but Lehman did not move to dismiss it (and the Court did not rule on it).

[24]    See Ex. A2 (Opinion, pp. 30-38).

13

defined under the Bankruptcy Code, making the safe harbor provisions of sections 559 and 555 applicable; (iii) the AHMIC-Owned Notes are "interests in mortgage loans" for purposes of the "repurchase agreement" definition; (iv) Lehman Brothers, Inc., the "sole counterparty" to the MRA for purposes of the AHMIC-Owned Notes transaction, is a "stockbroker," and (v) Lehman Brothers, Inc. did not violate the automatic stay.[25]

## C.    PROCEDURAL HISTORY

On June 3, 2008, AHMIC moved to amend the Original Order and Opinion to certify them as "final orders" for appellate purposes (because the lingering Declaratory Damages Sub-count rendered the order interlocutory).  On June 30, 2008, the Court entered the Amendment Order modifying the Original Order and certifying it as final pursuant to Federal Rule of Civil Procedure 54(b).  On July 10, 2008, AHMIC filed its notice of appeal from the Bankruptcy Court Decision.  On the same date, AHMIC filed its Initial Certification Request, to which Lehman objected.[26]  On or about August 5, 2008, the District Court docketed the appeal (albeit prior to Lehman's deadline to respond to the Designation of the

---

[25]    Ex. A2 (Opinion, pp. 9-30).

[26]    Request, Of American Home Mortgage Investment Corp., Pursuant To 11 U.S.C. § 105(a), 28 U.S.C. § 158(d)(2) And Fed. R. Bankr. P. 8001(f), For Certification For Direct Appeal To United States Court Of Appeals For Third Circuit For Order Dismissing In Part With Prejudice And In Part Without Prejudice Complaint Against Lehman Brothers, Inc. And Lehman Commercial Paper, Inc. (As Amended), Docket No. 38 on the adversary proceeding docket (e.g., Adv. Proc. 07-51739 (CSS) (Bankr. D. Del.)), a copy of which is attached hereto as Exhibit C1.  A copy of Lehman's opposition to the Initial Certification Request is attached hereto as Exhibit C2.

Record and Statement of the Issues on Appeal filed by AHMIC),[27]
divesting the Bankruptcy Court of jurisdiction to decide the
Certification Request.[28]  Recognizing that the docketing of the
appeal with the District Court placed the issue of certification
before the District Court, the Bankruptcy Court dismissed the
Initial Certification Request as "moot" on August 6, 2008.[29]

---

[27]    To that end, the docketing was premature.  Specifically, an
appeal becomes docketed after the record is complete.
Because Lehman had not submitted its counter-designation as
of August 5, 2008, the record was not complete, and
docketing was premature.  Docketing should not have occurred
until at least August 8, 2008, after Lehman submitted its
counter-designation.  See Fed. R. Bankr. 8007(b) (stating
appeal is docketed after record is complete); Fed. R. Bankr.
8006 (affording Lehman 10 days after AHMIC filed its
designation of the record on August 1, 2008, i.e., until
August 11, 2008), to submit its counter-designation and
complete the record).

[28]    See Fed. R. Bankr. P. 8001(f)(1)(A) (providing that before
docketing of an appeal "[o]nly a bankruptcy court may make a
certification on request or on its own initiative ..."); 
Frye v. Excelsior College, 2008 WL 1850627 (9th Cir. BAP
Apr. 10, 2008) (explaining bankruptcy court's exclusive
jurisdiction to determine certification prior to docketing
is a bright-line rule; Fed. R. Bankr. P. 8001(f)(1)(B).

[29]    A copy of the Bankruptcy Court's Order (Docket No. 50 in the
Adversary Proceeding) is attached hereto as Exhibit D ("IT
IS HEREBY ORDERED that, pursuant to Bankruptcy
8001(f)(2)(A)(ii), this Court is divested of power to decide
whether to make a certification that a circumstance
specified in 28 U.S.C. § 158(d)(2)(A)(i)-(iii) exists; the
Certification Request before this Court is moot; and, thus,
the Certification Request is denied without prejudice").

### III.  RELIEF REQUESTED

AHMIC respectfully requests the entry of an order, pursuant to 11 U.S.C. § 105(a), 28 U.S.C. § 158(d)(2), and Bankruptcy Rule 8001(f), certifying its appeal from the Bankruptcy Court Decision for direct appeal to the Third Circuit.  It also requests the entry of an order staying the instant appeal while the Certification Request is pending.

### IV.   ARGUMENT

**A.    CERTIFICATION IS MANDATORY IF ANY SINGLE CIRCUMSTANCE OF THOSE ENUMERATED IN 28 U.S.C. § 158(D)(2)(A) EXISTS**

In 2005, Congress streamlined bankruptcy appeals to enable expedited access to the United States Circuit Courts of Appeal by enacting 28 U.S.C. § 158(d)(2)(A).  Section 158(d)(2)(A) provides that if either of the parties consent[30] or the bankruptcy or district court so certify, an appeal from a judgment or order may be taken directly to the governing United States Circuit Court of Appeals when "[(i) it] involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance .... [or (iii)] an immediate appeal ... may materially advance the progress of the case or proceeding in which the appeal is taken ...."  28 U.S.C. § 158(d)(2)(A).

---

[30]    Lehman will not agree to certify the appeal.

Congress enacted this procedure to address problems related to the "time and cost factors attendant to the [prior] appellate system ..." House Rep. No. 109-13, Pt. 1, 109th Cong. 1st Sess. 148-49 (2005). Particularly, Congress was concerned with the fact that "decisions rendered by district courts as well as the appellate panel are generally not binding and lack <u>stare</u> <u>decisis</u> value." <u>Id.</u>

To that end, certification is mandatory in the presence of any *single* circumstance of the circumstances enumerated in section 158(d)(2)(A). <u>See</u>, <u>e.g.</u>, 28 U.S.C. § 158(d)(2)(B) (providing that if a bankruptcy court "on its own motion or on the request of a party, determines that a circumstance specified in clause (i), (ii), or (iii) of subparagraph (A) exists ... then the *bankruptcy court ... shall* make the certification described") (emphasis added); <u>Simon & Schuster, Inc. v. Advanced Marketing Servs., Inc.</u>, 360 B.R. 429, 433 (Bankr. D. Del. 2007) (noting court "must issue a certification if it determines that the order ... involves ... (1) a question of law upon which there is no controlling decision of the Third Circuit or of the Supreme Court ... (2) a matter of public importance; or (3) a question of law requiring resolution of conflicting decisions" or it determines that a direct appeal will materially advance case).

**B.    BANKRUPTCY COURT DECISION RESOLVED ISSUES OF FIRST IMPRESSION FOR WHICH THERE ARE NO CONTROLLING THIRD CIRCUIT OR UNITED STATES SUPREME COURT DECISIONS**

The Bankruptcy Court Decision addressed various issues of first impression (identified more fully in the "Statement of the Issues" *supra*) concerning, among other things:

- the scope and contours of the Bankruptcy Code safe-harbor provisions (sections 555 and 559);

- whether standards of commercial reasonableness apply to the parties' performance under a repurchase agreement and the lender's exercise of remedies following an *ipso facto* termination, either through the repurchase agreement's express terms, an implied covenant of good faith and fair dealing, or U.C.C. Article 9; and

- the rights and obligations of parties to repurchase agreements following an *ipso facto* termination;

- the applicability of Article 9 to repurchase agreements that grant contingent security interests in the wake of revisions to U.C.C. § 9-109(a)(1); and

- the entitlement of a chapter 11 debtor to its residual interests in securities sold under a repurchase agreement following an *ipso facto* termination.

Relatively little case law exists examining the contours of the Bankruptcy Code's safe harbor provisions or more generally a bankruptcy filing's impact on the debtor's interests in securities its sold under a repurchase agreement.[31]  No decision

---

[31]    AHMIC found only one case in the Third Circuit discussing the application of section 559 of the Bankruptcy Code, but it does not address the specific issues presented in this proceeding.  See Bevill, Bresler & Schulman Asset Management Corp. v. Spencer Sav. & Loan Ass'n, 878 F.2d 742 (3d Cir. 1989) (examining whether repurchase agreement settlement payment gave rise to an avoidable transfer in a chapter 7 liquidation; noting section 559 limited chapter 7 trustee's

from either the Third Circuit or the U.S. Supreme Court has examined or decided the issues addressed in the Bankruptcy Court Decision (and Lehman has never disputed this).  That fact alone warrants certification because the factors enunciated in section 158(d)(2) are listed disjunctively.  The satisfaction of one factor should end the inquiry.

Moreover, certification is especially appropriate when "Congress intended [section 158(d)] to facilitate [the Circuit Court's] provision of guidance on pure questions of law .... Congress believed that direct appeal would be most appropriate where [the Circuit Court is] ... called upon to resolve a question of law not heavily dependent on the particular facts of a case ...." Weber v. United States, 484 F.3d 154, 161 (2d Cir. 2007) (noting bankruptcy court correctly certified appeal from order construing scope of homestead exception, but declining to accept certification where issue was not "of such a nature to create uncertainty in the bankruptcy courts;" noting three lower courts within circuit had ruled consistently on issue).  AHMIC's appeal involves mostly legal issues and is not fact intensive.

In the absence of any authority from the U.S. Supreme Court or the Third Circuit, certification for direct appeal is not only mandatory, but necessary and appropriate.  See, e.g., Tidewater Finance Company v. Kenney, 2008 WL 2514194 *2 (4th Cir. June 25,

_____

rights to repurchase agreement property without explicating on scope of those rights).

19

2008) (accepting direct appeal of bankruptcy court order because there was no controlling decisions on issue of whether secured lender had a deficiency claim under chapter 13 provisions); Ad Hoc Group of Timber Noteholders v. The Pacific Lumber Company (In re Scotia Pacific Company LLC), 508 F.3d 214 (5th Cir. 2007) (accepting certification of bankruptcy court order in absence of controlling decisions interpreting 2005 BAPCPA amendments concerning single-asset real estate cases); Perlin v. Hitachi Capital America Corp., 497 F.3d 364, 367 (3d Cir. 2007) (accepting certification of creditor's appeal of bankruptcy court order denying motion to dismiss chapter 7 case as bad-faith filing; appeal examined 2005 BAPCPA amendments' substantial modifications to Bankruptcy Code section 707(b)).

### C. BANKRUPTCY COURT DECISION INVOLVES A MATTER OF "PUBLIC IMPORTANCE" CONCERNING CORNERSTONE OF FINANCIAL MARKETS

Section 158(d)(2) does not articulate the precise measure of "public importance." Courts consider an issue of "public importance" if it affects debtors generally or creates the prospect of divergent authority. See, e.g., In re Ransom, 380 B.R. 809 (9th Cir. BAP 2007) (granting certification of issue because of number of debtors potentially affected); In re Virissimo, 332 B.R. 208, 209 (Bankr. D. Nev. 2005) (certifying appeal of order where issue it addressed was "one which will recur in Nevada as well as other districts ... and will impact the administration of bankruptcy estates until the issue is ultimately decided").

The Bankruptcy Court Decision recognized the significance of
repurchase agreements (and the Bankruptcy Code's safe-harbor
provisions) to both U.S. and global financial markets.  See Op.,
p. 9 ("As this Court recently discussed in Calyon N.Y. Branch v.
Am. Home Mortg. Corp., the market for repurchase agreements is a
critical component of, not only the U.S. financial market, but
global financial markets as well.  To protect the liquidity of
repurchase agreements, the Bankruptcy Code provides special
protections to non-debtor counterparties") (citation omitted).

Congress similarly has recognized the importance of
repurchase agreements.  See Sen. Rep. No. 65, 98th Cong., 1st
Sess. 45, 47 (1983) ("The country's major institutional and
fiduciary investors make heavy use of repos.  For these
investors, including such entities as state and local
governments, public and private pension funds, money market and
other mutual funds, banks, thrift institutions, and large
corporations, repos have become a vital tool of cash
management").

The Bankruptcy Court Decision affects any repurchase-
agreement counterparty seeking chapter 11 protection, defining
the rights and obligations the counterparties following an ipso
facto termination.  Because it decided an issue of first
impression, the Bankruptcy Court Decision and any subsequent
appellate decision will strongly influence other courts examining
these issues.  Accordingly, AHMIC's appeal presents issues of

sufficient "public importance" to warrant certification for a direct appeal.[32]

### D. DIRECT APPEAL TO THIRD CIRCUIT WILL MATERIALLY ADVANCE INSTANT PROCEEDING AND AMERICAN HOME'S CHAPTER 11 CASES

Since the inception of its bankruptcy cases, American Home has been investigating possible claims and causes of action against its various lenders and repurchase-agreement counterparties. AHMIC's ability to pursue a direct appeal of the Bankruptcy Court Decision will materially advance not just AHMIC's bankruptcy case, but the bankruptcy cases of American Home (and their estates' ability to maximize value through the pursuit of mutli-millions of dollars in claims).

Similarly, a direct appeal will advance the instant proceeding. Given the dollar amounts at stake and the significance of the decision to American Home's estates and Lehman (e.g., its ability to exercise remedies as a repurchase-agreement lender with other counterparties), a Third Circuit appeal may be inevitable. Even if the appeal were to proceed before this Court, the grave import of these issues suggests the non-prevailing party would further appeal any adverse ruling to the Third Circuit. To that end, a direct appeal removes what

---

[32]   Indeed, the significance of the Bankruptcy Court Decision is underscored by the myriad articles which have been published examining the decision, some of which are attached hereto as Exhibit E.

might very well may be an intermediate step on the path to the Third Circuit.[33]

**E.    INSTANT APPEAL SHOULD BE STAYED PENDING DECISION ON AHMIC'S CERTIFICATION REQUEST**

It is well established that the Court has the inherent power to manage its own docket.  See Cheyney State College Faculty v. Hufstedler, 703 F.3d 732, 737 (3d Cir. 1983) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.  How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance").

The exercise of that power to stay the instant appeal pending a decision on the Certification Request will not result in prejudice or undue delay.  Indeed, Lehman's response to the Certification Request must be submitted within 10 days, so the issue should be resolved quickly.[34]  If the District Court grants the Certification Request, the parties will proceed directly to

---

[33]    Cf., Weber, 484 F.2d at 158 ("Legislative history confirms that direct appeal may be appropriate where a judgment of this court would 'materially advance the progress of the case.'  For instance, where a bankruptcy court has made a ruling which, if correct, will essentially determine the result of future litigation, the parties adversely affected by the ruling might very well fold up their tents if convinced that the ruling has the approval of the court of appeals, but will not give up until that becomes clear").

[34]    See Fed. R. Bankr. P. 8001 (f)(3)(F).

the Third Circuit irrespective of what has transpired before the
District Court.   To that end, the Certification Request presents
a "gating issue" that should be addressed before proceeding with
the appeal.   C.f., Pegasus Dev. Corp. v. Direct TV, 2003 WL
21105073, at *2-3 (D. Del. May 14, 2003) (granting defendant's
request to stay patent action while Patent and Trademark Action
reexamined patents when stay would result in simplification and
reduction of issues for court's consideration (depending on
results of reexamination); reexamination constitutes an
additional layer of review without expending judicial resources;
discovery was not complete; trial was "months away;" and
reexamination proceeding would continue with "dispatch").

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

24

## V.    CONCLUSION

For the foregoing reasons, the Certification Request should be granted and the instant proceeding should be stayed while the Certification Request is <u>sub judice</u>.

Respectfully submitted,

Dated:    Wilmington, Delaware
          August 18, 2008

**YOUNG, CONAWAY,**
**STARGATT & TAYLOR, LLP**

_____
John T. Dorsey (No. 2988)
Erin D. Edwards (No. 4392)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

-and-

**QUINN, EMANUEL, URQUHART,**
**OLIVER & HEDGES, LLP**
Susheel Kirpalani
James C. Tecce
Robert K. Dakis
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7199
Facsimile: (212) 849-7100

_Counsel to American Home_
_Mortgage Investment Corp._

**EXHIBIT A1**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERICAN HOME MORTGAGE, | ) Case No. 07-11047 (CSS) |
| HOLDINGS, INC., a Delaware Corporation, | ) Jointly Administered |
| et al., | ) |
| | ) |
|     Debtors. | ) |
| _____ | ) |
| AMERICAN HOME MORTGAGE | ) |
| INVESTMENT CORP., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) Adv. Proc. No. 07-51739 (CSS) |
| | ) |
| LEHMAN BROTHERS INC., and LEHMAN | ) |
| COMMERCIAL PAPER INC., | ) |
| | ) |
|     Defendants. | ) |

**<u>ORDER</u>**

For the reasons set forth in this Court's Opinion[1] dated May 23, 2008,

which is incorporated by reference as if set forth in full herein:

IT IS HEREBY ORDERED that Counts I, II, III, IV, and the first four claims

for declaratory judgment in Count V of the Complaint are DISMISSED WITH

PREJUDICE, provided, however, that the portion of Count I of the complaint

asserting a pre-petition breach of contract is DISMISSED WITHOUT PREJUDICE

---

[1] The Opinion constitutes the Court's findings of fact and conclusions of law, pursuant to Federal Rule of Bankruptcy Procedure 7052.

to allow the plaintiff an opportunity to plead with more specificity its claim of damages, which Plaintiff shall file and serve by no later than June 30, 2008.

_____
Christopher S. Sontchi
United States Bankruptcy Judge

Dated: May 23, 2008

**EXHIBIT A2**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERICAN HOME MORTGAGE, | ) Case No. 07-11047 (CSS) |
| HOLDINGS, INC., a Delaware Corporation, | ) Jointly Administered |
| et al., | ) |
| | ) |
| Debtors. | ) |
| | ) |
| AMERICAN HOME MORTGAGE | ) |
| INVESTMENT CORP., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Proc. No. 07-51739 (CSS) |
| | ) |
| LEHMAN BROTHERS INC., and LEHMAN | ) |
| COMMERCIAL PAPER INC., | ) |
| | ) |
| Defendants. | ) |

**OPINION[1]**

| | |
|---|---|
| William P. Bowden | John T.  Dorsey |
| Amanda M. Winfree | Erin D. Edwards |
| Benjamin W. Keenan | Young, Conaway, Stargatt |
| Ashby & Geddes, P.A. | Taylor, LLP |
| 500 Delaware Avenue | The Brandywine Building |
| P.O. Box 1150 | 1000 West Street, 17th Street |
| Wilmington, DE  19899 | Wilmington, DE  19801 |
| | |
| - and - | - and - |
| | |
| Robert J. Rosenberg  (Argued) | Susheel Kirpalani |
| Noreen A. Kelly-Najah | James C. Tecce (Argued) |
| George Royle | Harrison Denman |
| Michael J. Riela | Quinn, Emanuel, Urquhart, |
| Latham & Watkins, LLP | Oliver & Hedges, LLP |

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, pursuant to Federal Rule of Bankruptcy Procedure 7052.

885 Third Avenue, Suite 1000                51 Madison Avenue, 22nd Floor
New York, New York  10022                   New York, New York  10010

Attorneys for Defendants Lehman             Counsel to American Home
Brothers, Inc. and Lehman Commercial        Mortgage Investment Corp.
Paper Inc.

Dated:  May 23, 2008

Sontchi, J. _____

## INTRODUCTION

Before the Court is a motion to dismiss the bulk of the complaint filed by

American Home Mortgage Investment Corp. against Lehman Brothers Inc. and

Lehman Commercial Paper Inc.  The complaint contains five counts, including

five requests for declaratory judgment contained in the fifth count.  The first

three requests for declaratory judgment center on whether the "safe harbor"

protections of section 559 and 555 of the Bankruptcy Code apply to the

transaction in question.  The Court finds that the transaction in question is a

"repurchase agreement" under the statute and the safe harbor provisions of

sections 559 and 555 of the Bankruptcy Code are applicable.

Consequently, the Court further finds that the relevant defendant did not

violate the automatic stay imposed by section 362(a) of the Bankruptcy Code

when it exercised its rights under an *ipso facto* clause.  Furthermore, the Court

finds that the relevant defendant was not constrained by Article 9 of the Uniform

Commercial Code when it exercised its rights under the *ipso facto* clause.  Thus,

the Court will dismiss four of the five requests for declaratory judgment contained in the fifth count. [2]

Finally, the Court will dismiss Counts I through IV of the complaint. For the reasons set forth below, each of these counts fails to state a claim upon which relief can be granted.[3]

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (G) and (O).

## STATEMENT OF FACTS

### I.  Procedural Background

American Home Mortgage Investment Corp. ("AHMIC" or "Plaintiff"), a debtor in possession in the above-captioned chapter 11 cases, commenced this adversary proceeding by filing a complaint ("Complaint") against Lehman Brothers Inc. and Lehman Commercial Paper Inc. (collectively "Lehman" or "Defendants").[4]  In the Complaint, AHMIC puts forward five counts:  breach of contract, turnover of property of the estate, conversion, unjust enrichment, and declaratory judgment.

---

[2] The Defendants do not seek to dismiss the Plaintiff's fifth request for declaratory judgment.

[3] The Court will dismiss without prejudice the portion of Count I of the complaint asserting a pre-petition breach of contract to allow the Plaintiff an opportunity to plead with more specificity its claim of damages.

[4] [Docket Entry 1].

3

In response to the Complaint, the Defendants filed a motion to dismiss the bulk of the Complaint and a supporting brief (collectively, "Motion to Dismiss).[5] The Defendants request that the Court dismiss the Plaintiff's claims for breach of contract, turnover of property of the estate, conversion, and unjust enrichment. The Defendants also request that the Court dismiss the first four claims for declaratory judgment contained in the fifth count.

The Plaintiff filed an answering brief in opposition to the Motion to Dismiss ("Plaintiff's Answer").[6] The Defendants subsequently filed a response ("Defendants' Response").[7] The Court heard oral argument on March 13, 2008. This matter is now ripe for decision.

## II. Facts[8]

The facts relevant to this dispute center on a structured finance transaction involving AHMIC, Lehman Brothers Inc. ("Lehman Brothers") and Lehman Commercial Paper Inc.

AHMIC was engaged in the business of originating residential mortgage loans.[9] To fund its business of originating loans, AMHIC sold mortgage loans to special-purpose entities ("SPE's").[10] The SPE's issued commercial paper and

---

[5] [Docket Entries 5 and 6].

[6] [Docket Entry 16].

[7] [Docket Entry 18].

[8] The facts set forth herein are derived from the Complaint.

[9] Complaint, ¶ 9.

[10] Id.

subordinated debt to raise funds to purchase the mortgage loans from AHMIC.[11]

One such SPE, Broadhollow Funding LLC ("Broadhollow"), issued commercial

paper in the form of secured liquidity notes and subordinated notes.[12]  Both the

commercial paper and the subordinated notes were secured by liens on the

mortgage loans it purchased from AHMIC.[13]  Relevant to this dispute are the

subordinated notes known as Series 2004-A Notes and Series 2005-A Notes.[14]

Standard & Poor's rated the Subordinated Notes "BBB," and Moody's rated the

Subordinated Notes "Baa2."[15]

 In June, 2005, AHMIC purchased the Series 2005-A Notes from Lehman in

the aggregate principal face amount of $53,125,000.  In July, 2007, AHMIC

purchased the Series 2004-A Notes in the aggregate principal face amount of

$31,000,000.[16]  Lehman agreed to finance both note purchases under the parties'

pre-existing master repurchase agreement ("MRA").[17]

 Later, in July, 2007, AHMIC and Lehman entered into a transaction under

the MRA (the "Subordinated Notes Transaction").  Under the Subordinated

Notes Transaction, AHMIC sold the Series 2004-A Notes and Series 2005-A Notes

---

[11] *Id.*

[12] *Id.*, ¶12.

[13] *Id.*

[14] *Id.*

[15] *Id.*, ¶13.  Neither rating agency took any action with respect to these notes until August 6, 2007. *Id.*

[16] *Id.*, ¶ 15.

[17] AHMIC, Lehman Brothers Inc. and Lehman Commercial Paper Inc. are parties to the MRA which was executed on November 4, 2003.  *Id.*, ¶ 16.

(collectively "Subordinated Notes" or "Notes") to Lehman pursuant to the MRA.[18]   Under the terms of the MRA, AHMIC was the "Seller" of the Subordinated Notes and one or more entities comprising or affiliated with Lehman was the "Buyer" of the Notes. [19]

After the initial sale of the Subordinated Notes, the MRA entitled Lehman to make margin calls when the market value of the Notes, as determined by a "generally recognized source," fell below a certain amount.[20]  If Lehman made a margin call, AHMIC was required to transfer to Lehman cash or additional securities, so that the value of the cash or additional securities or both combined with the aggregate value of the Subordinated Notes equaled or exceeded the aggregate Buyer's Margin Amount.[21]

Throughout July 2007, Lehman asserted that the market value of the Notes had dropped to 91 percent of their market value.[22]   Then on July, 23, 2007,

---

[18] _Id._, ¶ 18.   Lehman Brothers Inc. and Lehman Commercial Paper Inc. use the word "sold" to describe this element of the transaction.  AHMIC, however, disputes that the Subordinated Notes were sold.  The Court uses the word "sold" as a convenient way to describe the transaction.

[19] _Id._, ¶ 18.

[20] _Id._, ¶ 19.

[21] _Id._, ¶ 19.  The Buyer's Margin Amount is defined by the MRA as the Repurchase Price of the Subordinated Notes multiplied by a "Buyer's Margin Percentage." _Id._, Ex. A, p. 2 (§ 2(c)).  The Buyer's Margin Percentage is a percentage either agreed to by the parties to the MRA or, "in the absence of any such agreement, the percentage obtained by dividing the Market Value of the [Subordinated Notes] on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction." _Id._, Ex. A, p. 2 (§ 2(d)).

[22] _Id._, ¶¶ 23 – 28.

Lehman made a margin call.[23]    While AHMIC disagreed with Lehman's characterization of the Notes' value, it satisfied this margin call.[24]

On July 26, 2007, Lehman asserted that the value of the Subordinated Notes had fallen to 80 percent of their face value and that this drop entitled Lehman to make a second margin call.[25]    AHMIC did not satisfy this margin call.[26]

On August 1, 2007, Lehman sent notice ("Pre-Petition Default Notice") to AHMIC stating that its failure to pay the latest margin constituted an event of default and that Lehman reserved all of its rights under the MRA.[27]    AHMIC and its affiliated debtors and debtors in possession sought protection under chapter 11 on August 6, 2007.[28]    Subsequently, on August 27, Lehman issued the Post-Petition Foreclosure Notice in which it notified AMHIC that "it had terminated the MRA and that it either had foreclosed or intended to foreclose on the [Subordinated Notes] in lieu of selling them to a third party."[29]    In addition, Lehman notified AHMIC that the market value of the Notes was 68.25 percent of

---

[23] _Id._, ¶ 27.    In the Complaint, AHMIC refers to the July 23, 2007 margin call as the "First Margin Call," despite the fact that Lehman made a previous margin call on March 16, 2007.

[24] _Id._, ¶ 28.

[25] _Id._, ¶¶ 30 – 32.    Again, AHMIC refers to the July 26, 2007 margin call as the "Second Margin Call" despite the March 16 and July 23, 2007 margin calls.

[26] _Id._, ¶ 33.

[27] _Id._, ¶ 36.

[28] _Id._, ¶ 40.

[29] _Id._, ¶ 41.

face value.[30]    After these events, "Lehman held itself out to third parties, including the Indenture Trustee with respect to the Subordinated Notes, as the owner of the [Notes.]"[31]

## LEGAL DISCUSSION

### I.  The Standard for Evaluating a Motion to Dismiss

A motion under Rule 12(b)(6) serves to test the sufficiency of the factual allegations in the plaintiff's complaint.[32]  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level."[33]  In deciding a motion to dismiss, the Court must "accept all factual allegations in the complaint as true."[34]  In addition, the Court will "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."[35]  Furthermore, "[t]he issue is not whether a plaintiff will ultimately prevail but whether he or she is entitled to offer evidence to support the claims."[36]

---

[30] *Id.*, ¶ 42.

[31] *Id.*, ¶ 43.

[32] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

[33] *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-1965 (2007).

[34] *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007).

[35] *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) (*quoting Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n. 7 (3d Cir. 2002)).

[36] *Ballentine v. U.S.*, 486 F.3d 806, 810 (3d Cir. 2007) (*quoting Oatway v. Am. Int'l Group, Inc.*, 325 F.3d 184, 187 (3d Cir. 2003)).

II. **The Master Repurchase Agreement In This Case Is A "Repurchase Agreement" Under The Statute And The "Safe Harbor" Provisions Of Sections 559 And 555 Of The Bankruptcy Code Are Applicable.**

   a. **Background**

In *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer S&L Ass'n.*, the Third Circuit succinctly described the nature of the agreement before the Court:

> A standard repurchase agreement, commonly called a "repo," consists of a two-part transaction. The first part is the transfer of specified securities by one party, the dealer, to another party, the purchaser, in exchange for cash. The second part consists of a contemporaneous agreement by the dealer to repurchase the securities at the original price, plus an agreed upon additional amount on a specified future date. A "reverse repo" is the identical transaction viewed from the perspective of the dealer who purchases securities with an agreement to resell.[37]

As this Court recently discussed in *Calyon N.Y. Branch v. Am. Home Mortg. Corp.*, the market for repurchase agreements is a critical component of, not only the U.S. financial market, but global financial markets as well.[38]  To protect the liquidity of repurchase agreements, the Bankruptcy Code provides special protections to non-debtor counterparties.  Without these special protections, or safe harbors as they are known, the bankruptcy of a counterparty to a repurchase agreement would impair the liquidity of the repurchase agreement and possibly lead to the bankruptcy of the non-debtor counterparties.

---

[37] *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer S&L Ass'n. (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.)*, 878 F.2d 742, 743 (3d Cir. 1989).

[38] *Calyon N.Y. Branch v. Am. Home Mortg. Corp. (In re Am. Home Mortg., Inc.)*, 379 B.R. 503, 512 (Bankr. D. Del. 2008).

One such special protection applies to *ipso facto* clauses.  *Ipso facto* clauses are found in many contracts and allow one party to terminate the contract because the other party files for bankruptcy.  The Bankruptcy Code generally prohibits non-debtor counterparties from enforcing an *ipso facto* clause.[39]  Section 559 of the Bankruptcy Code provides an exception to this general rule and allows a non-debtor counterparty to a "repurchase agreement" (as defined by section 101(47) of the Bankruptcy Code) to exercise its contractual right under an *ipso facto* clause to liquidate, terminate or accelerate the repurchase agreement.[40] Section 555 provides a similar protection for the non-debtor counterparty to a "securities contract" (as defined by section 741 of the Bankruptcy Code).[41]  Thus, if the provisions of either section 559 or 555 are satisfied, enforcement of the non-debtor counterparty's rights under an *ipso facto* clause is not prohibited by section 365(e) or section 362(a) of the Bankruptcy Code.

The MRA contains such an *ipso facto* clause.  Specifically, the MRA provides that upon an "Event of Default," the nondefaulting party may:

> [I]mmediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder, or . . . elect . . . to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date,

---

[39] 11 U.S.C. § 365(e); *see also In re Am. Home Mortg., Inc.*, 379 B.R. at 513.

[40] 11 U.S.C. §559.

[41] 11 U.S.C. §§ 555 and 741.

obtained from a generally recognized source . . . against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder . . .[42]

Under the MRA an "Event of Default" includes an "Act of Insolvency," which is defined by the MRA to include, "[t]he commencement by such party as debtor of any case or proceeding under any bankruptcy . . . law . . ."[43]  Therefore, on August 6, 2007, when AHMIC filed for bankruptcy, an Event of Default occurred under the MRA.  Simultaneously, the appropriate Lehman counterparty to the Subordinated Notes Transaction ("Lehman Counterparty") became entitled to exercise it rights under the MRA's *ipso facto* clause.

Turning to Defendants' Motion to Dismiss, if the MRA is a "repurchase agreement," the Court must dismiss the Plaintiff's request for a declaration that, "the MRA is not a 'repurchase agreement' as defined in section 101(47) . . ."[44]  If the Court finds that the MRA is a "securities contract," the Court must dismiss the Plaintiff's request for a declaration that, "Lehman is not entitled to the 'securities contract' safe harbor of section 555 . ."[45]  Finally, if the Court finds that the MRA is either a "securities contract" or a "repurchase agreement" or both, the Court must dismiss the Plaintiff's request for a declaration that, "Lehman violated the automatic stay imposed under section 362(a) of the Bankruptcy

---

[42] Complaint, Ex. A, p. 8 (§ 11(d)(i)).

[43] *Id.*, Ex. A, p. 1 (§ 2(a)).

[44] *Id.*, p. 16.

[45] *Id.*.

Code by terminating the MRA and foreclosing on and/or liquidating the AHMIC-Owned Notes…"[46]

### b. Section 559 of the Bankruptcy Code Applies to the MRA

In the Complaint, the Plaintiff seeks a declaration that:

> [T]he MRA is not a "repurchase agreement" as defined in section 101(47) of the Bankruptcy Code because the Subordinated Notes do not meet the definition of "mortgage related securities (as defined in section 3 of the Securities and Exchange Act of 1934)" when they were rated "BBB" by Standard & Poor's and "Baa2" by Moody's.[47]

The Defendants argue that the Lehman Counterparty is entitled to the safe harbor protections of section 559 because the MRA is a "repurchase agreement."[48]  Accordingly, the Court must determine whether the MRA is a "repurchase agreement."

Section 101(47) of the Bankruptcy Code, in relevant part, defines "repurchase agreement" as:

> [A]n agreement, including related terms, which provides for the transfer of one or more… mortgage related securities (as defined in section 3 of the Securities Exchange Act of 1934), mortgage loans, interests in mortgage related securities or mortgage loans… against the transfer of funds by the transferee of such… mortgage loans, or interests, with a simultaneous agreement by such transferee to transfer to the transferor thereof… mortgage loans, or interests of the kind as described in this clause, at a date certain not later than 1 year after such transfer or on demand, against the transfer of funds . . .[49]

---

[46] _Id._.

[47] _Id._.

[48] Motion to Dismiss, p. 11.

[49] 11 U.S.C. § 101(47).  An agreement to transfer various other financial instruments may also be a "repurchase agreement."  However, as no party argued that the Subordinated Notes were one of these other financial instruments,  the Court will not address them in its analysis.

No other criteria are set forth in the statute for a contract to be considered a repurchase agreement under the Bankruptcy Code.

To determine whether the MRA is a "repurchase agreement" the Court must make a two-part inquiry. First, the Court must determine if the Subordinated Notes qualify as either mortgage related securities, mortgage loans, interests in mortgage related securities or interests in mortgage loans. Second, the Court must determine if the structure of the MRA follows the structure of a "repurchase agreement" as defined by the Bankruptcy Code.

### i.  The Subordinated Notes are Interests in Mortgage Loans

Having addressed the requirements of a "repurchase agreement" under the Bankruptcy Code, the Court turns to the first step in its inquiry, i.e., whether the Subordinated Notes qualify as mortgage related securities, mortgage loans, interests in mortgage related securities or interests in mortgage loans.

The Bankruptcy Code defines the term "mortgage related securities" by incorporating the definition of the term contained in section 3 of the Securities Exchange Act of 1934.[50]  The Securities Exchange Act of 1934 defines "mortgage related securities," in relevant part, as "a security that is rated in one of the two highest rating categories by at least one nationally recognized statistical rating organization…"[51]

---

[50] 11 U.S.C. § 101(47)(A)(i).

[51] Securities and Exchange Act of 1934, 15 U.S.C. § 78c.

As discussed above, after Broadhollow issued the Subordinated Notes, the notes were rated by Standard and Poor's as "BBB" and by Moody's as "Baa2."[52] Standard and Poor's and Moody's provide, among many other services, nationally recognized credit ratings for various debt instruments. Standard and Poor's system of credit evaluation rates default risk on a scale of from AAA to D, with intermediate ratings of AA, A, BBB, BB, B, CCC, CC, and C.[53] Moody's system of credit evaluation rates default risk on a scale of from Aaa to C, with intermediate ratings of Aa, A, Baa, Ba, B, Caa and Ca (1s, 2s or 3s are added within each category to indicate the high, middle or low end of the range).[54]

Accordingly, the Subordinated Notes are not "mortgage related securities" because neither Standard and Poor's nor Moody's gave the Subordinated Notes one of their two highest ratings. Thus, in order to qualify as a "repurchase transaction," the Subordinated Notes must qualify as mortgage loans, interests in mortgage related securities or interests in mortgage loans.[55] The Court's analysis of these three terms is complicated by the fact that none are defined by the Bankruptcy Code.

---

[52] *Id.*, ¶ 13.

[53] http://www2.standardandpoors.com/portal/site/sp/en/us/page.article/2,1,1,4,120483406720 8.html#ID213

[54] James M. Peaslee and David Z. Nirenberg, *Distinguishing Sales from Financings and Debt from Equity*, 791 PLI/Tax 9, *165 (2007).

[55] *See* 11 U.S.C. § 101(47)(A).

To determine the meaning of each of these terms, the Court must begin by giving the language of each its ordinary meaning.[56]   As the Supreme Court recently observed in *Hartford Underwriters Ins. Co. v. Union Planters Bank*, "when a statute's language is plain, the sole function of the courts, at least where the disposition by the text is not absurd, is to enforce it according to its terms."[57] With this principle in mind, the Court turns to the analysis of whether the Subordinated Notes qualify as mortgage loans, interests in mortgage related securities or interests in mortgage loans.

The Court will first examine the term "interests in mortgage related securities."   While the Bankruptcy Code does not define "interests in mortgage related securities," the Code does define the term "mortgage related securities." From a plain reading of the statute, it is clear that "interests in mortgage related securities" must be some interest in "mortgage related securities."   The term "interest" in this context means "a financial share or stake in something: the relation of being one of the owners or beneficiaries of an asset, company, etc."[58]

---

[56] *In re Am. Home Mortg., Inc.*, 379 B.R. at 514-15.  *See also* Hon. Thomas F. Waldron and Neil M. Berman, *Principled Principles of Statutory Interpretation: A Judicial Perspective After Two Years of BAPCPA*, 81 AM. BANKR. L.J. 195, 211 (2007).

[57] *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S. Ct. 1942, 147 L. Ed. 2d 1 (2000). *See also United States v. Ron Pair Enters.*, 489 U.S. 235, 240, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1989); *Caminetti v. United States*, 242 U.S. 470, 485, 37 S. Ct. 192, 61 L. Ed. 442 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms.").

[58] I SHORTER OXFORD ENGLISH DICTIONARY, p. 1408 (6th ed. 2007).

Thus, the term "interests in mortgage related securities" means a financial share or stake in "mortgage related securities."

The Subordinated Notes are not "mortgage related securities" because of the ratings they received from Standard and Poor's and Moody's.  It follows that, since the Subordinated Notes are not "mortgage related securities," they cannot constitute an "interest" in mortgage related securities.  Therefore, the Defendants are left with two options: the Subordinated Notes must either be "mortgage loans" or "interests in mortgage loans."

The Defendants argue that the Subordinated Notes are "interests in mortgage loans" because the Notes are secured by the mortgage loans Broadhollow purchased from one or more of the Debtors.[59]  The Plaintiff, however, disagrees with this reading of the term "interests in mortgage loans."

As discussed earlier, the 1934 Act requires that "mortgage related securities" receive one of the two highest credit ratings.  The 1934 Act also has a second criteria, and one way securities can meet this criteria is if the securities are secured by mortgage loans.  The Plaintiff argues that it was not Congress' intent for notes which fail to meet the first element of the 1934 Act's definition of "mortgage related securities," but meet the second element, to nonetheless qualify as "interests in mortgage loans."  For the Plaintiff, such a reading "eviscerates the 'mortgage related securities' definition, and . . . its reference to

---

[59] Motion to Dismiss, p. 13.

the 1934 Act."[60]    And, "[i]f Congress had intended this result, it could simply have eliminated the requirement that 'mortgage related securities' satisfy the 1934 Act."[61]

The Plaintiff's reading, however, leads to a different, but equally troubling, result.   The Plaintiff argues essentially that the 1934 Act's rating requirement must be read into the definition of "interests in mortgage loans."   If Congress intended such a result it easily could have required that "interests in mortgage loans" also achieve one of the two highest credit ratings.   It did not. Congress specifically provided that the 1934 Act's requirements would only apply to "mortgage related securities."

The Court agrees with the Defendants that the Subordinated Notes are "interests in mortgage loans."    The Subordinated Notes were issued by Broadhollow and secured by mortgage loans owned by Broadhollow.[62]   Clearly, the mortgage loans owned by Broadhollow would qualify as "mortgage loans" as the term is used in section 101(47)(A).   The Subordinated Notes, however, are not "mortgage loans."    Rather, they are a payment obligation secured by Broadhollow's mortgage loans.  The Bankruptcy Code defines "security interest" to mean a "lien created by an agreement."[63]    Thus, a holder of the Subordinated

---

[60] <u>Plaintiffs' Answer</u>, p. 27.

[61] <u>Id.</u>, p. 28.

[62] <u>Complaint</u>, ¶ 12 ("Broadhollow also issued certain subordinated notes (the 'Subordinated Notes'), which were likewise secured by the mortgage loans.").

[63] 11 U.S.C. § 101(51).

Notes holds a lien on the mortgage loans owned by Broadhollow. "Lien" is defined by the Bankruptcy Code as a "charge against **or interest in property** to secure payment of a debt or performance of an obligation."[64] Therefore, a holder of the Subordinated Notes holds an interest in the mortgage loans owned by Broadhollow, or, more simply put, an interest in mortgage loans. Accordingly, the Subordinated Notes are "interests in mortgage loans" as the term is used in section 101(47)(A).

### ii. The MRA is a Repurchase Agreement

Since the Subordinated Notes are interests in mortgage loans under the Bankruptcy Code, the MRA will qualify as a repurchase agreement if the MRA (i) provides for the transfer of one or more interests in mortgage loans; (ii) against the transfer of funds by the transferee of such interests in mortgage loans; (iii) with a simultaneous agreement by such transferee to transfer to the transferor thereof interests in mortgage loans; (iv) at a date certain not later than 1 year after such transfer or on demand; and (v) against the transfer of funds.[65]

The terms of the MRA which are relevant to this analysis provide that:

From time to time the parties hereto may enter into transactions in which one party ("Seller") agrees to transfer to the other ("Buyer") securities or other assets ("Securities") against the transfer of funds by Buyer, with a simultaneous agreement by Buyer to transfer to Seller such Securities at a date certain or on demand, against the transfer of funds by Seller.[66]

---

[64] 11 U.S.C. § 101(37) (emphasis added).

[65] *See In re Am. Home Mortg., Inc.,* 379 B.R. at 518 (applying 11 U.S.C. § 101(47)).

[66] Complaint, Exhibit A. p. 1.

The Court concludes that the terms of the MRA satisfy the elements of a "repurchase agreement."

First, the MRA provides for the transfer of one or more interests in mortgage loans.

Second, the transfer of one or more interests in mortgage loans from the Seller to the Buyer is against the transfer of funds from the Buyer to the Seller.

Third, the MRA contains a simultaneous agreement by the Buyer to transfer the interest in mortgage loans to the Seller.

Fourth, the transfer of interests in mortgage loans from Buyer to the Sellers occurs at a date certain or on demand.

Fifth, the transfer of the interests in mortgage loans from the Buyer to the Seller is against the transfer of funds by the Seller to the Buyer.

The Court concludes that section 559 of the Bankruptcy Code is applicable, as the sale and repurchase of the Subordinated Notes under the MRA is a repurchase agreement. No further criteria must be met.[67] Accordingly, the Court will dismiss the Plaintiff's second request for declaratory judgment.[68]

---

[67] *In re Am. Home Mortg., Inc.*, 379 B.R. at 518.

[68] Complaint, p. 16.

### c. Section 555 of the Bankruptcy Code Applies to the MRA

In the Complaint, the Plaintiff seeks a declaration that:

> Lehman is not entitled to the "securities contract" safe harbor of section 555 of the Bankruptcy Code because the Lehman entity that was counterparty to the MRA and the relevant transactions relating to the Subordinated Notes is not a "stockbroker, financial institution, financial participant, or securities clearing agency . . .[69]

The Defendants argue that Lehman Brothers is entitled to the safe harbor protections of section 555 because the MRA is a "securities contract" and Lehman Brothers, the sole Lehman Counterparty to the Subordinated Notes Transaction, is a "stockbroker" as the terms are defined by the Bankruptcy Code.[70] Accordingly, the Court must determine whether Lehman Brothers is the sole Lehman Counterparty and, if so, whether the MRA is "securities contract" and Lehman Brothers is a "stockbroker."

### i. Lehman Brothers is the Sole Lehman Counterparty to the Subordinated Notes Transaction.

As discussed above, both Lehman Brothers and Lehman Commercial Paper were parties to the MRA with AHMIC. But, under the terms of the MRA, "[u]pon agreeing to enter into a Transaction hereunder, Buyer or Seller (or both), as shall be agreed, shall promptly deliver to the other party a written confirmation of each Transaction ('a Confirmation'). The Confirmation shall…

---

[69] *Id.*

[70] <u>Motion to Dismiss, p. 8</u>.  The Defendants also argue that Lehman Brothers is entitled to the protections of section 555 because Lehman Brothers is a "financial participant."  As the Court finds that Lehman Brothers is a "stockbroker," an analysis of whether Lehman Brothers is a "financial participant" is unnecessary.

identify Buyer and Seller…"[71]    Thus, the MRA anticipated that transactions occurring under it might involve Lehman Brothers and not Lehman Commercial Paper, and vice versa.

With respect to the Subordinated Notes Transaction at the center of this dispute, the Plaintiff argues that it is not clear whether Lehman Commercial Paper or Lehman Brothers or both were the Lehman Counterparty to the Subordinated Notes Transaction.[72]    Therefore, the Plaintiff argues, given the procedural posture of this proceeding, it would be inappropriate for the Court to decide what Lehman entity or entities were the Lehman Counterparty to the Subordinated Notes Transaction.    Thus, the Plaintiff continues, its third request for a declaratory judgment should survive the Defendants' Motion to Dismiss. The Defendants attempt to refute this argument by drawing the Court's attention to two trading confirmations ("Trading Confirmations").

The Defendants included the Trading Confirmations in an affidavit in support of their Response.    Typically, courts deciding a motion to dismiss only consider allegations contained in the complaint and exhibits attached to the complaint.[73]    Therefore, as an initial matter, the question arises as to whether the Court may consider the Trading Confirmations on a motion to dismiss.

---

[71] Complaint, Exhibit A, p. 3.

[72] Plaintiffs' Answering Brief, p. 30.

[73] *Pension Benefit Guar. Corp. v. White Consol. Ind., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

In the Third Circuit, when evaluating a motion to dismiss courts may considered a document which is not part of the complaint if that document is "'**integral to or explicitly relied upon** in the complaint.'"[74]    According to the MRA, the terms of the MRA combined with trading confirmations make up the terms of each individual transaction under the MRA.[75]    As the terms of the MRA and the Subordinated Notes Transaction are central to the Plaintiff's Complaint, therefore, so too are the Trading Confirmations.    Thus, the Trading Confirmations meet the standard of "'document **integral to or explicitly relied upon** in the complaint.'"[76]    Accordingly, the Court will consider the Trading Confirmations in evaluating the Motion to Dismiss.

As discussed above, the trading confirmations, *inter alia*, identify the buyer and seller to each transaction under the MRA.  The Trading Confirmations provided by the Defendants show that Lehman Brothers was the sole Lehman Counterparty to the Subordinated Notes Transaction.[77]    Therefore, in evaluating the Plaintiff's third request for declaratory judgment, the Court need only determine whether Lehman Brothers qualifies for the safe harbor protections of section 555.

---

[74] *In re Rockefeller Center Properties, Inc. Securities Litigation*, 184 F.3d 280, 287 (3d Cir. 1999) (*quoting In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)) (emphasis in original).

[75] Complaint, Exhibit A, p. 3 ("The Confirmation, together with this Agreement [i.e., the MRA], shall constitute conclusive evidence of the terms agreed between Buyer and Seller with respect to the Transaction to which the Confirmation relates… .")

[76] *In re Rockefeller Center Properties, Inc. Securities Litigation*, 184 F.3d 280, 287 (3d Cir. 1999) (*quoting In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)) (emphasis in original).

[77] Rosenberg Affidavit II, Exhibit A., pp. 1-2.  Specifically, the Trading Confirmations state "Lehman Brothers Inc. as principal we bought from you:"

The safe harbor protections of section 555 of the Bankruptcy Code extend to a stockbroker, financial institution, financial participant, or securities clearing agency which seeks to exercise its contractual right to cause the liquidation, termination, or acceleration of a securities contract.[78]  Therefore, Lehman Brothers will qualify for the safe harbor protections of section 555 if [1] the MRA is a "securities contract," and [2] Lehman Brothers is either a "stockbroker," "financial institution," "financial participant," or "securities clearing agency," as the terms are defined by the Bankruptcy Code.

### ii.  The MRA is a Securities Contract

The term "securities contract" is defined in section 741 of the Bankruptcy Code as "a contract for the purchase, sale, or loan of a . . . mortgage loan, [or] any interest in a mortgage loan . . . and including any repurchase or reverse repurchase transaction on any such . . . mortgage loan, [or] interest [in a mortgage loan] . . . (whether or not such repurchase or reverse repurchase transaction is a 'repurchase agreement', as defined in section 101)."[79]  As the Court has already determined that the MRA is a "repurchase agreement" and that the Subordinated Notes are "interests in mortgage loans," the MRA therefore is a "securities contract."

---

[78] *See* 11 U.S.C. § 555.

[79] 11 U.S.C. § 741(7)(A)(i).  A "securities contract" is also a master agreement that provides for an agreement or transaction referred to in § 741(A)(i).  11 U.S.C. § 741(A)(x).

### iii.  Lehman Brothers is a Stockbroker

The term "stockbroker" is defined in section 101(53A) of the Bankruptcy Code as a "person, with respect to which there is a customer, as defined in section 741 of this title; and that is engaged in the business of effecting transactions in securities for the account of others; or with members of the general public, from or for such person's own account."[80]   Therefore, for the Court to find that Lehman Brothers is a stockbroker, it must find that, [1] Lehman Brothers is in the business of effecting securities transactions for itself, others or the general public; and that [2] Lehman Brothers has "customers," as the term is defined in section 741 of the Bankruptcy Code.   The Defendants attempt to support their argument that Lehman Brothers meets the first element by attaching to their Response the Form 10-Q for Lehman Brothers Holdings, Inc.[81]

As discussed earlier, when evaluating a motion to dismiss courts may considered a document which is not part of the complaint if that document is "'**integral to or explicitly relied upon** in the complaint.'"[82]   As the Form 10-Q for Lehman Brothers Holdings is not part of the Complaint, the Court will, therefore, turn to whether the Form 10-Q for Lehman Brothers Holdings, Inc. meets this standard.

---

[80] 11 U.S.C. § 101(53A).  The term "person" as used in the section 101(53A) is also defined by the Bankruptcy Code and includes an individual, partnership and corporation.  11 U.S.C. § 101(41).

[81] Lehman Brothers Inc. is a subsidiary of Lehman Brothers Holdings, Inc.

[82] *In re Rockefeller Center Properties, Inc. Securities Litigation*, 184 F.3d 280, 287 (3d Cir. 1999) (*quoting In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)) (emphasis in original).

In the Complaint, the Plaintiff seeks a declaration that "Lehman [i.e., Lehman Brothers and Lehman Commercial Paper] is not entitled to the 'securities contract' safe harbor of section 555 of the Bankruptcy Code because the Lehman entity that was counterparty the relevant transactions relating to the Subordinated Notes is not a 'stockbroker, financial institution, financial participant, or securities clearing agency . . .'" Thus, the Plaintiff's argument depends on the Bankruptcy Code's definition of these terms.

If one looks at the these definitions, it is clear that the Form 10-Q for Lehman Brothers Holdings, Inc. is one, if not the only, source for the information the Court requires in order to determine whether Lehman Brothers is a "'stockbroker," "financial institution," "financial participant," or "securities clearing agency."[83]    For example, the definition of "financial participant"

---

[83] 11 U.S.C. § 101(53A) - The term "stockbroker" means person—

    (A) with respect to which there is a customer, as defined in section 741 of this title; and

    (B) that is engaged in the business of effecting transactions in securities—

        (i) for the account of others; or

        (ii) with members of the general public, from or for such person's own account.

11 U.S.C. § 101(22) - The term "financial institution" means—

    (A) a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity and, when any such Federal reserve bank, receiver, liquidating agent, conservator or entity is acting as agent or custodian for a customer (whether or not a "customer", as defined in section 741) in connection with a securities contract (as defined in section 741) such customer; or

    (B) in connection with a securities contract (as defined in section 741) an investment company registered under the Investment Company Act of 1940.

11 U.S.C. §101(22A) - The term "financial participant" means—

    (A) an entity that, at the time it enters into a securities contract, commodity contract, swap agreement, repurchase agreement, or forward contract, or at the time of the date of

requires that an entity have one or more various agreements or transactions with the debtor or any other entity (other than an affiliate) of a total gross dollar value of not less than $1 billion. The definition of "financial institution" requires a court to inquire into whether an entity is a "is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity . . ." Finally, the definition of "securities clearing agency" requires a court to determine whether an entity is "registered as a clearing agency under section 17A of the Securities Exchange Act of 1934 . . ."

Therefore, the Form 10-Q of Lehman Brothers Holdings, Inc., is certainly integral to the Plaintiff's request for a declaratory judgment that "the Lehman entity that was counterparty to the MRA and the relevant transactions relating to the Subordinated Notes is not a 'stockbroker, financial institution, financial

---

the filing of the petition, has one or more agreements or transactions described in paragraph (1), (2), (3), (4), (5), or (6) of section 561 (a) with the debtor or any other entity (other than an affiliate) of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding (aggregated across counterparties) at such time or on any day during the 15-month period preceding the date of the filing of the petition, or has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements or transactions with the debtor or any other entity (other than an affiliate) at such time or on any day during the 15-month period preceding the date of the filing of the petition; or

(B) a clearing organization (as defined in section 402 of the Federal Deposit Insurance Corporation Improvement Act of 1991).

11 U.S.C. §101(48) - The term "securities clearing agency" means person that is registered as a clearing agency under section 17A of the Securities Exchange Act of 1934, or exempt from such registration under such section pursuant to an order of the Securities and Exchange Commission, or whose business is confined to the performance of functions of a clearing agency with respect to exempted securities, as defined in section 3(a)(12) of such Act for the purposes of such section 17A.

participant, or securities clearing agency . . .'"[84]    Accordingly, in deciding the Motion to Dismiss, the Court will consider the 10-Q of Lehman Brothers Holdings, Inc. contained in the Affidavit attached to the Defendants' Response.

Turning back to the analysis of whether Lehman Brothers is a "stockbroker," the Court begins with whether Lehman Brothers meets the first requirement of the "stockbroker" definition, i.e., whether Lehman Brothers is in the business of effecting securities transactions.    The 10-Q contained in the Defendants' Affidavit demonstrates that Lehman Brothers is a U.S. registered broker-dealer.[85]    The Securities and Exchange Act of 1934, which governs U.S. brokers and dealers, defines "broker" and "dealer."    As defined, a "broker" is "any person engaged in the business of effecting transactions in securities for the account of others;" and the term "dealer" is defined as "any person engaged in the business of buying and selling securities for such person's own account, through a broker or otherwise."[86]    As a registered broker-dealer, Lehman Brothers in the ordinary course of its business engages in effectuating transactions in securities for the account of others, with the general public, and for its own account.    Thus, Lehman Brothers meets the first element of a "stockbroker."

---

[84] Complaint, p. 16.  *See also In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 293 (3d Cir. 1999).

[85] Rosenberg Affidavit II, Exhibit B, p. 10.

[86] Securities and Exchange Act of 1934, 15 U.S.C. § 78c.

In addition to being in the business of effecting securities transactions, in order for Lehman Brothers to qualify as a "stockbroker" it must have "customers," as the term is defined in section 741.[87]  Courts interpreting the definition of "customer" have held that, "[a]n investor qualifies as a customer when the investor deposits money or securities with the [stockbroker] with the expectation that the [stockbroker] purchase stock or trade securities."[88]  As a registered broker-dealer, by definition, Lehman Brothers has "customers." Therefore, Lehman Brothers meets the second element of the definition of "stockbroker."

As the Court concludes that the MRA is a securities contract and Lehman Brothers is a stockbroker, section 555 of the Bankruptcy Code applies to the

---

[87] 11 U.S.C. § 741(2)

"customer" includes —

(A) entity with whom a person deals as principal or agent and that has a claim against such person on account of a security received, acquired, or held by such person in the ordinary course of such person's business as a stockbroker, from or for the securities account or accounts of such entity —

(i) for safekeeping;

(ii) with a view to sale;

(iii) to cover a consummated sale;

(iv) pursuant to a purchase;

(v) as collateral under a security agreement; or

(vi) for the purpose of effecting registration of transfer.

[88] *WesBanco Bank Barnesville v. Rafoth (In re Baker & Getty Financial Services, Inc.)*, 106 F.3d 1255, 1260 (6th Cir. 1997); *see also Johnson v. Neilson (In re Slatkin)*, ___ F.3d ___, 2008 WL 1946739, *8 (9th Cir. May 6, 2008); *Wider v. Wooton*, 907 F.3d 570, 572-73 (5th Cir. 1990); *Tew v. Resource Mgmt (In re ESM Gov't Sec. Inc.)*, 812 F.2d 1374, 1376 (11th Cir. 1987); *see also* S.Rep. No. 989, 95th Cong., 2d Sess. 100 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5886 (The definition of customer in Section 741 is intended to "include anybody that interacts with the [stockbroker] in a capacity that concerns security transactions.").

MRA. Accordingly, the Court will dismiss the Plaintiff's third request for declaratory judgment.[89]

### d. As the Safe Harbor Protections of Section 559 and 555 Apply to the MRA, Lehman Brothers Did Not Violate the Automatic Stay Imposed By Section 362(a) of the Bankruptcy Code When It Exercised Its Rights Under the MRA

Under the Subordinated Notes Transaction, the MRA deemed AHMIC as the "Seller" and Lehman Brothers as the "Buyer." The MRA further provided that if the "Seller" defaults, the "Buyer" may immediately sell the "Purchased Securities" (i.e., the Subordinated Notes) and apply the proceeds from that sale to any amounts which the "Seller" owes, or elect to credit the amount owing in an amount equal to the price of the "Purchased Securities."[90] The MRA outlined the circumstances under which a party would be in default; the MRA defined these circumstances as "Events of Default."[91] One such "Event of Default" was the commencement of a bankruptcy proceeding. Therefore, under the terms of the MRA, an "Event of Default" occurred when AHMIC filed its bankruptcy petition in August, 2007. Thus, Lehman Brothers, as the "Buyer" in the Subordinated Notes Transaction, became entitled to, and did exercise its rights under the MRA's *ipso facto* clause.

The automatic stay imposed by section 362(a) of the Bankruptcy Code generally prohibits a party from enforcing an *ipso facto* clause. Accordingly, in

---

[89] Complaint, p. 16.

[90] *Id.*, Ex. A, p. 8 (§11(d)(i)).

[91] *Id.*, Ex. A, p. 8 (§11).

the Complaint, the Plaintiff seeks a declaration that, "Lehman violated the automatic stay imposed under section 362(a) of the Bankruptcy Code by terminating the MRA and foreclosing on and/or liquidating the AHMIC-Owned Notes . . ."[92]  However, as discussed earlier, the Bankruptcy Code provides exceptions to this general rule.   As the Court has decided that the Subordinated Notes Transaction under MRA is "repurchase agreement," and that the MRA is a "securities contract" and Lehman Brothers is a "stockbroker," the safe harbor protections of sections 559 and 555 apply.  Thus, Lehman Brothers may enforce its rights under the MRA triggered by a condition of the kind specified in section 365(e)(1) of the Bankruptcy Code.  As the MRA's *ipso facto* clause is of a kind specified in section 365(e)(1), the Defendants did not violate the automatic stay by foreclosing on and/or liquidating the Subordinated Notes.  Accordingly, the Court will dismiss the Plaintiff's first request for declaratory relief.

## III.  Applicability of Article 9 to the MRA

In the Plaintiff's fourth request for declaratory relief the Plaintiff seeks a declaration that:

> (i) Lehman's foreclosure and/or liquidation of the AHMIC-Owned Notes, is governed by Article 9 of the N.Y.U.C.C., § 901, *et seq*., and, at all times Lehman was required to act in a commercially reasonable manner and (ii) any damages AHMIC incurred as a consequence of Lehman's failure to comply with those standards and Article 9 shall be determined in accordance with section 562 of the Bankruptcy Code . . .[93]

---

[92] *Id.*, p. 16.

[93] *Id.*.

Article 9 of the Uniform Commercial Code has a definitive scope, and, in order for the Subordinated Notes Transaction to be governed by Article 9, it must fall somewhere within that scope.  The Plaintiff represents that the MRA creates a security interest in the Subordinated Notes.[94]  Alternatively, if the MRA is found to be a purchase and sale agreement, the Plaintiff argues that Article 9 applies, nonetheless, because the Subordinated Notes qualify as both "promissory notes" and "payment intangibles" and Article 9 applies to the sale of "promissory notes" or "payments intangibles."[95]

**a.    The Intent Of The Parties To The MRA Is Relevant To This Court's Consideration Of Whether Article 9 of the Uniform Commercial Code Applies To The MRA**

Article 9 applies to a transaction "regardless of its form, that creates a security interest in personal property or fixtures by contract . . ."[96]  The Plaintiff argues that the Section 6 of the MRA creates a security interest in Purchased Securities, i.e., the Subordinated Notes.  Section 6 of the MRA, entitled "Security Interest," provides:

> Although the parties intend that all Transactions hereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, Seller shall be deemed to have pledged to Buyer as security for the performance by Seller of its obligations

---

[94] Plaintiff's Answer, pp. 14-15.

[95] *Id.*, p. 18.  The Plaintiff also argues that because the MRA uses the term "commercial reasonableness" to describe the standard by which Lehman must liquidate Purchased Securities, the parties agreed to the specific commercial reasonableness standard under Article 9.  The Court is not persuaded that a reference to "commercial reasonableness," without any evidence that the reference is to Article 9's commercial reasonableness standard, implies that the parties agreed to Article 9's standard.

[96] N.Y. U.C.C. Rev. § 9-109(a)(1) (McKinney 2001).

> under each such Transaction, and shall be deemed to have granted
> to Buyer a security interest in, all of the Purchased Securities with
> respect to all Transactions hereunder and all Income thereon and
> other proceeds thereof.[97]

While it appears from an initial reading of this section that the parties to the

MRA did not intend to create a security interest in the Subordinated Notes, the

Plaintiff represents that this section creates a security interest in the Notes

nonetheless.

The Plaintiff first argues, quite simply, that, under the MRA, AHMIC

granted Lehman a security interest in Purchased Securities.[98]  To support this,

the Plaintiff emphasizes that Article 9 applies to a transaction, "**regardless of its**

**form, that creates a security interest in personal property or fixtures by**

**contract**."[99]  The Plaintiff reads the phrase "regardless of its form" to allow this

Court to ignore the stated intent of the parties and focus on the portion of Section

6 of the MRA, which provides for a security interest.

To further support this argument, the Plaintiff contrasts Former Section 9-

102(1) with its replacement, Revised Section 9-109(a)(1).  As discussed above,

Revised Section 9-109(a)(1) provides that Article 9 applies to "a transaction,

regardless of its form, that creates a security interest in personal property or

fixtures by contract . . ."  Former Section 9-102(1) provided that Article 9 applies

"to any transaction (regardless of its form) which is intended to create a security

---

[97] Complaint, Ex. A, p. 5 (§ 6).

[98] Plaintiff's Answer, p. 14.

[99] Id., p. 14. (emphasis in original).

interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts . . ."[100]  The Plaintiff interprets the deletion of the phrase "which is intended to create a security interest" as evidence that intent is no longer relevant to a court's consideration of whether a transaction creates a security interest.[101]  Thus, the Plaintiff concludes, this Court may ignore the parties stated intent in Section 6 of the MRA.

The Plaintiff is correct that Revised Section 9-109(a)(1) replaced Former Section 9-102(1).  Furthermore, the Plaintiff is correct that Former Section 9-102(1) provided that Article 9 applies "to any transaction (regardless of its form) which is intended to create a security interest . . ." and that Revised Section 9-109(a)(1) now states that Article 9 applies to "a transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract . . ."  However, the Court disagrees that this change eliminated the intent requirement from Former Section 9-102(1).  Official Comment 2 to N.Y. U.C.C. § 9-109 expressly states that "Subsection (a)(1) derives from former Section 9-102(1) and (2).  These subsections have been combined and shortened.  **No change in meaning is intended**."[102]  Thus, while the drafters deleted from the phrase "intended to create a security interest" in order to shorten the section, they did not intend to change the meaning of Former Section 9-102(1).  Moreover, the

---

[100] N.Y. U.C.C. Former § 9-102(a)(1) (McKinney 1990).

[101] Plaintiff's Answer, p. 16.

[102] Official Comment 2 to N.Y. U.C.C. Rev. § 9-109.  (McKinney 2001) (emphasis added).

Plaintiff's reading of the Revised Section 9-109(a)(1) conflicts with the principal of New York law that the intention of the contracting parties controls the interpretation of their contract.[103]

The Plaintiff also provides a second, related argument.  The Plaintiff argues that Article 9 still applies to the MRA even if Section 6 of the MRA creates a security interest that is contingent upon a court deeming a Transaction to be a loan.[104]  To support this, the Plaintiff reads Section 9-109(a)(1) to include such a "contingent" security interest because the section states Article 9 applies to "a transaction, regardless of its form, that creates a security interest."  As discussed below, the Court finds that the MRA is a purchase and sale agreement and not a loan.  Therefore, this "contingent" security interests does not arise in this case, and Article 9 does not apply.  Furthermore, the MRA cannot be simultaneously a purchase and sale agreement and an agreement which creates a security interest.  Therefore, the simple existence of a "contingent" security interest, whether or not the contingency ever occurs, also does not give rise to Article 9 applicability.

---

[103] *Excess Ins. Co. Ltd. v. Factory Mut. Ins.,*  822 N.E.2d 768, 770-71 (N.Y. 2004) ("In resolving the issue before us, we are mindful that in interpreting reinsurance agreements, as with all contracts, the intention of the parties should control.  To discern the parties' intentions, the court should construe the agreements so as to give full meaning and effect to the material provisions.") *see also Breed v. Insurance Co. of N. Am.,* 385 N.E.2d 1280, 1282 (N.Y. 1978) ("It is axiomatic that a contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed") (*quoting Morlee Sales Corp. v. Manufacturers Trust Co.,* 172 N.E.2d 280, 282 (N.Y. 1961)).

[104] Plaintiff's Answer, p. 15.

#### b. The MRA Provides For the Purchase And Sale of Securities Such As The Subordinated Notes Rather Than A Security Interest In The Securities

As stated above, under New York law, the intention of contracting parties controls a court's interpretation of their contract. Therefore, "[w]hen interpreting a contract, the court should arrive at a construction which will give fair meaning to all of the language employed by the parties to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized."[105]    Courts have applied this rule when interpreting repurchase agreements.[106]    Furthermore, if a contract is clear, a court will not look beyond the four corners of the document for evidence of meaning.[107]    As the relevant terms of the MRA are clear and unambiguous, their meaning is an issue of law, which the Court may considered in the context of a motion to dismiss.[108]

Turning to the four corners of the MRA, the Court notes that the parties expressed their intent, and that intent was "that all Transactions hereunder be sales and purchases and not loans."[109]    However, the MRA further states that "in

---

[105] *Joseph v. Creek & Pines*, 217 A.D.2d 534, 535 (2d Dep't 1995).

[106] *In re Criimi Mae, Inc.*, 251 B.R. 796, 801 (Bankr. D. Md. 2000) and *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 300 (S.D.N.Y. 1998).

[107] *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir. 1994) ("When parties have entered into an unambiguous contract, the court should look to the terms expressed in the contract itself rather than to 'extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable.'").

[108] *Retail Brand Alliance, Inc. v. Rockvale Outlet Center, LP*,  2007 WL 403885, *2 (E.D. Pa. Jan. 31, 2007) ("Courts can resolve contract disputes on a motion to dismiss 'if the claims under which the plaintiff seeks relief are barred by the unambiguous terms of a contract attached to the pleading, because the interpretation of an unambiguous contract is a matter of law for the court.'") (*quoting Jaskey Finance & Leasing v. Display Data Corp.*, 564 F.Supp. 160, 163 (E.D. Pa. 1983)).

[109] Complaint, Ex. A, p. 5 (§ 6).

the event any such Transactions are deemed to be loans, Seller shall be deemed . . . to have granted to Buyer a security interest in all of the Purchased Securities with respect to all Transactions hereunder and all Income thereon and other proceeds thereof."[110]   Therefore, if the Court determines that the Subordinated Notes Transaction is a loan, then, and only then, will the Buyer be deemed to have granted the Seller a security interest in the Subordinated Notes.

It is clear, however, from the unambiguous terms of the MRA that the Subordinated Notes Transaction is a sale and purchase agreements and not a loan.  First, the MRA denominated the parties "Buyer" and "Seller" rather than lender and borrow or secured creditor and debtor.[111]   The terms of the MRA provide that the Seller agrees to transfer to the Buyer securities or other assets against the transfer of funds by the Buyer.[112]   The MRA defines these securities or other assets as "Purchased Securities."[113]   The date on which the Purchased Securities are transferred by the Seller to the Buyer is defined by the MRA as the "Purchase Date."[114]   Also, the price at which the Purchased Securities are transferred by Seller to the Buyer is defined as the "Purchase Price."[115] Furthermore, the "Repurchase Price" is the price at which Purchased Securities

---

[110] *Id.*, Ex. A, p. 5 (§ 6).

[111] *Id.*, Ex. A, p. 1 (§ 1).

[112] *Id.*, Ex. A, p. 1 (§ 1).

[113] *Id.*, Ex. A, p. 3 (§ 2(p)).

[114] *Id.*, Ex. A, p. 2 (§ 2(n)).

[115] *Id.*, Ex. A, p. 3 (§ 2(o)).

are to be transferred from Buyer to Seller.[116]   The date on which the Seller is to repurchase the Purchased Securities from the Buyer is defined by the MRA as "Repurchase Date."[117]    Furthermore, the Trading Confirmations state that "Lehman Brothers Inc., as principal we bought from you [i.e., AHMIC] . . ."[118] Considering both the stated intent of the parties and the operative provisions of the MRA, the Court concludes that the MRA is a purchase and sale agreement.

Nevertheless, because Article 9 applies to certain purchase and sale agreements, Article 9 may still apply to the MRA.  Specifically, Article 9 applies to the sale of accounts, chattel paper, payment intangibles, and promissory notes, as the terms are defined by Article 9.[119]   The Plaintiff argues that the Subordinated Notes qualify as both "promissory notes" and "payment intangibles."[120]

However, while Article 9 does apply to purchases and sales of "promissory notes" and "payment intangibles," *the Article 9 commercial reasonableness standard that the Plaintiff seeks to impose on the Defendants is limited in that context.* Specifically, 9-610 outlines the standards applicable to post-default collateral dispositions, including commercial reasonableness.[121]  Section 9-601(g), provides, however, that "this part imposes no duties upon a secured party that is a

---

[116] *Id.*, Ex. A, p. 3 (§ 2(r)).

[117] *Id.*, Ex. A, p. 3 (§ 2(q)).

[118] Rosenberg Affidavit II, Exhibit A., pp. 1-2

[119] N.Y. U.C.C. § 9-109(a)(3) (McKinney 2001).

[120] Plaintiff's Answer, p. 18.

[121] N.Y. U.C.C. §9-610(b) (McKinney 2001).

consignor or is a buyer of accounts, chattel paper, payment intangibles, or promissory notes."[122]   Official Comment 9 to N.Y. U.C.C. § 9-601 further provides that:

> Subsection (g) provides that, except as provided in Section 9-607(c), the duties imposed on secured parties do not apply to buyers of accounts, chattel paper, payment intangibles, or promissory notes. Although denominated "secured parties," these buyers own the entire interest in the property sold and so may enforce their rights without regard to the seller ("debtor") or the seller's creditors. Likewise, a true consignor may enforce its ownership interest under other law without regard to the duties that this Part imposes on secured parties.[123]

As the MRA is a purchase and sale agreement, the commercial reasonableness standard of Article 9 does not apply whether or not the Subordinated Notes are "promissory notes" or "payment intangibles." Therefore, Lehman Brothers' foreclosure and/or liquidation of the Subordinated Notes is not governed by Article 9.   Accordingly, the Court will dismiss the Plaintiff's fourth request for declaratory judgment.

## IV.  Count I Alleging Breach of Contract is Dismissed

In the Complaint, the Plaintiff alleges that Lehman's conduct, both pre-petition and post-petition, breached the MRA.[124]   Specifically, the Plaintiff argues that Lehman wrongly triggered the July 26, 2007 margin call by "misrepresenting the existence of, or overstating the Margin Deficit and . . . ascribing an overly

---

[122] N.Y. U.C.C. § 9-601(g) (McKinney 2001).

[123] Official Comment 9 to N.Y. U.C.C. § 9-601.  Furthermore, section 9-607(c) is not applicable.

[124] Complaint, ¶¶ 46-55.

depressed Market Value to the Subordinated Notes."[125]    Furthermore, the Plaintiff alleges "[t]o the extent Lehman maintains that . . . it is a 'generally recognized source' as a market maker with respect to the Subordinated Notes, Lehman failed to . . . act in good faith, without conflicts of interest, and in a commercially reasonable manner in calculating Market Value."[126]    Also, the Plaintiff alleges that "Lehman was not entitled to issue either the Pre-Petition Default Notice or the Post-Petition Foreclosure Notice, because (a) AHMIC . . . complied with its obligations under the MRA and (b) and Event of Default . . . had not occurred."[127]    Finally, the Plaintiff alleges that Lehman "has not complied with or approached the applicable standards of commercial reasonableness."[128]    The Plaintiff argues that Lehman's actions damaged them in an amount "not less than $84,125,000, less amounts advanced by Lehman, plus costs and attorneys fees."[129]

Under New York law,[130] to state a claim for breach of contract AHMIC must allege: "(1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages

---

[125] *Id.*, ¶ 50.

[126] *Id.*, ¶ 51.

[127] *Id.*, ¶ 52.

[128] *Id.*, ¶ 53.

[129] *Id.*, ¶ 55.

[130] New York law controls the MRA.  *Id.*, Ex. A, p. 10 (§ 16).

resulting from the breach."[131]   As the Court has decided that an "Event of Default" occurred under the MRA when AHMIC filed its bankruptcy petition in August, 2007, Lehman Brothers properly exercised its right to foreclosure or liquidate the Subordinated Notes post-petition.   Therefore, Lehman Brothers' actions post-petition did not breach the MRA.   Accordingly, the Plaintiff cannot prove the Defendants breached the MRA post-petition and the portion of Count I asserting a post-petition breach of contract will be dismissed.

Since Lehman Brothers' post-petition actions were not a breach of the MRA, the Plaintiff must show how the alleged pre-petition breaches damaged it in order to support its breach of contract claim.   However, it is not clear from the Complaint how the pre-petition breaches damaged the Plaintiff differently from the alleged post-petition breaches.   Accordingly, the Plaintiff must specify with more particularity how it was damaged by the alleged pre-petition breaches. Since the Plaintiffs' pre-petition breach of contract claim satisfies three of the four required elements, if the Plaintiff had pled the damages element with more particularity it may have survived the Defendants' Motion to Dismiss.   Thus, the Court will dismiss *without prejudice* the portion of Count I asserting a pre-petition breach of contract to allow the Plaintiff an opportunity to plead with more specificity its claim of damages.

---

[131] *K.Bell & Associates, Inc. v. Lloyd's Underwriters*, 827 F.Supp. 985, 988 (S.D.N.Y. 1993) (citations omitted).

**V.  Plaintiff's Claim for Turnover of Property of the Estate Under 11 U.S.C. § 542 Is Dismissed Because It Is Premature**

In Count II of the Complaint, the Plaintiff argues that "Lehman should be directed to turnover either (a) the AHMIC-Owned Notes to AHMIC's estate or (b) in the event that the safe harbor provisions of the Bankruptcy Code apply, the debt owed by Lehman for damages arising from Lehman's termination of the MRA and foreclosure and/or liquidation of the AHMIC-Owned Notes."[132]  As the Court has determined that sections 555 and 559 apply to the MRA, the Court's analysis will focus on the second aspect of the Plaintiff's claim for turnover of property of the estate.

The Defendants argue that the Court must dismiss the Plaintiff's turnover claim because it seeks the turnover of a debt which is in dispute.  In support of this argument, the Defendants cite *American Business Financial Services.* [133]

The debtor in *American Business Financial Services* was in the business of originating and servicing mortgage loans.  The debtor raised capital by selling pools of mortgage loans to special purpose entities, which in turn sold the mortgage loans to mortgage loan trusts.  The mortgage loan trusts raised the funds needed to purchase the mortgage loans by selling notes and trust certificates.  The notes and trust certificates were secured by the mortgage loans. In exchange for the loans sold to the special purpose entities (and subsequently

---

[132] Complaint, ¶ 61.

[133] *Miller v. Greenwich Capital Fin. Prods. (In re American. Bus. Fin. Servs.),* 361 B.R. 747, 761 (Bankr. D. Del. 2007).

resold to the mortgage loan trusts), the debtor received cash and beneficial interests in the mortgage loan trusts (known as I/O Strips) entitling the debtor to certain cash flows from the mortgage loan trusts.

The debtor filed for relief under Chapter 11, and subsequently obtained DIP financing.  The terms of the DIP financing gave the DIP lender a security interest in substantially all of the debtor's assets, including the I/O Strips.  A few months into the reorganization process, the debtor publically announced that reorganization was not possible.  The DIP lender subsequently declared a default on the DIP loan, and, as a result, the case converted to a Chapter 7 and a trustee was appointed.  Thereafter, the DIP lender foreclosed on the I/O Strips and sold them at public auction under Article 9 of the UCC.  In connection with this foreclosure, the chapter 7 trustee filed a complaint which contained multiple claims, including turnover under section 542, conversion and breach of contract. Before Chief Judge Walrath was the DIP lender's motion to dismiss the entire complaint.

The trustee's turnover claim specifically sought turnover of the allegedly converted I/O Strips, and various fees, interest and penalties collected by the DIP lender after the alleged conversion.  The trustee argued that the I/O Strips were "indisputably the Debtor's and [were] held as collateral by [the DIP lender].[134]  The Court found that the DIP lender properly exercised its right to foreclose on the collateral upon default.  With respect to the various fees,

---

[134] *Id.* at 761.

42

interests and penalties for which the trustee sought a turnover, the Court held that the trustee could not claim title to this property.  Rather, the trustee's right to turnover of the fees, interests and penalties was dependant on validity of the various other counts in its complaint.  Thus, the Court held "[b]ecause title to the property is in dispute, a claim for turnover cannot arise at this stage" and the Court dismissed the trustee's turnover claim.[135]

The debtor's claim for turnover of the various fees, interests and penalties in *American Business Financial Services* mirrors the Plaintiff's claim for turnover of the "debt owed by Lehman for damages arising from Lehman's termination of the MRA and foreclosure and/or liquidation of the AHMIC-Owned Notes."[136] In *American Business Financial Services*, the Court held that the fees, interests and penalties were not property which trustee could claim title to, but rather needed a judgment to collect.  Here, the "debt" the Plaintiff refers to is not actually "debt," but damages which are dependant on various other counts in the Plaintiff's Complaint.  Thus, title to this "debt" is in dispute and an action for turnover is premature.[137]

Accordingly, the Court will dismiss the Plaintiff's turnover claim.

---

[135] *Id.*

[136] Complaint, ¶ 61.

[137] *In* re American Bus. Fin. Servs., 361 B.R. at 761; *see, e.g., Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*, 335 B.R. 539, 554 (D. Del. 2005) ("[I]n order to state a claim for turnover of property under § 542, a plaintiff must allege that transfer of the property has already been avoided or that the property is otherwise the **undisputed property of the bankruptcy estate**. Here, the Trustee has not made, and cannot make that allegation.") (emphasis added); and *Hechinger Inv. Co. of De. Inc., v. Allfirst Bank (In re Hechinger Inv. Co. of De. Inc.)*, 282 B.R. 149, 161 (Bankr. D. Del. 2002).

## VI.  Count III Alleging Conversion is Dismissed

In Count III of the Complaint, the Plaintiff alleges that Lehman has converted the Plaintiff's interest in the Subordinated Notes.  Specifically, the Plaintiff argues that under the MRA "AHMIC provided Lehman with a limited interest in the [Subordinated Notes] for the sole purpose of their serving as collateral with respect to AHMIC's obligations to repay the funds Lehman advanced under that agreement . . . [and this limited interest] was at all times subject to AHMIC's right to retake possession of those notes in exchange for the principal loan borrowed by AHMIC."[138]  The Plaintiff further alleges that the Defendants are liable for conversion because they have confiscated the Subordinated Notes and, as a result, the Plaintiff has, and will continue to suffer damages.[139]

Under New York law, the "tort of conversion is the 'exercise of unauthorized dominion over the property of another in interference with a plaintiff's legal title or superior right of possession.'"[140]  In addition, in order for a conversion claim to succeed in the context of a contract dispute, as the Plaintiff attempts to accomplish, "a plaintiff must allege acts that are unlawful or wrongful as distinguished from acts that are a mere violation of contractual

---

[138] Complaint, ¶¶ 63-64.

[139] Id., ¶¶ 66-67.

[140] Briarpatch LTD. L.P. v. Geisler Roberdeau, Inc. 148 F.Supp.2d 321, 328 (S.D.N.Y. 2001) (quoting Lopresti v. Terwilliger, 126 F.3d 34, 41 (2d Cir. 1997)).

rights."[141]    The Defendants argue the Plaintiff fails to meet this second requirement.[142]

Specifically, the Defendants argue that the Plaintiff's conversion claim is a recharacterization of its breach of contract claim because the Plaintiff "does nothing more than recite allegations that [Lehman Brothers] breached its obligations under the MRA."[143]  The Plaintiff argues in return that its conversion claim does not duplicate its breach of contract claim because it rests on different facts "*inter alia*, interference with AHMIC's possessory interests (i.e., illegal foreclosure and confiscation of the notes) and fabrication of the Market Values (in connection with an improvident margin call)."[144]  The Court agrees with the Defendants.

In the Complaint, the Plaintiff argues in its conversion claim that:

Under the MRA, AHMIC provided Lehman with a limited interest in the AHMIC-Owned Notes for the sole purpose of their serving as collateral with respect to AHMIC's obligations to repay the funds Lehman advanced under that agreement.  [This] limited interest in the AHMIC-Owned Notes was at all times subject to AHMIC's right to retake possession of those notes . . .

Lehman has interfered with AHMIC's right to possess the AHMIC-Owned Notes, will not deliver possession of those notes to AHMIC, and wrongly claims an ownership interest with respect to the

---

[141] *Fraser v. Doubleday & Co., Inc.*, 587 F.Supp. 1284, 1288 (S.D.N.Y. 1984); and *Briarpatch LTD. L.P. v. Geisler Roberdeau, Inc.* 148 F.Supp.2d 321, 328 (S.D.N.Y. 2001).

[142] Motion to Dismiss, p. 20.

[143] *Id.*, p. 21.

[144] Plaintiff's Answer, pp. 24-25.

> AHMIC-Owned Notes.  As a direct and proximate result . . .
> AHMIC has suffered, and will continue to suffer damages.[145]

This is a recharacterization of the Plaintiff's breach of contract claim.  In the breach of contract claim, the Plaintiff alleges that Lehman unjustly issued the Post-Petition Foreclosure Notice, i.e., the notice that Lehman "foreclosed or intended to foreclose on the AHMIC-Owned Notes."[146]  In its conversion claim, the Plaintiff alleges that "Lehman has interfered with AHMIC's right to possess the AHMIC-Owned Notes . . ."[147]  The Plaintiff states that its right to possess the Notes was provided by the MRA.[148]  Therefore, both claims are based on the MRA and an argument that Lehman has unjustly taken the Subordinated Notes.

Furthermore, the Court disagrees that the conversion claim rests on different facts than the breach of contract claim.  The Plaintiff states that its conversion claim rests on the "fabrication of the Market Values (in connection with an improvident margin call)."[149]  The Plaintiff's breach of contract claim also alleges that Lehman breached the MRA in its calculation of the Market Value.  Specifically, in its breach of contract claim the Plaintiff alleges that:

> Lehman did not calculate Market Value in accordance with the MRA with respect to the Second Margin Call and wrongfully triggered that margin call by, *inter alia*, (a) misrepresenting the existence of, or overstating the Margin Deficit and (b) ascribing an overly depressed Market Value to the Subordinated Notes.

---

[145] Complaint, ¶¶ 63-66.

[146] *Id.*, ¶¶ 41 and 52.

[147] *Id.*, ¶ 65.

[148] *Id.*, ¶ 63.

[149] Plaintiff's Answer, pp. 24-25.

>To the extent Lehman maintains that it (i.e., Lehman) is a 'generally recognized source' as a market maker with respect to the Subordinated Notes, Lehman failed to satisfy its obligation to act in good faith, without conflicts of interest, and in a commercially reasonable manner in calculating Market Value.[150]

Also, the Plaintiff states that its conversion claim rests on the "interference with AHMIC's possessory interests (i.e., illegal foreclosure and confiscation of the notes)." However, in the Plaintiff's breach of contract claim it alleges "Lehman was not entitled to issue . . . the Post-Petition Foreclosure Notice, because (a) AHMIC at all relevant times complied with its obligations under the MRA and (b) an Event of Default (as defined therein) had not occurred."[151]

The Court sees no substantive difference between the acts which support the Plaintiff's conversion claim and those that support its breach of contract claim. Therefore, the Plaintiff does not "allege acts that are unlawful or wrongful as distinguished from acts that are a mere violation of contractual rights."[152] Accordingly, the Court will dismiss the Plaintiff's conversion claim.

## VII.  Count IV Alleging Unjust Enrichment is Dismissed

In Count IV of the Complaint, the Plaintiff brings a claim for unjust enrichment.[153] "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's

---

[150] Complaint, ¶¶ 50-51.

[151] *Id.*, ¶ 52.

[152] *Fraser v. Doubleday & Co., Inc.*, 587 F.Supp. 1284, 1288 (S.D.N.Y. 1984).

[153] Complaint, ¶¶ 68-76.

expense; and (3) that equity and good conscience require restitution."[154]    In

support of its unjust enrichment claim, the Plaintiff argues that:

> Lehman did not look to a "generally recognized source" [as required by the MRA] when assessing the Market Value of the Subordinated Notes, instead manufacturing its own Market Value and a corresponding Margin Deficit as part of a scheme to deprive AHMIC of the true value of the AHMIC-Owned Notes.
>
> Lehman has been unjustly enriched at AHMIC's expense by wrongfully foreclosing upon and/or liquidating for itself the AHMIC-Owned Notes that (a) AHMIC was entitled to take repossession of at the conclusion of the MRA and (b) had a higher Market Value than the amounts Lehman represented in connection with the Second Margin Call.  As a direct and proximate result of Lehman's unjust enrichment, AHMIC has suffered and will continue to suffer damages.[155]

In addition to the three elements described above, an unjust enrichment claim is

a quasi-contract claim.[156]  Therefore, "[t]he existence of a valid and enforceable

written contract governing a particular subject matter ordinarily precludes

recovery in quasi contract for events arising out of the same subject matter."[157]

The Defendants argue that the Plaintiff's unjust enrichment claim is a

recharacterization of their breach of contract claim.[158]  And, as such, the Plaintiff

may not bring this quasi-contract claim because the MRA is a valid and

---

[154] *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*  448 F.3d 573, 586 (2d Cir. 2006).

[155] Complaint, ¶¶ 71, 75 and 76.

[156] *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*  448 F.3d 573, 586 (2d Cir. 2006).

[157] *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*  448 F.3d 573, 587 (2d Cir. 2006) (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388-89, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987)).

[158] Motion to Dismiss, p. 21.

enforceable contract.[159]   The Plaintiff presents two counterarguments for why this is not the correct result.

First, the Plaintiff argues that an unjust enrichment claim may stand in the presence of an existing contract when the scope of the contract does not cover the dispute between the parties.[160]   To support this argument, the Plaintiff alleges that the Defendants have been unjustly enriched by benefits they received beyond the scope of the MRA, i.e., post-foreclosure, the Subordinated Notes have appreciated beyond the amount the Defendants are owed.[161]

Second, the Plaintiff argues that the Defendants themselves admit that the MRA was terminated post-petition by virtue of the bankruptcy filing.[162]   The Court believes this is an attempt to argue that the unjust enrichment claim may stand because there is not a valid and enforceable contract governing the dispute.

The Court agrees with the Defendants.   The MRA is a valid and enforceable contract. And, under New York law, the quasi-contract theory of unjust enrichment is unavailable when there is a valid and enforceable agreement.[163]   Thus, unjust enrichment is not available to the Plaintiff.

Furthermore, the Plaintiff's two counter-arguments do not alter this conclusion.   First, the Court disagrees with the Plaintiff's argument that the MRA

---

[159] *Id.*, p. 20.

[160] Plaintiff's Answer, p. 22.

[161] *Id.*, p. 22.

[162] *Id.*, p. 22.

[163] *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*  448 F.3d 573, 586 (2d Cir. 2006).

does not cover the post-foreclosure appreciation of the Subordinated Notes.

Section 11(d)(i)) of the MRA deals with post-foreclosure appreciation and

provides, in relevant part, that the non-defaulting party may:

> [I]mmediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and **apply the proceeds thereof to the aggregate unpaid Repurchase Prices** and any other amounts owing by the defaulting party hereunder, **or... elect, in lieu of selling all or a portion of such Purchased Securities, to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source** . . . against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder . . .[164]

Therefore, any post-foreclosure appreciation received by the Defendants is

covered by the MRA.

Second, it is irrelevant to the Court's analysis whether or not the

Defendants terminated the MRA. To support a claim for unjust enrichment, the

Plaintiff must show that the Defendants were unjustly enriched. The Plaintiff

premises its unjust enrichment claim on the argument that "Lehman has been

unjustly enriched at AHMIC's expense by wrongfully foreclosing upon and/or

liquidating for itself the AHMIC-Owned Notes."[165] As the Court has decided

that an "Event of Default" occurred under the MRA when AHMIC filed for

bankruptcy, Lehman Brothers properly exercised its rights under the MRA's *ipso*

---

[164] Complaint, Ex. A, p. 8 (§ 11(d)(i)) (emphasis added).

[165] *Id.*, ¶ 75.

*facto* clause, and, accordingly, was not unjustly enriched its foreclosure and/or liquidation of the Subordinated Notes.

However, if the Defendants had terminated the MRA after the liquidation of the Subordinated Notes, from that point forward the Plaintiff may bring an unjust enrichment claim. Claims for unjust enrichment may lie in the situation where a valid and enforceable contract is rescinded or abrogated, and a party is unjustly enriched thereafter.[166]  Thus, if the MRA was terminated post-liquidation, in order to support a claim for unjust enrichment the Plaintiff must put forward some evidence which shows that the Defendants were unjustly enriched after the Defendants terminated the MRA. However, the only unjust enrichment the Plaintiff alleges stems from the alleged wrongful foreclosure and/or liquidation of the Subordinated Notes. Therefore, it is irrelevant whether or not the Defendants terminated the MRA post-foreclosure because the Plaintiff has not alleged any grounds for unjust enrichment besides the liquidation of the Subordinated Notes.

Accordingly, the Court will dismiss the Plaintiff's unjust enrichment claim.

---

[166] *Waldman v. Englishtown Sportswear, Ltd.*, 92 A.D.2d 833, 836 (N.Y.A.D. 1 Dept. 1983).

## <u>CONCLUSION</u>

For the foregoing reasons the Motion to Dismiss is granted.  Specifically, the Court will dismiss Counts I, II, III, IV, and the first four claims for declaratory judgment in Count V of the Complaint.[167]   An order will be issued.

---

[167] The Court will dismiss without prejudice the portion of Count I of the complaint asserting a pre-petition breach of contract to allow the plaintiff an opportunity to plead with more specificity its claim of damages.

**EXHIBIT A3**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------x
In re:                               : Chapter 11 Case
                                     : No. 07-11047 (CSS)
                                     :
AMERICAN HOME                        : (Jointly
MORTGAGE INVESTMENT CORP., et al.,   : Administered)
                                     :
                         Debtors. :
-------------------------------------x
AMERICAN HOME MORTGAGE               : Adversary
INVESTMENT CORP.,                    : Proceeding
                                     : No. 07-51739 (CSS)
                                     :
      Plaintiff,                     :
                                     :
           v.                        :
                                     :
LEHMAN BROTHERS INC. and LEHMAN      :
COMMERCIAL PAPER INC.,               :
                                     :
                                     :
      Defendants.                    :
-------------------------------------x
```

## ORDER GRANTING MOTION, PURSUANT TO FEDERAL RULES OF BANKRUPTCY PROCEDURE 7052 AND 9023 AND 11 U.S.C. § 105(a), TO ALTER AND AMEND MAY 23 ORDER

For the reasons set forth in this Court's Opinion[1] dated May 23, 2008 (the "Opinion," and the Order entered in connection therewith, the "May 23 Order"), which Opinion is incorporated by reference as if set forth in full herein, and upon consideration of the Motion Of American Home Mortgage Investment Corporation, Pursuant To Federal Rules Of Bankruptcy Procedure 7052 And 9023,

---

[1]    The Opinion constitutes the Court's findings of fact and conclusions of law, pursuant to Federal Rule of Bankruptcy Procedure 7052.

And 11 U.S.C. § 105(a), To Alter And Amend May 23 Order (collectively, with the briefs submitted in support thereof, the "Motion"):

IT IS HEREBY FOUND that for the reasons enunciated in the Motion, there is no just reason to delay entry of the May 23 Order or any order relating to the Opinion as a final judgment as provided in Fed. R. Civ. P. 54(b); and

IT IS HEREBY ORDERED that the Motion is granted; and

IT IS FURTHER ORDERED that Counts I, II, III, IV and the first four claims for declaratory judgment in Count V of the Complaint are DISMISSED WITH PREJUDICE, provided however, that the portion of Count I of the complaint asserting a pre-petition breach of contract is DISMISSED WITHOUT PREJUDICE to allow Plaintiff an opportunity to plead with more specificity its claim of damages, which Plaintiff may file and serve by no later than June 30, 2008 if it seeks to preserve such claim; and

IT IS FURTHER ORDERED that, pursuant to Fed. R. Civ. P. 54(b), this Order constitutes a final judgment.

Hon. Christopher S. Sontchi
United States Bankruptcy Judge

June 30, 2008

2

**EXHIBIT B**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------------------x
In re:                                                     :    Chapter 11
                                                           :    Case No. 07-11047 (CSS)
AMERICAN HOME                                              :    (Jointly Administered)
MORTGAGE HOLDINGS, INC., et al.,                          :
                                            Debtors.       :
-------------------------------------------------------------------x
AMERICAN HOME MORTGAGE                                     :    Adversary Proceeding
INVESTMENT CORP.,                                          :    Case No. __-_____ (CSS)
                                                           :
                                            Plaintiff,     :
                                                           :
                                                           :
                    v.                                     :
                                                           :
LEHMAN BROTHERS INC. and LEHMAN                            :
COMMERCIAL PAPER INC.,                                     :
                                                           :
                                            Defendants.    :
-------------------------------------------------------------------x

## COMPLAINT

Plaintiff American Home Mortgage Investment Corp., a debtor in possession in the above-captioned chapter 11 cases ("**AHMIC**"), as and for its Complaint against Lehman Brothers Inc. ("**Lehman, Inc.**") and Lehman Commercial Paper Inc. ("**Lehman Commercial Paper**," and with Lehman, Inc., "**Defendants**" or "**Lehman**"), states as follows:

## PRELIMINARY STATEMENT

1.      This is an action for breach of contract, turnover, conversion, and unjust enrichment brought by AHMIC against Lehman, a highly sophisticated party with an intimate understanding of the private-label notes it sold AHMIC shortly before AHMIC's bankruptcy filing.  Just days after Lehman financed AHMIC's purchase, Lehman took advantage of AHMIC's liquidity problems in a scheme to foreclose on these valuable notes for a quick profit. Hiding behind the temporarily dysfunctional market for the notes, Lehman misrepresented that the "Market Value" (a defined term under their financing agreement (the "MRA" as defined

below)) of the financed notes suffered a steep decline that required AHMIC to provide millions of dollars in alleged margin deficits or else Lehman would foreclose.

2.    Lehman knew fully that the Market Value of the Subordinated Notes had not changed since the prior margin call days before. Moreover, Lehman made no effort to obtain bids from a "generally recognized source" to value these notes, and one of the most significant trades had just occurred when Lehman sold the notes to AHMIC at 97% of their face value. Notwithstanding the temporary turmoil in the credit markets, the notes' rating had not changed, and they were protected against value degradation in any event through swap agreements. Lehman understood this structure all too well, having been the chief architect of the Broadhollow-Melville warehouse securitization program pursuant to which the notes were issued. Lehman knew these notes were close to being "money good."

3.    Liquidity problems prevented AHMIC from satisfying Lehman's July 26, 2007 margin call. Thereafter, AHMIC filed for bankruptcy protection, and Lehman asserted that its unmet margin call constituted an Event of Default warranting termination of AHMIC's financing agreement and Lehman's foreclosure on the notes. In so doing, Lehman did nothing short of "stealing" property of AHMIC's bankruptcy estate.

4.    AHMIC therefore brings this action for the benefit of its bankruptcy estate, seeking a determination that, among other things:

- Lehman breached the MRA by (i) fabricating values for the notes and representing them as "Market Value" determinations, (ii) asserting the existence of a "Margin Deficit" based on such false pretenses, (iii) asserting the existence of a pre-petition Event of Default when none existed, (iv) acting in violation of the implied covenant of good faith and fair dealing, and (v) not acting in a commercially reasonable manner;

- Lehman's termination and liquidation of the financing transaction with respect to the Subordinated Notes violated the automatic stay imposed under section 362 of the Bankruptcy Code;

- Lehman has wrongfully taken possession of $84,125,000 of Subordinated Notes provided as collateral under the MRA;

- The MRA is not a "repurchase agreement" as defined in section 101(47) of the Bankruptcy Code because the Subordinated Notes do not meet the definition of "mortgage-related securities" -- they were rated "BBB" by Standard & Poor's and "Baa2" by Moody's;

- Lehman is not entitled to the "securities contract" safe harbor of section 555 of the Bankruptcy Code because the Lehman entity that was a counterparty to the purported repurchase transaction with AHMIC is not a "stockbroker, financial institution, financial participant, or securities clearing agency;"

- In accordance with section 542 of the Bankruptcy Code, Lehman must turnover either (i) the Subordinated Notes or (ii) in the event that the safe harbor of section 555 does apply, the debt owed by Lehman for damages arising from Lehman's termination of the MRA and subsequent foreclosure on and/or liquidation of the Subordinated Notes; and

- In the event Lehman is entitled to the "securities contract" safe harbor of section 555 of the Bankruptcy Code, the determination of damages owed by Lehman must be made in accordance with section 562 of the Bankruptcy Code because commercially reasonable determinants of value do not exist.

## PARTIES

5.    Plaintiff AHMIC is a Maryland corporation having its principal place of business in Melville, New York.  AHMIC is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

6.    Lehman Inc. is a Delaware corporation with its principal place of business in New York, New York.

7.    Lehman Commercial Paper is a New York corporation with its principal place of business in New York.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408, 1409. This proceeding is a core proceeding under 28 U.S.C. § 157(b), arising in a case under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**").

## FACTUAL BACKGROUND

A.    **Broadhollow And Melville Securitization Program**

9.    Prior to their bankruptcy filings, AHMIC and its affiliated debtors and debtors in possession (the "**American Home Parties**") funded a portion of their mortgage origination through structured financing techniques.  The American Home Parties sold mortgage loans to certain special-purpose entities ("**SPEs**"), which financed the acquisition through the issuance of highly-rated (i.e., "A-1+" by Standard & Poor's) commercial paper and lower-rated subordinated notes.

10.    Lehman was the architect of the American Home Parties' warehouse securitization program for two SPEs, Broadhollow  Funding, LLC ("**Broadhollow**") and Melville Funding, LLC ("**Melville**").  Under the program, Broadhollow and Melville acquired thousands of mortgage loans from two mortgage loan originators, American Home Mortgage Acceptance, Inc. ("**AHMA**") and American Home Mortgage Corp. ("**AHMC**"), respectively. The acquisitions were financed by issuing commercial paper and subordinated notes.

11.    Pursuant to the Base Indenture dated as of May 27, 2004 among Melville and Deutsche Bank Trust Company Americans (and various supplements thereto), Melville issued a single variable funding note to Broadhollow in exchange for a loan extended from Broadhollow to Melville in the original principal amount of approximately $168,000,000. Melville used the proceeds of that note to purchase mortgage loans.

12.    Broadhollow issued commercial paper in the form of secured liquidity notes (the "**Senior Notes**"), and its obligations with respect thereto were secured by liens on the mortgage loans it purchased.  Broadhollow also issued certain subordinated notes (the "**Subordinated Notes**"), which were likewise secured by the mortgage loans.  The Senior Notes and Subordinated Notes were issued pursuant to the Base Indenture dated as of May 27, 2004 among Broadhollow and Deutsche Bank Trust Company Americas, and various supplements

thereto, including that certain (a) Series 2004-A Supplement To Base Indenture, dated as of May 27, 2004 (and the notes issued thereunder, the "**Series 2004-A Notes**"), and Series 2005-A Supplement To Base Indenture, dated as of June 7, 2005 (and the notes issued thereunder, the "**Series 2004-A Notes**").

   13. Standard & Poor's rated the Subordinated Notes "BBB," and Moody's rated the Subordinated Notes "Baa2."  Neither agency took any action with respect to those ratings until August 6, 2007.

   14. As the architect of the program, Lehman had an intimate understanding of the value of the Subordinated Notes.  A summary of Lehman's structure appears below:[1]



---

[1] This chart initially was extracted from the document entitled "Lehman Brothers:  American Home Mortgage Investment Corp. Warehouse Securitization Program:  Summary Of Terms," dated January 26, 2004 at p.1.

**B.**    **AHMIC Acquires Subordinated Notes With Funds Advanced By Lehman**

15.    On or about June 8, 2005, AHMIC purchased the Series 2005-A Notes from Lehman in the aggregate principal face amount of $53,125,000 (the "**2005 Note Purchase**").  On July 11, 2007, AHMIC acquired additional Subordinated Notes from Lehman, purchasing Series 2004-A Notes in the aggregate principal face amount of $31,000,000 (the "**2007 Note Purchase**").  Collectively, the Subordinated Notes purchased in the 2005 Note Purchase and the 2007 Note Purchase shall be referred to as the "**AHMIC-Owned Notes**").

16.    Lehman agreed to finance both the 2005 Note Purchase and the 2007 Note Purchase under the parties' pre-existing Master Repurchase Agreement that AHMIC, Lehman Commercial Paper, and Lehman, Inc. executed previously on November 4, 2003 (the "**MRA**"). A copy of the MRA is attached hereto as Exhibit A.

17.    On July 13, 2007, with respect to loans advanced in connection with both the 2005 Note Purchase and the 2007 Note Purchase, Lehman agreed to advance 75% of the Subordinated Notes' market price (set for financing purposes at 97% of the notes' face value). Thus, AHMIC's effective outstanding advance rate from Lehman on that date was 72.75% of face value, or $61,200,938.

**C.**    **MRA Terms**

18.    Under the MRA, AHMIC was the "Seller" of the AHMIC-Owned Notes, and one or more entities comprising or affiliated with Lehman was the "Buyer" of the AHMIC-Owned Notes.  The AHMIC-Owned Notes were the "Purchased Securities" under the MRA (as defined therein).

19.    The MRA contained provisions entitling the Buyer to make margin calls in the event the market value of the Purchased Securities -- as determined by a "generally recognized source" -- fell below the original market value (on the initial purchase date), such that the outstanding loan exceeded the contemplated borrowing base:

> If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Buyer is less than the aggregate Buyer's Margin Amount for all such Transactions (a '**Margin Deficit**'), then Buyer may by notice to Seller require Seller in such Transactions, at Seller's option, to transfer to Buyer cash or additional securities reasonably acceptable to Buyer ('Additional Purchased Securities'), so that the cash and aggregate Market Value of the Purchased Securities, including any such Additional Purchased Securities, will thereupon equal or exceed such aggregate Buyer's Margin Amount (decreased by the amount of any Margin Deficit as of such date arising from any Transactions in which such Buyer is acting as Seller).

Ex.A, (MRA, p. 4 (§ 4)).

20.    The agreement defined "**Market Value**" to mean "the price for such Securities on such date obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein ..."  Ex. A, p. 2 (§ 2(j)).  See also id. p. 2 (§ 2(c) (defining "Buyer's Margin Amount" to mean "with respect to any Transaction as of any date, the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price for such Transaction as of such date")); p.2 (§ 2(d) (defining "Buyer's Margin Percentage" to mean "with respect to any Transaction as of any date, a percentage (which may be equal to the Seller's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price for Such Transaction")).

21.    The failure of the Seller to maintain the Buyer's Margin Amount as required by section 4 of the MRA constituted an "Event of Default" under the MRA.  Ex. A (MRA, p. 7 (§ 11(ii)).

**D.    July 23, 2007 Margin Call**

22.    Between June 2005 and March 2007, Lehman did not make any margin calls with respect to the Subordinated Notes.  On March 16, 2007, Lehman made its first margin call, asserting the Market Value had fallen to 92.27% of the notes' face value.  AHMIC satisfied that margin call.  When AHMIC purchased the Subordinated Notes from Lehman on July 13,

2007, however, Lehman established the Market Value for the Subordinated Notes at 97% of the notes' face value.

23.    Within four days of the closing of the 2007 Note Purchase, on July 17, 2007, Lehman advised AHMIC that the Market Value of the Subordinated Notes had precipitously declined by six hundred basis points, i.e., from 97% of their face value (on July 13, 2007) to 91% of their face value (on July 17, 2007).

24.    After AHMIC advised Lehman it did not agree that the Market Value had dropped to 91% the notes' face value, Lehman agreed to restore the Market Value to 97% of the notes' face value.

25.    On July 23, 2007, Lehman advised AHMIC again that the Market Value of the Subordinated Notes had fallen to 91% of their face value.

26.    Lehman took the position that the borrowing base securing the funds it advanced under the MRA declined by $3,785,625 during the prior week and that the amount of funds it was willing to advance dropped from $61,200,938 (75% of 97% of the notes' face value) to $57,415,313 (75% of 91% of the notes' face value).

27.    Lehman maintained this supposed drop entitled Lehman to make a margin call and demanded that AHMIC immediately pay Lehman $3,785,625 as the Margin Deficit (hereinafter, the "**First Margin Call**") in order to keep AHMIC within the borrowing base of 75% of Market Value.

28.    AHMIC did not agree with Lehman's characterization of this supposed drop in Market Value to 91% of the notes' face value.  Nonetheless, it satisfied, in full, the First Margin Call on July 23, 2007.

29.    Upon payment of the alleged Margin Deficit, Lehman's effective outstanding advance rate for AHMIC's acquisition of the Subordinated Notes was reduced from 72.75% of their face value to 68.25% of their face value (i.e., 75% of 91% of their face value).

E.     **July 26, 2007 Margin Call**

30.     Three days after the First Margin Call, on July 26, 2007, Lehman advised AHMIC that the value of the Subordinated Notes had taken a nosedive during the prior three days -- falling to just 80% of their face value.

31.     Lehman took the position that the borrowing base securing the funds it advanced under the MRA declined by $6,940,313 during the prior week and that the amount of funds it was willing to advance to AHMIC dropped from $57,415,313 (75% of 91% of the notes' face value) to $50,475,000 (75% of 80% of the notes' face value).

32.     Lehman maintained this supposed drop entitled Lehman to make a second margin call and demanded that AHMIC immediately pay to Lehman $6,940,313 as a Margin Deficit (hereinafter, the "**Second Margin Call**") in order to keep AHMIC within the borrowing base of 75% of Market Value.

33.     AHMIC did not satisfy the Second Margin Call.

34.     At the time of the Second Margin Call, Lehman did not have the July 2007 monthly portfolio summary report which would have shown the extent to which delinquencies and defaults for the mortgage loans had increased or decreased from the prior month.  Lehman also knew that (a) AHMIC was facing financial difficulties due to liquidity problems with its warehouse lenders; (b) the Market Value had not changed over the prior three days (since the First Margin Call) because there was no "generally recognized source" for trading the Subordinated Notes; (c) over the prior three days (since the First Margin Call), the rating of the Subordinated Notes had not been downgraded, and the SPEs' assets had not changed to justify market depreciation; (d) the SPEs had swap agreements designed to mitigate the risk of value degradation; (e) there were no significant trades of the Subordinated Notes other than Lehman's own sale of the Subordinated Notes to AHMIC at 97% of face value 15 days before the Second Margin Call.

35.    At all times, Lehman was required to act in a commercially reasonable manner and in good faith.  In making the Second Margin Call, Lehman took advantage of AHMIC's financial difficulty and breached the express terms of the Master Repurchase Agreement and all modicums of good faith, fair dealing, and commercial reasonableness.

F.    **Pre-Petition Default Notice**

36.    On August 1, 2007, just days before the American Home Parties commenced the Chapter 11 Cases, Lehman sent a notice asserting that the failure to pay the Second Margin Call constituted an Event of Default and that Lehman reserved its rights to take action with respect to the Subordinated Notes (the "**Pre-Petition Default Notice**").

37.    The Pre-Petition Default Notice was delivered in breach of the MRA because, inter alia, the alleged default -- AHMIC's failure to honor the Second Margin Call -- did not constitute a legitimate Event of Default.

38.    Lehman violated the terms of the MRA in making the Second Margin Call. The MRA directed Lehman to look to a "generally recognized source" when assessing the Market Value of the Subordinated Notes.  Lehman did not look to a "generally recognized source," and instead manufactured its own Market Value and a corresponding Margin Deficit as part of a scheme to deprive AHMIC of the true value of the AHMIC-Owned Notes.  Lehman also unjustifiably pointed to the crisis of confidence in the mortgage arena instead of giving a fair, good faith valuation of the Subordinated Notes.

39.    To the extent Lehman maintains that it (i.e., Lehman) is a "generally recognized source" as a market maker with respect to the Subordinated Notes, Lehman had an obligation to act in good faith, without conflicts of interest, and in a commercially reasonable manner in calculating Market Value.  Lehman did none of this.

### G. Post-Petition Termination Attempts

40.     On August 6, 2007 (the "**Petition Date**"), AHMIC and its affiliated debtors and debtors in possession each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

41.     On August 27, 2007, after the Petition Date, Lehman notified AHMIC that it had terminated the MRA and that it either had foreclosed or intended to foreclose on the AHMIC-Owned Notes in lieu of selling them to a third party (the "**Post-Petition Foreclosure Notice**").

42.     Lehman notified AHMIC that the market value of the Subordinated Notes for purposes of calculating the price at liquidation was 68.25% of face value -- coincidentally, the effective outstanding advance rate on the Subordinated Notes following the First Margin Call.

43.     As of the date hereof, Lehman has held itself out to third parties, including the Indenture Trustee with respect to the Subordinated Notes, as the owner of the AHMIC-Owned Notes.

44.     Lehman's alleged termination on August 27, 2007 and foreclosure was part of a scheme to keep the valuable Subordinated Notes rather than sell them into a dysfunctional and aberrational market.

45.     At all times, Lehman was required to act in a commercially reasonable manner.  Lehman's foreclosure and/or liquidation of the AHMIC-Owned Notes has not complied with the applicable standards of commercial reasonableness.

## COUNT I

### (Breach of Contract)

46.     AHMIC incorporates by reference the allegations contained in paragraphs 1 through 45 of the Complaint.

47.    Lehman and AHMIC are parties to the MRA.

48.    At all relevant times, AHMIC performed its obligations under the MRA.

49.    The MRA required that Lehman act in all instances in good faith in accordance with the implied covenant of good faith and fair dealing.

50.    Lehman did not calculate Market Value in accordance with the MRA with respect to the Second Margin Call and wrongfully triggered that margin call by, inter alia, (a) misrepresenting the existence of, or overstating the Margin Deficit and (b) ascribing an overly depressed Market Value to the Subordinated Notes.

51.    To the extent Lehman maintains that it (i.e., Lehman) is a "generally recognized source" as a market maker with respect to the Subordinated Notes, Lehman failed to satisfy its obligation to act in good faith, without conflicts of interest, and in a commercially reasonable manner in calculating Market Value.

52.    Lehman was not entitled to issue either the Pre-Petition Default Notice or the Post-Petition Foreclosure Notice, because (a) AHMIC at all relevant times complied with its obligations under the MRA and (b) an Event of Default (as defined therein) had not occurred.

53.    At all times, Lehman was required to act in a commercially reasonable manner.  Lehman has not complied with or approached the applicable standards of commercial reasonableness.

54.    Lehman's actions constitute a material breach of the MRA, including, without limitation, a material breach of the implied covenant of good faith and fair dealing with respect to the MRA and a breach of all modicums of good faith, fair dealing, and commercial reasonableness.

55.    Lehman's breach of the MRA has damaged AHMIC in an amount not less than $84,125,000, less the amounts advanced by Lehman, plus costs and attorneys' fees.

**COUNT II**

**(Turnover Of Property Of The Estate (11 U.S.C. § 542))**

56.    AHMIC incorporates by reference the allegations contained in paragraphs 1 through 55 of the Complaint.

57.    Lehman and AHMIC are parties to the MRA.

58.    Lehman owes a debt to AHMIC under the MRA that is property of AHMIC and that is matured, payable on demand, or payable on order.

59.    Lehman is in possession, custody, and control of property that AHMIC may use, sell or lease under section 363 of the Bankruptcy Code.

60.    All or a portion of the AHMIC-Owned Notes and their proceeds (less any funds advanced by Lehman) constitute property of AHMIC's estate under section 541 of the Bankruptcy Code.

61.    Lehman should be directed to turnover either (a) the AHMIC-Owned Notes to AHMIC's estate or (b) in the event that the safe harbor provisions of the Bankruptcy Code apply, the debt owed by Lehman for damages arising from Lehman's termination of the MRA and foreclosure and/or liquidation of the AHMIC-Owned Notes**.**

**COUNT III**

**(Conversion)**

62.    AHMIC incorporates by reference the allegations contained in paragraphs 1 through 61 of the Complaint.

63.    Under the MRA, AHMIC provided Lehman with a limited interest in the AHMIC-Owned Notes for the sole purpose of their serving as collateral with respect to AHMIC's obligations to repay the funds Lehman advanced under that agreement.

64.    Lehman's limited interest in the AHMIC-Owned Notes was at all times subject to AHMIC's right to retake possession of those notes in exchange for the principal loan borrowed by AHMIC (plus accrued interest).

65.    Lehman has interfered with AHMIC's right to possess the AHMIC-Owned Notes, will not deliver possession of those notes to AHMIC, and wrongly claims an ownership interest with respect to the AHMIC-Owned Notes.

66.    As a direct and proximate result of Lehman's wrongful interference with AHMIC's rights to possess the AHMIC-Owned Notes, AHMIC has suffered, and will continue to suffer damages.

67.    By reason of the foregoing acts of confiscating the AHMIC-Owned Notes for itself rather than returning possession of the AHMIC-Owned Notes to AHMIC (their rightful owners), Lehman is liable to AHMIC for conversion.

## COUNT IV

### (Unjust Enrichment)

68.    AHMIC incorporates by reference the allegations contained in paragraphs 1 through 67 of the Complaint.

69.    The AHMIC-Owned Notes served solely as collateral to secure AHMIC's obligations under the MRA and were subject to AHMIC's right to retake possession thereof in exchange for the principal amount borrowed from Lehman under the MRA (plus accrued interest).

70.    Lehman violated the terms of the MRA with respect to the Second Margin Call because the MRA directed Lehman to look to a "generally recognized source" when assessing the Market Value of the Subordinated Notes.

71.    Lehman did not look to a "generally recognized source" when assessing the Market Value of the Subordinated Notes, instead manufacturing its own Market Value and a

corresponding Margin Deficit as part of a scheme to deprive AHMIC of the true value of the AHMIC-Owned Notes.

72.    Given its intimate understanding of the Subordinated Notes, Lehman was well aware that the notes had a higher Market Value than that represented by Lehman in connection with the Second Margin Call.

73.    Lehman's foreclosure and/or liquidation of the AHMIC-Owned Notes was part of a scheme to keep the valuable Subordinated Notes rather than sell them into a dysfunctional and aberrational market.

74.    At all times, Lehman was required to act in a commercially reasonable manner.  Lehman has not complied with the applicable standards of commercial reasonableness.

75.    By reason of the foregoing acts, Lehman has been unjustly enriched at AHMIC's expense by wrongfully foreclosing upon and/or liquidating for itself the AHMIC-Owned Notes that (a) AHMIC was entitled to take repossession of at the conclusion of the MRA and (b) had a higher Market Value than the amounts Lehman represented in connection with the Second Margin Call.

76.    As a direct and proximate result of Lehman's unjust enrichment, AHMIC has suffered and will continue to suffer damages.

## COUNT V

### (Declaratory Judgment)

77.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 76 of the Complaint.

78.    This claim for relief arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

79.    Lehman maintains that (a) AHMIC's failure to satisfy the Second Margin Call constitutes an Event of Default under the MRA; (b) the MRA was terminated prior to the Petition Date; and (c) Lehman was entitled to foreclose upon and/or liquidate the AHMIC-Owned Notes.  AHMIC disputes each of these assertions.

80.    An actual, justiciable controversy exists.  The Court should declare that:

(a)    Lehman violated the automatic stay imposed under section 362(a) of the Bankruptcy Code by terminating the MRA and foreclosing on and/or liquidating the AHMIC-Owned Notes;

(b)    the MRA is not a "repurchase agreement" as defined in section 101(47) of the Bankruptcy Code because the Subordinated Notes do not meet the definition of "mortgage related securities (as defined in section 3 of the Securities and Exchange Act of 1934)" when they were rated "BBB" by Standard & Poor's and "Baa2" by Moody's;

(c)    Lehman is not entitled to the "securities contract" safe harbor of section 555 of the Bankruptcy Code because the Lehman entity that was counterparty to the MRA and the relevant transactions relating to the Subordinated Notes is not a "stockbroker, financial institution, financial participant, or securities clearing agency;"

(d)    (i) Lehman's foreclosure and/or liquidation of the AHMIC-Owned Notes, is governed by Article 9 of the N.Y.U.C.C., § 901, et seq., and, at all times Lehman was required to act in a commercially reasonable manner and (ii) any damages AHMIC incurred as a consequence of Lehman's failure to comply with those standards and Article 9 shall be determined in accordance with section 562 of the Bankruptcy Code; and

(e)    alternatively, even if (i) the MRA is a "repurchase agreement" as defined in section 101(47) of the Bankruptcy Code or (ii) Lehman is entitled to the safe harbor of section 555 of the Bankruptcy Code, then the determination of damages owed by Lehman must be made in accordance with section 562 of the Bankruptcy Code because commercially reasonable determinants of value do not exist.

## PRAYER FOR RELIEF

WHEREFORE, the AHMIC respectfully requests that this Court enter judgment in its favor and grant the following relief:

a)  judgment in favor of AHMIC on all claims set forth herein;

b)   the entry of an Order directing Lehman to turnover the AHMIC-Owned Notes within five (5) business days of the entry of such Order, 11 U.S.C. § 542;

c)   Declaratory Judgment of the Court decreeing that Lehman violated the automatic stay imposed under section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a);

d)   Declaratory Judgment of the Court decreeing that the MRA is not a "repurchase agreement" as defined in section 101(47) of the Bankruptcy Code, 11 U.S.C. § 101(47);

e)   Declaratory Judgment of the Court decreeing that Lehman is not entitled to the safe harbor of section 555 of the Bankruptcy Code, 11 U.S.C. § 555;

f)   Declaratory Judgment of the Court decreeing that any and all actions taken by Lehman in connection with its foreclosure and/or liquidation of the AHMIC-Owned Notes are governed by Article 9 of the N.Y.U.C.C., § 901, et seq.;

g)   Declaratory Judgment of the Court decreeing that even if (i) the MRA is a "repurchase agreement" as defined in section 101(47) of the Bankruptcy Code or (ii) Lehman is entitled to the safe harbor of section 555 of the Bankruptcy Code, then the determination of damages owed by Lehman must be made in accordance with section 562 of the Bankruptcy Code because commercially reasonable determinants of value do not exist; and

h)  judgment awarding AHMIC's costs and attorneys' fees; and

Any other, further relief the Court deems just and appropriate.

Dated: October 24, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Robert S. Brady*
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Pauline K. Morgan (No. 3650)
Erin D. Edwards (No. 4392)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-AND-

QUINN EMANUEL URQUHART
OLIVER & HEDGES LLP
Susheel Kirpalani
James C. Tecce
51 Madison Avenue
New York, New York 10010
Telephone: (212) 849-7000

Counsel for Debtors and
Debtors in Possession

# Exhibit A



# Master Repurchase Agreement

September 1996 Version

Dated as of    **November 4, 2003**

Between:     **Lehman Brothers Inc. and Lehman Commercial Paper Inc.**

and          **American Home Mortgage Investment Corp.**

## 1. Applicability

From time to time the parties hereto may enter into transactions in which one party ("Seller") agrees to transfer to the other ("Buyer") securities or other assets ("Securities") against the transfer of funds by Buyer, with a simultaneous agreement by Buyer to transfer to Seller such Securities at a date certain or on demand, against the transfer of funds by Seller. Each such transaction shall be referred to herein as a "Transaction" and, unless otherwise agreed in writing, shall be governed by this Agreement, including any supplemental terms or conditions contained in Annex I hereto and in any other annexes identified herein or therein as applicable hereunder.

## 2. Definitions

(a) "Act of Insolvency", with respect to any party, (i) the commencement by such party as debtor of any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency or similar law, or such party seeking the appointment or election of a receiver, conservator, trustee, custodian or similar official for such party or any substantial part of its property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the commencement of any such case or proceeding against such party, or another seeking such an appointment or election, or the filing against a party of an application for a protective decree under the provisions of the Securities Investor Protection Act of 1970, which (A) is consented to or not timely contested by such party, (B) results in the entry of an order for relief, such an appointment or election, the issuance of such a protective decree or the entry of an order having a similar effect, or (C) is not dismissed within 15 days, (iii) the making by such party of a general assignment for the benefit of creditors, or (iv) the admission in writing by such party of such party's inability to pay such party's debts as they become due;

(b) "Additional Purchased Securities", Securities provided by Seller to Buyer pursuant to Paragraph 4(a) hereof;

(c) "Buyer's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(d) "Buyer's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Seller's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction;

(e) "Confirmation", the meaning specified in Paragraph 3(b) hereof;

(f) "Income", with respect to any Security at any time, any principal thereof and all interest, dividends or other distributions thereon;

(g) "Margin Deficit", the meaning specified in Paragraph 4(a) hereof;

(h) "Margin Excess", the meaning specified in Paragraph 4(b) hereof;

(i) "Margin Notice Deadline", the time agreed to by the parties in the relevant Confirmation, Annex I hereto or otherwise as the deadline for giving notice requiring same-day satisfaction of margin maintenance obligations as provided in Paragraph 4 hereof (or, in the absence of any such agreement, the deadline for such purposes established in accordance with market practice);

(j) "Market Value", with respect to any Securities as of any date, the price for such Securities on such date obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein (other than any Income credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) as of such date (unless contrary to market practice for such Securities);

(k) "Price Differential", with respect to any Transaction as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction to the Purchase Price for such Transaction on a 360 day per year basis for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the date of determination (reduced by any amount of such Price Differential previously paid by Seller to Buyer with respect to such Transaction);

(l) "Pricing Rate", the per annum percentage rate for determination of the Price Differential;

(m) "Prime Rate", the prime rate of U.S. commercial banks as published in The Wall Street Journal (or, if more than one such rate is published, the average of such rates);

(n) "Purchase Date", the date on which Purchased Securities are to be transferred by Seller to Buyer;

(o) "Purchase Price", (i) on the Purchase Date, the price at which Purchased Securities are transferred by Seller to Buyer, and (ii) thereafter, except where Buyer and Seller agree otherwise, such price increased by the amount of any cash transferred by Buyer to Seller pursuant to Paragraph 4(b) hereof and decreased by the amount of any cash transferred by Seller to Buyer pursuant to Paragraph 4(a) hereof or applied to reduce Seller's obligations under clause (ii) of Paragraph 5 hereof;

(p) "Purchased Securities", the Securities transferred by Seller to Buyer in a Transaction hereunder, and any Securities substituted therefor in accordance with Paragraph 9 hereof. The term "Purchased Securities" with respect to any Transaction at any time also shall include Additional Purchased Securities delivered pursuant to Paragraph 4(a) hereof and shall exclude Securities returned pursuant to Paragraph 4(b) hereof;

(q) "Repurchase Date", the date on which Seller is to repurchase the Purchased Securities from Buyer, including any date determined by application of the provisions of Paragraph 3(c) or 11 hereof;

(r) "Repurchase Price", the price at which Purchased Securities are to be transferred from Buyer to Seller upon termination of a Transaction, which will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price and the Price Differential as of the date of such determination;

(s) "Seller's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Seller's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(t) "Seller's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Buyer's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction.

## 3. Initiation; Confirmation; Termination

(a) An agreement to enter into a Transaction may be made orally or in writing at the initiation of either Buyer or Seller. On the Purchase Date for the Transaction, the Purchased Securities shall be transferred to Buyer or its agent against the transfer of the Purchase Price to an account of Seller.

(b) Upon agreeing to enter into a Transaction hereunder, Buyer or Seller (or both), as shall be agreed, shall promptly deliver to the other party a written confirmation of each Transaction (a "Confirmation"). The Confirmation shall describe the Purchased Securities (including CUSIP number, if any), identify Buyer and Seller and set forth (i) the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date, unless the Transaction is to be terminable on demand, (iv) the Pricing Rate or Repurchase Price applicable to the Transaction, and (v) any additional terms or conditions of the Transaction not inconsistent with this Agreement. The Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between Buyer and Seller with respect to the Transaction to which the Confirmation relates, unless with

respect to the Confirmation specific objection is made promptly after receipt thereof. In the event of any conflict between the terms of such Confirmation and this Agreement, this Agreement shall prevail.

(c) In the case of Transactions terminable upon demand, such demand shall be made by Buyer or Seller, no later than such time as is customary in accordance with market practice, by telephone or otherwise on or prior to the business day on which such termination will be effective. On the date specified in such demand, or on the date fixed for termination in the case of Transactions having a fixed term, termination of the Transaction will be effected by transfer to Seller or its agent of the Purchased Securities and any Income in respect thereof received by Buyer (and not previously credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) against the transfer of the Repurchase Price to an account of Buyer.

## 4. Margin Maintenance

(a) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Buyer is less than the aggregate Buyer's Margin Amount for all such Transactions (a "Margin Deficit"), then Buyer may by notice to Seller require Seller in such Transactions, at Seller's option, to transfer to Buyer cash or additional Securities reasonably acceptable to Buyer ("Additional Purchased Securities"), so that the cash and aggregate Market Value of the Purchased Securities, including any such Additional Purchased Securities, will thereupon equal or exceed such aggregate Buyer's Margin Amount (decreased by the amount of any Margin Deficit as of such date arising from any Transactions in which such Buyer is acting as Seller).

(b) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Seller exceeds the aggregate Seller's Margin Amount for all such Transactions at such time (a "Margin Excess"), then Seller may by notice to Buyer require Buyer in such Transactions, at Buyer's option, to transfer cash or Purchased Securities to Seller, so that the aggregate Market Value of the Purchased Securities, after deduction of any such cash or any Purchased Securities so transferred, will thereupon not exceed such aggregate Seller's Margin Amount (increased by the amount of any Margin Excess as of such date arising from any Transactions in which such Seller is acting as Buyer).

(c) If any notice is given by Buyer or Seller under subparagraph (a) or (b) of this Paragraph at or before the Margin Notice Deadline on any business day, the party receiving such notice shall transfer cash or Additional Purchased Securities as provided in such subparagraph no later than the close of business in the relevant market on such day. If any such notice is given after the Margin Notice Deadline, the party receiving such notice shall transfer such cash or Securities no later than the close of business in the relevant market on the next business day following such notice.

(d) Any cash transferred pursuant to this Paragraph shall be attributed to such Transactions as shall be agreed upon by Buyer and Seller.

(e) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer or Seller (or both) under subparagraphs (a) and (b) of this Paragraph may be exercised only where a Margin Deficit or Margin Excess, as the case may be, exceeds a specified dollar amount or a specified percentage of the Repurchase Prices for such Transactions (which amount or percentage shall be agreed to by Buyer and Seller prior to entering into any such Transactions).

(f) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer and Seller under subparagraphs (a) and (b) of this Paragraph to require the elimination of a Margin Deficit or a Margin Excess, as the case may be, may be exercised whenever such a Margin Deficit or Margin Excess exists with respect to any single Transaction hereunder (calculated without regard to any other Transaction outstanding under this Agreement).

## 5. Income Payments

Seller shall be entitled to receive an amount equal to all Income paid or distributed on or in respect of the Securities that is not otherwise received by Seller, to the full extent it would be so entitled if the Securities had not been sold to Buyer. Buyer shall, as the parties may agree with respect to any Transaction (or, in the absence of any such agreement, as Buyer shall reasonably determine in its discretion), on the date such Income is paid or distributed either (i) transfer to or credit to the account of Seller such Income with respect to any Purchased Securities subject to such Transaction or (ii) with respect to Income paid in cash, apply the Income payment or payments to reduce the amount, if any, to be transferred to Buyer by Seller upon termination of such Transaction. Buyer shall not be obligated to take any action pursuant to the preceding sentence (A) to the extent that such action would result in the creation of a Margin Deficit, unless prior thereto or simultaneously therewith Seller transfers to Buyer cash or Additional Purchased Securities sufficient to eliminate such Margin Deficit, or (B) if an Event of Default with respect to Seller has occurred and is then continuing at the time such Income is paid or distributed.

## 6. Security Interest

Although the parties intend that all Transactions hereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, Seller shall be deemed to have pledged to Buyer as security for the performance by Seller of its obligations under each such Transaction, and shall be deemed to have granted to Buyer a security interest in, all of the Purchased Securities with respect to all Transactions hereunder and all Income thereon and other proceeds thereof.

## 7. Payment and Transfer

Unless otherwise mutually agreed, all transfers of funds hereunder shall be in immediately available funds. All Securities transferred by one party hereto to the other party (i) shall be in suitable form for transfer or shall be accompanied by duly executed instruments of transfer or assignment in blank and such other documentation as the party receiving possession may reasonably request, (ii) shall be transferred on the book-entry system of a Federal Reserve Bank, or (iii) shall be transferred by any other method mutually acceptable to Seller and Buyer.

## 8. Segregation of Purchased Securities

To the extent required by applicable law, all Purchased Securities in the possession of Seller shall be segregated from other securities in its possession and shall be identified as subject to this Agreement. Segregation may be accomplished by appropriate identification on the books and records of the holder, including a financial or securities intermediary or a clearing corporation. All of Seller's interest in the Purchased Securities shall pass to Buyer on the Purchase Date and, unless otherwise agreed by Buyer and Seller, nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging or hypothecating the Purchased Securities, but no such transaction shall relieve Buyer of its obligations to transfer Purchased Securities to Seller pursuant to Paragraph 3, 4 or 11 hereof, or of Buyer's obligation to credit or pay Income to, or apply Income to the obligations of, Seller pursuant to Paragraph 5 hereof.

---

**Required Disclosure for Transactions in Which the Seller Retains Custody of the Purchased Securities**

Seller is not permitted to substitute other securities for those subject to this Agreement and therefore must keep Buyer's securities segregated at all times, unless in this Agreement Buyer grants Seller the right to substitute other securities. If Buyer grants the right to substitute, this means that Buyer's securities will likely be commingled with Seller's own securities during the trading day. Buyer is advised that, during any trading day that Buyer's securities are commingled with Seller's securities, they [will]* [may]** be subject to liens granted by Seller to [its clearing bank]* [third parties]** and may be used by Seller for deliveries on other securities transactions. Whenever the securities are commingled, Seller's ability to resegregate substitute securities for Buyer will be subject to Seller's ability to satisfy [the clearing]* [any]** lien or to obtain substitute securities.

* Language to be used under 17 C.F.R. β403.4(e) if Seller is a government securities broker or dealer other than a financial institution.
** Language to be used under 17 C.F.R. β403.5(d) if Seller is a financial institution.

---

## 9. Substitution

(a) Seller may, subject to agreement with and acceptance by Buyer, substitute other Securities for any Purchased Securities. Such substitution shall be made by transfer to Buyer of such other Securities and transfer to Seller of such Purchased Securities. After substitution, the substituted Securities shall be deemed to be Purchased Securities.

(b) In Transactions in which Seller retains custody of Purchased Securities, the parties expressly agree that Buyer shall be deemed, for purposes of subparagraph (a) of this Paragraph, to have agreed to and accepted in this Agreement substitution by Seller of other Securities for Purchased Securities; provided, however, that such other Securities shall have a Market Value at least equal to the Market Value of the Purchased Securities for which they are substituted.

## 10. Representations

Each of Buyer and Seller represents and warrants to the other that (i) it is duly authorized to execute and deliver this Agreement, to enter into Transactions contemplated hereunder and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery and performance, (ii) it will engage in such Transactions as principal (or, if agreed in writing, in the form of an annex hereto or otherwise, in advance of any Transaction by the other party hereto, as agent for a disclosed principal), (iii) the person signing this Agreement on its behalf is duly authorized to do so on its behalf (or on behalf of any such disclosed principal), (iv) it has obtained all authorizations of any governmental body required in connection with this Agreement and the Transactions hereunder and such authorizations are in full force and effect and (v) the execution, delivery and performance of this Agreement and the Transactions hereunder will not violate any law, ordinance, charter, by-law or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected. On the Purchase Date for any Transaction Buyer and Seller shall each be deemed to repeat all the foregoing representations made by it.

## 11. Events of Default

In the event that (i) Seller fails to transfer or Buyer fails to purchase Purchased Securities upon the applicable Purchase Date, (ii) Seller fails to repurchase or Buyer fails to transfer Purchased Securities upon the applicable Repurchase Date, (iii) Seller or Buyer fails to comply with Paragraph 4 hereof, (iv) Buyer fails, after one business day's notice, to comply with Paragraph 5 hereof, (v) an Act of Insolvency occurs with respect to Seller or Buyer, (vi) any representation made by Seller or Buyer shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, or (vii) Seller or Buyer shall admit to the other its inability to, or its intention not to, perform any of its obligations hereunder (each an "Event of Default"):

(a) The nondefaulting party may, at its option (which option shall be deemed to have been exercised immediately upon the occurrence of an Act of Insolvency), declare an Event of Default to have occurred hereunder and, upon the exercise or deemed exercise of such option, the Repurchase Date for each Transaction hereunder shall, if it has not already occurred, be deemed immediately to occur (except that, in the event that the Purchase Date for any Transaction has not yet occurred as of the date of such exercise or deemed exercise, such Transaction shall be deemed immediately canceled). The nondefaulting party shall (except upon the occurrence of an Act of Insolvency) give notice to the defaulting party of the exercise of such option as promptly as practicable.

(b) In all Transactions in which the defaulting party is acting as Seller, if the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, (i) the defaulting party's obligations in such Transactions to repurchase all Purchased Securities, at the Repurchase Price therefor on the Repurchase Date determined in accordance with subparagraph (a) of this Paragraph, shall thereupon become immediately due and payable, (ii) all Income paid after such exercise or deemed exercise shall be retained by the nondefaulting party and applied to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder, and (iii) the defaulting party shall immediately deliver to the nondefaulting party any Purchased Securities subject to such Transactions then in the defaulting party's possession or control.

(c) In all Transactions in which the defaulting party is acting as Buyer, upon tender by the nondefaulting party of payment of the aggregate Repurchase Prices for all such Transactions, all right, title and interest in and entitlement to all Purchased Securities subject to such Transactions shall be deemed transferred to the nondefaulting party, and the defaulting party shall deliver all such Purchased Securities to the nondefaulting party.

(d) If the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, the nondefaulting party, without prior notice to the defaulting party, may:

(i) as to Transactions in which the defaulting party is acting as Seller, (A) immediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source, against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder; and

(ii) as to Transactions in which the defaulting party is acting as Buyer, (A) immediately purchase, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, securities ("Replacement Securities") of the same class and amount as any Purchased Securities that are not delivered by the defaulting party to the nondefaulting party as required hereunder or (B) in its sole discretion elect, in lieu of purchasing Replacement Securities, to be deemed to have purchased Replacement Securities at the price therefor on such date, obtained from a generally recognized source or the most recent closing offer quotation from such a source.

Unless otherwise provided in Annex I, the parties acknowledge and agree that (1) the Securities subject to any Transaction hereunder are instruments traded in a recognized market, (2) in the absence of a generally recognized source for prices or bid or offer quotations for any Security, the nondefaulting party may establish the source therefor in its sole discretion and (3) all prices, bids and offers shall be determined together with accrued Income (except to the extent contrary to market practice with respect to the relevant Securities).

(e) As to Transactions in which the defaulting party is acting as Buyer, the defaulting party shall be liable to the nondefaulting party for any excess of the price paid (or deemed paid) by the nondefaulting party for Replacement Securities over the Repurchase Price for the Purchased Securities replaced thereby and for any amounts payable by the defaulting party under Paragraph 5 hereof or otherwise hereunder.

(f) For purposes of this Paragraph 11, the Repurchase Price for each Transaction hereunder in respect of which the defaulting party is acting as Buyer shall not increase above the

amount of such Repurchase Price for such Transaction determined as of the date of the
exercise or deemed exercise by the nondefaulting party of the option referred to in sub-
paragraph (a) of this Paragraph.

(g) The defaulting party shall be liable to the nondefaulting party for (i) the amount of all
reasonable legal or other expenses incurred by the nondefaulting party in connection
with or as a result of an Event of Default, (ii) damages in an amount equal to the cost
(including all fees, expenses and commissions) of entering into replacement transactions
and entering into or terminating hedge transactions in connection with or as a result of
an Event of Default, and (iii) any other loss, damage, cost or expense directly arising or
resulting from the occurrence of an Event of Default in respect of a Transaction.

(h) To the extent permitted by applicable law, the defaulting party shall be liable to the non-
defaulting party for interest on any amounts owing by the defaulting party hereunder,
from the date the defaulting party becomes liable for such amounts hereunder until such
amounts are (i) paid in full by the defaulting party or (ii) satisfied in full by the exercise
of the nondefaulting party's rights hereunder. Interest on any sum payable by the default-
ing party to the nondefaulting party under this Paragraph 11(h) shall be at a rate equal to
the greater of the Pricing Rate for the relevant Transaction or the Prime Rate.

(i) The nondefaulting party shall have, in addition to its rights hereunder, any rights other-
wise available to it under any other agreement or applicable law.

## 12. Single Agreement

Buyer and Seller acknowledge that, and have entered hereinto and will enter into each
Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions
hereunder constitute a single business and contractual relationship and have been made in
consideration of each other. Accordingly, each of Buyer and Seller agrees (i) to perform all of
its obligations in respect of each Transaction hereunder, and that a default in the perfor-
mance of any such obligations shall constitute a default by it in respect of all Transactions
hereunder, (ii) that each of them shall be entitled to set off claims and apply property held by
them in respect of any Transaction against obligations owing to them in respect of any other
Transactions hereunder and (iii) that payments, deliveries and other transfers made by either
of them in respect of any Transaction shall be deemed to have been made in consideration of
payments, deliveries and other transfers in respect of any other Transactions hereunder, and
the obligations to make any such payments, deliveries and other transfers may be applied
against each other and netted.

## 13. Notices and Other Communications

Any and all notices, statements, demands or other communications hereunder may be given
by a party to the other by mail, facsimile, telegraph, messenger or otherwise to the address
specified in Annex II hereto, or so sent to such party at any other place specified in a notice of
change of address hereafter received by the other. All notices, demands and requests hereun-
der may be made orally, to be confirmed promptly in writing, or by other communication as
specified in the preceding sentence.

## 14. Entire Agreement; Severability

This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for repurchase transactions. Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

## 15. Non-assignability; Termination

(a) The rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned by either party without the prior written consent of the other party, and any such assignment without the prior written consent of the other party shall be null and void. Subject to the foregoing, this Agreement and any Transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. This Agreement may be terminated by either party upon giving written notice to the other, except that this Agreement shall, notwithstanding such notice, remain applicable to any Transactions then outstanding.

(b) Subparagraph (a) of this Paragraph 15 shall not preclude a party from assigning, charging or otherwise dealing with all or any part of its interest in any sum payable to it under Paragraph 11 hereof.

## 16. Governing Law

This Agreement shall be governed by the laws of the State of New York without giving effect to the conflict of law principles thereof.

## 17. No Waivers, Etc.

No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and no exercise of any remedy hereunder by any party shall constitute a waiver of its right to exercise any other remedy hereunder. No modification or waiver of any provision of this Agreement and no consent by any party to a departure herefrom shall be effective unless and until such shall be in writing and duly executed by both of the parties hereto. Without limitation on any of the foregoing, the failure to give a notice pursuant to Paragraph 4(a) or 4(b) hereof will not constitute a waiver of any right to do so at a later date.

## 18. Use of Employee Plan Assets

(a) If assets of an employee benefit plan subject to any provision of the Employee Retirement Income Security Act of 1974 ("ERISA") are intended to be used by either party hereto (the "Plan Party") in a Transaction, the Plan Party shall so notify the other party prior to the Transaction. The Plan Party shall represent in writing to the other party that the Transaction does not constitute a prohibited transaction under ERISA or is otherwise exempt therefrom, and the other party may proceed in reliance thereon but shall not be required so to proceed.

(b) Subject to the last sentence of subparagraph (a) of this Paragraph, any such Transaction shall proceed only if Seller furnishes or has furnished to Buyer its most recent available audited statement of its financial condition and its most recent subsequent unaudited statement of its financial condition.

(c) By entering into a Transaction pursuant to this Paragraph, Seller shall be deemed (i) to represent to Buyer that since the date of Seller's latest such financial statements, there has been no material adverse change in Seller's financial condition which Seller has not disclosed to Buyer, and (ii) to agree to provide Buyer with future audited and unaudited statements of its financial condition as they are issued, so long as it is a Seller in any outstanding Transaction involving a Plan Party.

## 19. Intent

(a) The parties recognize that each Transaction is a "repurchase agreement" as that term is defined in Section 101 of Title 11 of the United States Code, as amended (except insofar as the type of Securities subject to such Transaction or the term of such Transaction would render such definition inapplicable), and a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(b) It is understood that either party's right to liquidate Securities delivered to it in connection with Transactions hereunder or to exercise any other remedies pursuant to Paragraph 11 hereof is a contractual right to liquidate such Transaction as described in Sections 555 and 559 of Title 11 of the United States Code, as amended.

(c) The parties agree and acknowledge that if a party hereto is an "insured depository institution," as such term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Transaction hereunder is a "qualified financial contract," as that term is defined in FDIA and any rules, orders or policy statements thereunder (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(d) It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment entitlement and payment obligation under any Transaction hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation", respectively, as defined in and subject to FDICIA (except insofar as one or both of the parties is not a "financial institution" as that term is defined in FDICIA).

## 20. Disclosure Relating to Certain Federal Protections

The parties acknowledge that they have been advised that:

(a) in the case of Transactions in which one of the parties is a broker or dealer registered with the Securities and Exchange Commission ("SEC") under Section 15 of the Securities Exchange Act of 1934 ("1934 Act"), the Securities Investor Protection Corporation has

taken the position that the provisions of the Securities Investor Protection Act of 1970 ("SIPA") do not protect the other party with respect to any Transaction hereunder;

(b) in the case of Transactions in which one of the parties is a government securities broker or a government securities dealer registered with the SEC under Section 15C of the 1934 Act, SIPA will not provide protection to the other party with respect to any Transaction hereunder; and

(c) in the case of Transactions in which one of the parties is a financial institution, funds held by the financial institution pursuant to a Transaction hereunder are not a deposit and therefore are not insured by the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund, as applicable.

**Lehman Brothers Inc.**

By: _____

Name: _____

Title: _____

Date: _____

**American Home Mortgage Investment Corp.**

By: _____

Name: __Thomas McDonagh__

Title: __Chief Investment Officer__

Date: _____

**Lehman Commercial Paper Inc.**

By: _____

Name: _____

Title: __ROBERT E. GUGLIELMO__

Date: __SENIOR VICE PRESIDENT__

12 ▪ September 1996 ▪ Master Repurchase Agreement

## ANNEX I
## Supplemental Terms and Conditions

This Annex forms a part of the Master Repurchase Agreement dated as of November 4, 2003 (the "Agreement") between Lehman Brothers Inc., Lehman Commercial Paper Inc., and American Home Mortgage Investment Corp.

Capitalized terms used but not defined in this Annex I shall have the meanings ascribed to them in the Agreement.

1. In addition to this Annex I, Annex II shall be deemed executed by the parties hereto and shall also form a part of the Agreement.

2. With respect to individual repurchase transactions, this Agreement shall only apply to the Lehman Brothers entity (i.e. Lehman Brothers Inc., Lehman Commercial Paper Inc.) printed in the confirmation (as described in Section 3(b) herein) provided to the counterparty of the Lehman Brothers entity.

3. <u>Definitions</u>. For purposes of the Agreement, the following terms shall have the following meanings:

   (a) "Margin Notice Deadline", 10:00 am New York City time.

   (b) "Business Day" or "business day", with respect to any Transaction hereunder, a day on which regular trading may occur in the principal market for the Purchased Securities subject to such Transaction. In no event shall a Saturday or Sunday be considered a business day.

4. <u>Purchase Price Maintenance</u>.

   (a) Unless otherwise expressly agreed by the parties hereto, the parties agree that in any Transaction hereunder whose term extends over an Income payment date for the Securities subject to such Transaction, Buyer shall on the date such Income is paid transfer to or credit to the account of Seller an amount equal to such Income payment or payments pursuant to Paragraph 5(i) and shall not apply the Income payment or payments to reduce the amount to be transferred to Buyer or Seller upon termination of the Transaction pursuant to Paragraph 5(ii) of the Agreement.

   (b) Unless otherwise expressly agreed by the parties hereto, notwithstanding the definition of Purchase Price in Paragraph 2 of the Agreement and the provisions of Paragraph 4 of the Agreement, the parties agree (i) that the Purchase Price will not be increased or decreased by the amount of any cash transferred by one party to the other pursuant to Paragraph 4 of the Agreement and (ii) that transfer of cash shall be treated as if it constituted a transfer of Securities (with a Market Value equal to the U.S. dollar amount of such cash) pursuant to Paragraph 4(a) or (b), as the case may be (including for purposes of the definition of "Additional Purchased Securities").

5. <u>Submission to Jurisdiction; Waiver of Immunity; Waiver of Jury Trial</u>.

   (a) Each party irrevocably and unconditionally (i) submits to the non-exclusive jurisdiction of any United States Federal or New York State court sitting in Manhattan, and any appellate court from any such court, solely for the purpose of any suit, action or proceeding brought to enforce its obligations under the Agreement and (ii) waives, to the fullest extent it may effectively do so, any defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and any right of jurisdiction on account of its place of residence or domicile.

   (b) To the extent that either party has or hereafter may acquire any immunity (sovereign or otherwise) from any legal action, suit, or proceeding, from jurisdiction of any court or from set off or any legal process (whether service or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) with respect to itself or any of its property, such party hereby irrevocably waives and agrees not to plead or claim such immunity in respect of any action brought to enforce its obligations under the Agreement or relating in any way to the Agreement or any Transaction under the Agreement.

   (c) Each party hereto hereby irrevocably waives any right that it may have to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or the Transactions contemplated hereby.

**Annex II**
**Names and Addresses for Communications Between Parties**

## LEHMAN BROTHERS
745 Seventh Avenue, 28th Floor
New York, New York 10019

Attn.:  Robert Guglielmo, Senior Vice President
Transaction Management
(212) 526-7121  phone
(212) 526-7672 fax

**Legal/Documentation Information:**

Name of Firm: _____

Address: _____

_____

_____

Attn: _____

Tel #: _____

Fax #: _____

**Business/Trading Information:**

Name of Firm:  American Home Mortgage Holdings, Inc.

Address:  520 Broadhollow Road

Melville, NY 11747

tmcdonagh@americanhm.com

Attn:  Thomas McDonagh

Tel #:  516-622-8960

Fax #:  516-620-1031

**ANNEX l.1**
**Supplemental Terms and Conditions**

The parties hereto agree that the following Supplemental Terms and Conditions are hereby incorporated in the Master Repurchase Agreement dated as of November 4, 2003 (the "Agreement") by and between Lehman Brothers Inc. ("Lehman") and American Home Mortgage Investment Corp. ("Client") and this Annex I.1 shall supplement the terms and conditions and be a part of the Agreement.

A    **Financial Statement Reporting Requirement**
If not publicly available to Lehman, Client agrees to supply, or cause to be supplied, to Lehman the following:

(i)    Within 90 days after the expiration of each fiscal year, audited annual financial statements of the Client,

(ii)    Within 45 days after the end of each of the first three quarters in each fiscal year, equivalent financial information to that required by Subparagraph B.

(iii)    Prompt written notice of any material adverse change in Client's business, asset, prospects, operations, financial condition or in Client's ability to discharge its obligations under this Agreement.

B    **Covenants of Client**
Client shall deliver to Lehman upon execution of this Annex I.1. a copy of a resolution of the Board of Directors or other appropriate committee of Client authorizing Client to enter into Long-Term Transactions (as defined below)

Client shall not be responsible for filing any financing documents required to create a perfected security interest in the Purchased Securities, provided however the Client will execute any financing documents required in order to create the perfected security interest in the Purchased Securities.

C.    **Events of Default**
In addition to Events of Default defined in Paragraph 11 hereto,

(i) an Event of Default by Client shall occur if:

(a) Client shall fail to perform or observe any term, covenant or agreement contained in this Agreement (including, without limitation the failure to make any payment when due pursuant to the Agreement or any applicable Confirmation); (b) Client shall fail to pay any debt for borrowed money or other similar obligation or liability in excess of the lesser of $40,000,000 or two percent of Client's stockholder's equity ("Material Indebtedness") (excluding indebtedness evidenced by this Agreement) of Client, or any interest or premium thereon, when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Material Indebtedness, or any other default under any agreement or instrument relating to any such Material Indebtedness, or any other event, shall occur and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Material Indebtedness; or any such Material Indebtedness of Client shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), prior to the stated maturity thereof; (c) any provision of this Agreement or any Confirmation shall at any time for any reason be declared to be null and void by a court of competent jurisdiction, or the validity or enforceability thereof shall be contested by Client, or any other person, or a proceeding

shall be commenced by Client or any other person, seeking to establish the invalidity or unenforceability thereof, or Client shall deny that it has any liability or obligation hereunder or there under; or (d) the Seller shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof, first priority lien on or security interest in any of the Purchased Securities purported to be covered hereby in favor of Buyer.

(ii) an Event of Default by Seller shall occur if Seller shall fail to pay Price Differential when due pursuant to the Agreement or any applicable Confirmation

**D**     <u>Non-Assignability: Termination</u>
Paragraph 15(a) of the Agreement is amended by deleting the last sentence thereof and adding at the end of Paragraph 15(a) the following:

Notwithstanding the foregoing, Lehman shall have the right to assign this Agreement, and any of its rights, obligations (including its obligations to pay Replacement Value) and benefits hereunder, under any Confirmation and under any Transaction to any subsidiary or affiliate of Lehman, so long as such entity remains a direct or indirect wholly-owned subsidiary of Lehman Brothers Holdings Inc.("LBHI") and (x) the obligations of such entity generally or with respect to any such Transaction are guaranteed by LBHI or (y) such affiliated entity has a long term senior unsecured debt ratings that is equal to or better than those of LBHI (a "Permitted Lehman Assignee"). In the event of an assignment of Lehman's obligations hereunder to a Permitted Lehman Assignee, such assignee shall succeed to, and shall be responsible for the performance of, all of Lehman's covenants and obligations hereunder to the extent assigned, and Lehman shall be released from such covenants and obligations to the extent assigned and Lehman shall remain responsible for any covenants and obligations that were not assigned. Except as may be otherwise agreed in writing by the parties, this Agreement may be canceled by either party upon its giving written notice of cancellation to the other; provided, however, that this Agreement shall, notwithstanding such notice, remain applicable to any Transaction then outstanding and any forward or successive Transaction or Long-Term Transaction agreed to by the parties prior to the cancellation of this Agreement

**E.**     <u>Further Rights to Terminate Transactions</u>
In each of the following applicable instances, upon Lehman's written notice to Client ("Termination Notice"), Lehman shall have the right in its sole discretion to accelerate the Repurchase Date for all outstanding Transaction and to no longer be obligated to enter into any additional Transactions pursuant to any outstanding Confirmation, such accelerated Repurchase Date to occur on a Business Day designated by Lehman that shall not be earlier than the  effective date of  the Termination Notice is delivered to Client

(i) applicable Federal or state bankruptcy, insolvency or similar laws, or any other laws, including regulations or interpretations issued hereunder by appropriate courts or regulatory agencies, in existence on the date hereof, are altered or interpreted, or such laws, regulations or interpretations are enacted, adopted or issued after the date hereof, in either case in a manner which, with respect to an outstanding Transaction, either materially (x) limits the ability of Seller to pledge or grant to Buyer an effective first priority perfected security interest in Purchased Securities or limits the ability of Seller to transfer to Buyer all rights, title and interest herein and thereto, free and clear of any claim or interest of any other party, or (y) impairs the right of Lehman to exercise any of its remedies hereunder in a timely manner in accordance with this Agreement and obtain or transfer sole right, title and interest in and to the Purchased Securities.

(ii) changes in applicable law or regulations prohibit Client or Lehman from participating in repurchase agreements, as contemplated by this Agreement or any Confirmation, and such prohibition would be applicable to any outstanding Transactions including Long-Term Transactions.

(iii) if, during the term of any outstanding Transaction, quotations for repurchase (or reverse repurchase) transactions in securities of the same type as any Purchased Security subject to any such outstanding Transaction are not available to Lehman, Client and market participants generally from at least one of the primary government securities dealers (other than Lehman), designated from time to time by the Federal Reserve Bank of New York, after good faith efforts on the part of Lehman and Client to obtain such quotations over a continuous period of thirty (30) days; provided, however, that Lehman as a precondition to its terminating a Transaction pursuant to this Subparagraph E(iii), shall deliver to the other party an Officer's Certificate certifying the occurrence of the events hereinabove described.

(iv) On any day during the term hereof the Client (1) has experienced a decline in its Equity Capital (as determined in accordance with generally accepted accounting principals (GAAP)) during any consecutive three-month period preceding such date of 15 percent or more, or (2) has experienced a decline in its Equity Capital during any consecutive twelve-month period preceding such date of 30 percent or more. "Equity Capital" means the total of perpetual preferred stock, common stock, surplus, undivided profits and capital reserves (net), and cumulative foreign currency translation adjustments.

(v) on any day during the term hereof (but only after the consummation of the transactions contemplated by that certain Agreement and Plan of Merger dated July 12, 2003, among Client, American Home Mortgage Holdings Inc and Apex Mortgage Capital, Inc.), Lehman in its sole discretion determines (based on GAAP) that Client has failed to maintain minimum Equity Capital in an amount equal to at least $200,000,000.

(vi) an Act of Insolvency with respect to the Client

(vii) if, during the term of any outstanding Transaction, Client has experienced or is experiencing a material adverse change, determined by Lehman in Lehman's sole discretion, in its business, assets, operations or financial condition.

**F.**    **Set-off**

In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default or an event described in Paragraph F herein, with respect to a party ("X"), the other party ("Y") will have the right (but also not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation.) For the purpose of cross-currency set-off, Y may convert either obligation at the applicable market exchange rate selected by Y on the relevant date.

**G.**    **Additional Terms and Conditions with respect to Long-Term Transactions**

From time to time Lehman and Client may enter into a Transaction or a series of consecutive Transactions with a scheduled final Repurchase Date (the "Scheduled Final Repurchase Date") that is at least one year after the initial Purchase Date with a fixed, floating, capped or floored Pricing Rate (each a "Long-Term Transaction").

In connection with such Long-Term Transactions, the following additional terms and conditions shall apply

(i) **Provision with respect to Event of Default or Termination of Long-Term Transaction:**

Upon the occurrence of an Event of Default or delivery of a Termination Notice pursuant to Section E above, the Non-Affected Party (as defined below) shall attempt to obtain quotations from at least four (4) dealers identified in good faith (each a "Dealer") for the purpose of determining such

party's loss or gain associated with terminating each Long-Term Transaction. Each quotation will be for an amount, if any, that would be paid to the Non-Affected Party, or by the Non-Affected Party, in consideration of an agreement between the Non-Affected Party and the quoting Dealer to enter into a replacement transaction or transactions that would have the effect of preserving for the Non-Affected Party the remaining economic terms of the relevant Long-Term Transaction from the date of the quotation to the Scheduled Final Repurchase Date. The Non-Affected Party shall obtain the quotations on the date the Event of Default is declared or Termination Notice is delivered or as soon thereafter as reasonably practicable. If more than three (3) quotations are provided, the gain or loss will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three (3) such quotations are provided, the quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three (3) quotations are obtained, then the Non-Affected Party shall determine its damages and losses (or gains and benefits) associated with terminating the Long-Term Transactions in good faith and in a commercially reasonable manner. If as a result of this calculation, the Non-Affected Party determines that it would incur a loss or cost as a result of entering into a replacement transaction or transactions, and where applicable, such amount shall be added to any other amounts payable by the other party to the Non-Affected Party or netted against any amounts payable by the Non-Affected Party to the other party pursuant to this Agreement. If as a result of the calculation, the Non-Affected Party determines that it would incur a gain as a result of entering into a replacement transaction, the Non-Affected Party shall owe such amount to the other party and where applicable such gain shall be netted against any amounts payable by the other party to the Non-Affected Party or added to any other amounts payable by the Non-Affected Party to the other party pursuant to the Agreement.

The "Non-Affected Party" means (a) Lehman with respect to an event described in Section E above or the occurrence of an Event of Default (other than an Event of Default resulting from Act of Insolvency of Lehman) and (b) Client, with respect to an Event of Default resulting from an Act of Insolvency of Lehman.

(ii) **Provision with Respect to Margin Maintenance:**
The Buyer's Margin Percentage shall equal the Seller's Margin Percentage and each shall be known herein as the "Margin Percentage", provided, that, in the event (1) the margin percentage required by legal or regulatory authorities, including without limitation the New York Stock Exchange, the NASD, the SEC or the Federal Reserve Board, for the Purchased Securities, as determined by Lehman and applied in the ordinary course of its securities repo business, is increased, or (2) the Purchased Securities constituting U.S. Agency Securities no longer have the implicit or explicit guarantee of the U.S. government or are not treated by Lehman in the ordinary course of its securities repo business as "exempted securities" (either (1) or (2), a "Regulatory Change"), the Margin Percentage shall be increased by Lehman to the extent reasonably necessary to account for such Regulatory Change.

Notwithstanding the terms of the Agreement, with respect to a Long-Term Transaction as of any date, the Buyer's Margin Amount and the Seller's Margin Amount shall each equal the sum of (i) the amount obtained by application of the Margin Percentage to the Repurchase Price and (ii) the Replacement Value (as of the most recent date of determination) if positive.

The "Replacement Value" as of any date of determination for a Long-Term Transaction shall be an amount, as reasonably determined by Lehman, that would be Lehman's net cost or net gain if such Long-Term Transaction was terminated as a result of an Event of Default with respect to Client under the Agreement or an early termination of such Long-Term Transaction by Lehman pursuant to the Agreement. The Replacement Value shall be a positive amount if Lehman would incur a net cost or loss and a negative amount if Lehman would incur a net gain in connection with any such termination.

**H.    Counterparts**

This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original and such counterparts, taken together, shall constitute one and the same instrument.

Agreed and Accepted as of the date first written above.

**AMERICAN HOME MORTGAGE INVESTMENT CORP.**
**("Client")**

By: _____

Name:     Thomas McDonagh

Title:     Chief Investment Officer

**LEHMAN BROTHERS INC.**
**("Lehman")**

By: _____

Name:     Robert E. Guglielmo

Title:     Senior Vice President

**EXHIBIT C1**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------- x
In re:                                : Chapter 11
                                      : Case No. 07-11047 (CSS)
AMERICAN HOME                         : (Jointly Administered)
MORTGAGE INVESTMENT CORP., et al.,    :
                                      :
                  Debtors.            :
                                      :
------------------------------------- x
AMERICAN HOME MORTGAGE                : Adversary Proceeding
INVESTMENT CORP.,                     : Case No. 07-51739 (CSS)
                                      :
                  Plaintiff,          :
                                      :
        v.                            :
                                      :
LEHMAN BROTHERS INC. and LEHMAN       : Responses Due:
COMMERCIAL PAPER INC.,                : July 21, 2008
                                      :
                  Defendants.         :
------------------------------------- x
```

**REQUEST OF AMERICAN HOME MORTGAGE INVESTMENT CORPORATION, PURSUANT TO 11 U.S.C. § 105(a), 28 U.S.C. § 158(d)(2) AND FED. R. BANKR. P. 8001(f), FOR CERTIFICATION FOR DIRECT APPEAL TO UNITED STATES COURT OF APPEALS FOR THIRD CIRCUIT OF ORDER DISMISSING IN PART WITH PREJUDICE AND IN PART WITHOUT PREJUDICE COMPLAINT AGAINST LEHMAN BROTHERS INC. AND LEHMAN COMMERCIAL PAPER INC. (AS AMENDED)**

American Home Mortgage Investment Corporation ("AHMIC")

hereby requests (the "Certification Request"), pursuant to

section 105(a) of title 11 of the United States Code, 11 U.S.C.

§§ 101-1532 (the "Bankruptcy Code"), 28 U.S.C. § 158(d)(2), and

Rule 8001(f) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), the entry of an order certifying its appeal

of the Order Dismissing In Part With Prejudice And In Part

Without Prejudice The Complaint Against Lehman Brothers Inc. And

Lehman Commercial Paper Inc., dated May 23, 2008 (Docket No. 24)

(the "Original Order") as amended,[1] for direct appeal to the United States Court of Appeals for the Third Circuit (the "Third Circuit"), and, in support thereof, respectfully states as follows:

## I.   PRELIMINARY STATEMENT

1.   Notwithstanding the May 23 Order's significant impact on this proceeding and American Home's bankruptcy cases, its transcendent importance cannot be underestimated.  The May 23 Order tackled issues of first impression concerning the respective rights and obligations of repurchase agreement counterparties, including the interplay between agreed-upon contractual rights, implied contractual obligations, the Bankruptcy Code's safe harbor provisions, and non-bankruptcy law (e.g., U.C.C. Article 9).  Among other things, it examined:

- whether any restrictions or standards apply to a repurchase-agreement lender in its performance of a repurchase agreement and in its exercising remedies under that agreement (e.g., foreclosing and liquidating the securities it purchased under the repurchase agreement following an ipso facto termination), including standards (a) expressly contained in the repurchase agreement (e.g., language requiring

---

[1]   The Original Order incorporates the Court's Memorandum Opinion dated May 23, 2008 (Docket No. 23) (the "Opinion") and was amended pursuant to the Order Granting Motion, Pursuant To Federal Rules Of Bankruptcy Procedure 7052 And 9023 And 11 U.S.C. § 105(a), To Alter And Amend May 23 Order, dated June 30, 2008 (Docket No. 34) (the "Amendment Order").  The Original Order, the Opinion, and the Amendment Order, copies of which are attached hereto as Exhibits A1, A2, and A3, respectively, shall be referred to collectively as the "May 23 Order."

commercial reasonableness); (b) allegedly inherent in the repurchase agreement (e.g., an implied covenant of good faith and fair dealing) or (c) imposed under non-bankruptcy law (e.g., U.C.C. Article 9);

• whether a repurchase-agreement borrower can state a claim upon which relief can be granted for the lender's breach of that agreement when the agreement terminates after the borrower's bankruptcy filing;

• the entitlement of a repurchase-agreement borrower to its residual interest in securities it sold under a repurchase agreement (after repaying amounts the borrower owes thereunder) -- including the debtor/borrower's entitlement under section 559 of the Bankruptcy Code to that residual interest -- and whether an ipso facto termination extinguishes that entitlement;

• whether the residual interest of a repurchase-agreement borrower in securities it sold under a repurchase agreement (after repaying amounts the borrower owes thereunder) constitutes property of that borrower's bankruptcy estate pursuant to section 559 of the Bankruptcy Code that is subject to turnover; and

• the scope of the phrases "interests in mortgage loans" and "mortgage related securities" in the "repurchase agreement" definition found in section 101(47) of the Bankruptcy Code.

2.    Given its importance, AHMIC has appealed the May 23

Order and hereby requests that its appeal proceed directly to the

Third Circuit pursuant to section 28 U.S.C. § 158(d)(2) and

Bankruptcy Rule 8001(f).  These newly-enacted provisions require

certification *either* (1) in the absence of a controlling Third

Circuit or U.S. Supreme Court decision on the legal questions

presented, (2) when the issues presented involve a "matter of

public importance," *or* (3) when an immediate appeal will

materially advance the progress of the case or proceeding.[2]  Each of these factors provides an independent basis upon which to certify AHMIC's appeal.

*First*, neither the Third Circuit nor the U.S. Supreme Court has spoken to the legal issues of first impression decided in the May 23 Order.  Indeed, Congress believed appeals like AHMIC's involving mostly legal questions are the most appropriate for direct appeal.  *Second*, the May 23 Order involves legal questions of public importance because it significantly affects repurchase agreements (and hence both U.S. and global financial markets) as well as other repurchase-agreement borrowers that become debtors in possession.  *Third*, to the extent the May 23 Order affects the millions of dollars of claims American Home is evaluating against its other repurchase-agreement counterparties and lenders, a direct appeal will materially advance both this litigation and American Home's chapter 11 cases.  Accordingly, AHMIC respectfully submits certification for direct appeal to the Third Circuit is appropriate.

---

[2]    See 28 U.S.C. § 158(d)(2)(A).  A fourth factor which also demands certification, i.e., that the order involves a question of law requiring resolution of conflicting decisions (28 U.S.C. §  158(d)(2)(A)(ii)), is not applicable.

## II.  FACTUAL BACKGROUND

3.   Prior to filing its bankruptcy cases, AHMIC and its affiliated debtors and debtors in possession (collectively, "American Home") originated, sold and serviced mortgage loans and invested directly in mortgage-backed securities.  American Home funded a portion of its mortgage-loan origination through structured financing techniques, including the warehouse securitization program Lehman Brothers developed for two non-debtor special-purpose entities, Broadhollow Funding LLC ("Broadhollow") and Melville Funding, LLC.[3]  Broadhollow financed its acquisition of American Home-originated mortgage loans by issuing both highly-rated commercial paper and lower-rated subordinated notes (hereinafter, the "Broadhollow Notes").[4]

4.   AHMIC invested in mortgage-backed securities issued by its affiliates, including the private-label Broadhollow Notes. AHMIC purchased certain of the Broadhollow Notes (the "AHMIC-Owned Notes"), financing that acquisition through its Master Repurchase Agreement with Lehman, dated November 4, 2003 (the "MRA"),[5] i.e., selling Lehman the Broadhollow Notes under the MRA subject to AHMIC's obligation (and right) to repurchase them.

---

[3]    See Complaint Of AHMIC against Lehman Brothers, Inc. and Lehman Commercial Paper, Inc. (collectively, "Lehman"), dated October 24, 2007 (the "Complaint"), a copy of which is attached hereto as Exhibit B, at p. 4 (¶¶ 9-10).

[4]    See Compl. p. 4 (¶¶ 9-10).

[5]    A copy of the MRA appears attached to the Complaint as Exhibit A.

The MRA entitled Lehman to make a margin call if the purchased securities' "Market Value" (as defined therein) determined by a "generally recognized source" fell below their value on the initial purchase date.[6]  It also entitled Lehman, following AHMIC's default, to "immediately sell, in a recognized market (*or otherwise in a commercially reasonable manner*)" the purchased securities and to apply the proceeds to the aggregate outstanding purchase price.[7]

5.    After a series of margin calls that AHMIC disputed (but met) between March 2007 and July 2007, Lehman demanded that AHMIC provide as additional margin approximately $6.9 million on July 26, 2007.[8]  When AHMIC did not meet the July 26 margin call, Lehman declared AHMIC in default and terminated the MRA.  Shortly after American Home filed their chapter 11 cases on August 6, 2007 (the "Petition Date"), Lehman advised AHMIC that it had foreclosed or intended to foreclose on the AHMIC-Owned Notes in lieu of selling them to a third party.[9]

6.    On October 24, 2007, AHMIC filed a five-count complaint against Lehman, alleging, among other things, that Lehman unjustifiably defaulted AHMIC under the MRA as part of a scheme

---

[6]    MRA, p. 4 (§ 4).

[7]    MRA, p. 8 (§ 11(d)) (emphasis added).  The MRA also grants Lehman a contingent security interest in the event the purchase and sale transactions are re-characterized into loan transactions.  See MRA, p. 5 (§ 6).

[8]    See Compl., pp. 7-10 (¶¶ 22-35).

[9]    See Compl., pp. 10-11 (¶¶ 36-45).

to foreclose on the valuable AHMIC-Owned Notes and to extinguish AHMIC's residual interest in them.  After the parties briefed Lehman's motion to dismiss, and following oral argument on March 13, 2008, the Court issued the May 23 Order.  The May 23 Order dismissed nearly all the Complaint's counts and subcounts -- save a single orphan subcount requesting declaratory judgment on the narrow issue of damage calculation for the dismissed counts (hereinafter, the "Damage Calculation Subcount").

   7.   Specifically, the May 23 Order made the following findings:

> • *Breach Of Contract (Count I).*  AHMIC alleged Lehman breached the express terms of the MRA by, inter alia, making improvident margin calls, fabricating Market Value determinations, and failing to liquidate the AHMIC-Owned Notes in a commercially reasonable manner after AHMIC's alleged default.  AHMIC also alleged Lehman breached the implied covenant of good faith and fair dealing applicable to the MRA as well as all applicable standards of commercial reasonableness.  The Court dismissed AHMIC's breach of contract claims, finding American Home's bankruptcy filing (a) entitled Lehman to terminate the MRA and liquidate the AHMIC-Owned Notes and (b) precluded AHMIC from proving that Lehman breached the MRA post-petition. While the Court dismissed the post-petition breach claims with prejudice, it dismissed the pre-petition breach claims without prejudice to AHMIC's right to re-plead them and specify the damage allegations.[10]

---

[10]  See May 23 Order, pp. 38-40.  AHMIC did not re-plead the pre-petition breach of contract claims.

- *Turnover Of Property Of The Estate (Count II).* AHMIC alleged its residual interests in the AHM-Owned Notes, after repaying its obligations under the MRA, constitute property of the estate. The Court dismissed this Count with prejudice, finding the claim prematurely requested the turnover of a debt that was in dispute, *i.e.*, damages dependent on the Complaint's other counts.[11]

- *Conversion (Count III).* AHMIC alleged Lehman improperly interfered with AHMIC's right to possess the AHMIC-Owned Notes and AHMIC's residual interest in the notes. The Court dismissed this Count, styling it as a re-characterized breach of contract claim.[12]

- *Unjust Enrichment (Count IV).* AHMIC alleged Lehman was unjustly enriched by any appreciation in the AHMIC-Owned Notes' value (which would have been realized by AHMIC through its residual interest). The Court also considered this Count a re-characterized breach of contract claim and dismissed it.[13]

- *Declaratory Judgment (Count V).* AHMIC requested five forms of declaratory relief, specifically declarations that (a) Lehman violated the automatic stay by terminating the MRA and foreclosing; (b) the MRA does not satisfy the Bankruptcy Code's "repurchase agreement" definition; (c) Lehman is not entitled to the "securities contract" safe harbor of section 555 of the Bankruptcy Code; and (d) Article 9 governed Lehman's liquidation of the AHMIC-Owned notes, requiring it to liquidate them in a commercially reasonable manner.[14] The Court denied these requests for declaratory relief, finding (i) Article 9 does not apply to the MRA;[15] (ii) the MRA is a "repurchase agreement" and a "securities contract" as defined under the Bankruptcy Code, making the safe harbor provisions of sections 559 and 555 applicable; (iii) the AHMIC-Owned

---

[11]   See May 23 Order, pp. 41-43.

[12]   See May 23 Order, pp. 44-47.

[13]   See May 23 Order, pp. 47-51.

[14]   AHMIC also asserted the Damages Calculation Subcount, but Lehman did not move to dismiss it (and the Court did not rule on it).

[15]   See May 23 Order, pp. 30-38.

Notes are "interests in mortgage loans" for purposes of the "repurchase agreement" definition; (iv) Lehman Brothers, Inc., the "sole counterparty" to the MRA for purposes of the AHMIC-Owned Notes transaction, is a "stockbroker," and (v) Lehman Brothers, Inc. did not violate the automatic stay.[16]

8.    On June 3, 2008, AHMIC moved to amend the Original Order to certify it as a final order for appellate purposes (because the lingering Declaratory Damages Subcount rendered the order interlocutory).  On June 30, 2008, the Court entered the Amendment Order modifying the Original Order and certifying it as final pursuant to Federal Rule of Civil Procedure 54(b).  On July 10, 2008, AHMIC filed its notice of appeal from the May 23 Order.

### III.  RELIEF REQUESTED

9.    AHMIC respectfully requests the entry of an order, pursuant to 11 U.S.C. § 105(a), 28 U.S.C. § 158(d)(2), and Bankruptcy Rule 8001(f), certifying its appeal from the May 23 Order for direct appeal to the Third Circuit.

### IV.  ARGUMENT

#### A.    CERTIFICATION IS MANDATORY IF CIRCUMSTANCES ENUMERATED IN 28 U.S.C. § 158(D)(2)(A) EXIST

10.    In 2005, Congress streamlined bankruptcy appeals to enable expedited access to the United States Circuit Courts of Appeal by enacting 28 U.S.C. § 158(d)(2)(A).  Section 158(d)(2)(A) provides that if either the parties consent[17] or the

---

[16]    May 23 Order, pp. 9-30.

[17]    Lehman will not agree to certify the appeal.

bankruptcy or district court[18] so certify, an appeal from a
judgment or order may be taken directly to the governing United
States Circuit Court of Appeals when "[(i) it] involves a
question of law as to which there is no controlling decision of
the court of appeals for the circuit or of the Supreme Court of
the United States, or involves a matter of public importance ....
[or (iii)] an immediate appeal ... may materially advance the
progress of the case or proceeding in which the appeal is taken
...." 28 U.S.C. § 158(d)(2)(A).

11. Congress enacted this procedure to address problems
related to the "time and cost factors attendant to the [prior]
appellate system ..." House Rep. No. 109-13, Pt. 1, 109th Cong.
1st Sess. 148-49 (2005). Particularly, Congress was concerned
with the fact that "decisions rendered by district courts as well

---

[18]   The Certification Request is properly before this Court
because the appeal has not been "docketed" by the District
Court. See Fed. R. Bankr. P. 8001(f)(1)(A) (providing that
before docketing of an appeal "[o]nly a bankruptcy court may
make a certification on request or on its own initiative
..."); Frye v. Excelsior College, 2008 WL 1850627 (9th Cir.
BAP Apr. 10, 2008) (explaining bankruptcy court's exclusive
jurisdiction to determine certification prior to docketing
is a bright-line rule). If the District Court dockets
AHMIC's appeal before this Court decides the Certification
Request, then the District Court could certify AHMIC's
appeal. See Fed. R. Bankr. P. 8001(f)(1)(B).

Given the Bankruptcy Court's familiarity with the
complicated facts and procedural history of this proceeding,
however, AHMIC respectfully submits this Court is in the
best position to ascertain the propriety of certification.

as the appellate panel are generally not binding and lack stare decisis value." Id.

12.  To that end, certification is mandatory in the presence of any of the circumstances enumerated in section 158(d)(2)(A). See, e.g., 28 U.S.C. § 158(d)(2)(B) (providing that if a bankruptcy court "on its own motion or on the request of a party, determines that a circumstance specified in clause (i), (ii), or (iii) of subparagraph (A) exists ... then the **bankruptcy court ... shall** make the certification described") (emphasis added); Simon & Schuster, Inc. v. Advanced Marketing Servs., Inc., 360 B.R. 429, 433 (Bankr. D. Del. 2007) (noting court "must issue a certification if it determines that the order ... involves ... (1) a question of law upon which there is no controlling decision of the Third Circuit or of the Supreme Court ... (2) a matter of public importance; or (3) a question of law requiring resolution of conflicting decisions" or it determines that a direct appeal will materially advance case).

      **B.**   MAY 23 ORDER RESOLVED ISSUES OF FIRST IMPRESSION FOR WHICH THERE ARE NO CONTROLLING THIRD CIRCUIT OR UNITED STATES SUPREME COURT DECISIONS

13.  The May 23 Order resolved various issues of first impression concerning, among other things,

- the scope and contours of the Bankruptcy Code safe harbor provisions (sections 555 and 559);

- whether standards of commercial reasonableness apply to the parties' performance under a repurchase agreement and the lender's exercise of remedies following an *ipso facto* termination, either through the repurchase agreement's express terms, an implied covenant of good faith and fair dealing, or U.C.C. Article 9; and

- the rights and obligations of parties to repurchase agreements following an *ipso facto* termination;

- the applicability of Article 9 to repurchase agreements that grant contingent security interests in the wake of revisions to U.C.C. § 9-109(a)(1); and

- the entitlement of a chapter 11 debtor to its residual interests in securities sold under a repurchase agreement following an *ipso facto* termination.

14.   Relatively little case law exists examining the contours of the Bankruptcy Code's safe harbor provisions or more generally a bankruptcy filing's impact on the debtor's interests in securities its sold under a repurchase agreement.[19]   No decision from either the Third Circuit or the U.S. Supreme Court has examined or decided the issues addressed in the May 23 Order.

---

[19]   AHMIC found only one case in the Third Circuit discussing the application of section 559 of the Bankruptcy Code, but it does not address the specific issues presented in this proceeding.  See *Bevill, Bresler & Schulman Asset Management Corp. v. Spencer Sav. & Loan Ass'n*, 878 F.2d 742 (3d Cir. 1989) (examining whether repurchase agreement settlement payment gave rise to an avoidable transfer in a chapter 7 liquidation; noting section 559 limited chapter 7 trustee's rights to repurchase agreement property without explicating on scope of those rights).

15. Moreover, certification is especially appropriate when "Congress intended [section 158(d)] to facilitate [the Circuit Court's] provision of guidance on pure questions of law .... Congress believed that direct appeal would be most appropriate where [the Circuit Court is] ... called upon to resolve a question of law not heavily dependent on the particular facts of a case ...." Weber v. United States, 484 F.3d 154, 161 (2d Cir. 2007) (noting bankruptcy court correctly certified appeal from order construing scope of homestead exception, but declining to accept certification where issue was not "of such a nature to create uncertainty in the bankruptcy courts;" noting three lower courts within circuit had ruled consistently on issue). AHMIC's appeal involves mostly legal issues and is not fact intensive.

16. In the absence of any authority from the U.S. Supreme Court or the Third Circuit, certification for direct appeal is both necessary and appropriate. See, e.g., Tidewater Finance Company v. Kenney, 2008 WL 2514194 *2 (4th Cir. June 25, 2008) (accepting direct appeal of bankruptcy court order because there was no controlling decisions on issue of whether secured lender had a deficiency claim under chapter 13 provisions); Ad Hoc Group of Timber Noteholders v. The Pacific Lumber Company (In re Scotia Pacific Company LLC), 508 F.3d 214 (5th Cir. 2007) (accepting certification of bankruptcy court order in absence of controlling decisions interpreting 2005 BAPCPA amendments concerning single-asset real estate cases); Perlin v. Hitachi Capital America

Corp., 497 F.3d 364, 367 (3d Cir. 2007) (accepting certification of creditor's appeal of bankruptcy court order denying motion to dismiss chapter 7 case as bad-faith filing; appeal examined 2005 BAPCPA amendments' substantial modifications to Bankruptcy Code section 707(b)).

### C. MAY 23 ORDER INVOLVES A MATTER OF "PUBLIC IMPORTANCE"

17.    Section 158(d)(2) does not articulate the precise measure of "public importance."  Courts consider an issue of "public importance" if it affects debtors generally or creates the prospect of divergent authority.  See, e.g., In re Ransom, 380 B.R. 809 (9th Cir. BAP 2007) (granting certification of issue because of number of debtors potentially affected); In re Virissimo, 332 B.R. 208, 209 (Bankr. D. Nev. 2005) (certifying appeal of order where issue it addressed was "one which will recur in Nevada as well as other districts ... and will impact the administration of bankruptcy estates until the issue is ultimately decided").

18.    The May 23 Order seemed to recognize the significance of repurchase agreements (and the Bankruptcy Code's safe harbor provisions) to both U.S. and global financial markets.  See May 23 Order, p. 9 ("As this Court recently discussed in Calyon N.Y. Branch v. Am. Home Mortg. Corp., the market for repurchase agreements is a critical component of, not only the U.S. financial market, but global financial markets as well.  To protect the liquidity of repurchase agreements, the Bankruptcy

Code provides special protections to non-debtor counterparties")
(citation omitted).

19.   Congress similarly has recognized the importance of
repurchase agreements. See also Sen. Rep. No. 65, 98th Cong.,
1st Sess. 45, 47 (1983) ("The country's major institutional and
fiduciary investors make heavy use of repos.  For these
investors, including such entities as state and local
governments, public and private pension funds, money market and
other mutual funds, banks, thrift institutions, and large
corporations, repos have become a vital tool of cash
management").

20.   The May 23 Order affects any repurchase-agreement
counterparty seeking chapter 11 protection, defining the rights
and obligations the counterparties following an ipso facto
termination.  Because it decided an issue of first impression,
the May 23 Order and any subsequent appellate decision will
strongly influence other courts examining these issues.
Accordingly, AHMIC's appeal presents issues of sufficient "public
importance" to warrant certification for a direct appeal.[20]

---

[20]   Indeed, the significance of the May 23 Order is underscored
by the myriad articles which have been published examining
the decision, some of which are attached hereto as Exhibit
C.

### D.    DIRECT APPEAL TO THIRD CIRCUIT WILL MATERIALLY ADVANCE INSTANT PROCEEDING AND AMERICAN HOME'S CHAPTER 11 CASES

21.    Since the inception of its bankruptcy cases, American Home has been investigating possible claims and causes of action against its various lenders and repurchase-agreement counterparties.  AHMIC's ability to pursue a direct appeal of the May 23 Order will materially advance American Home's chapter 11 cases (and the estates' ability to maximize value).

22.    Similarly, a direct appeal will advance the instant proceeding.  Given the dollar amounts at stake and the significance of the decision to American Home's estates and Lehman (e.g., its ability to exercise remedies as a repurchase-agreement lender with other counterparties), a Third Circuit appeal may be inevitable.  Even if the appeal were to proceed to the District Court, the grave import of these issues suggests the non-prevailing party would further appeal any adverse District-Court ruling to the Third Circuit.  To that end, a direct appeal removes what might very well may be an intermediate step on the path to the Third Circuit.[21]

---

[21]    Cf., Weber, 484 F.2d at 158 ("Legislative history confirms that direct appeal may be appropriate where a judgment of this court would 'materially advance the progress of the case.'  For instance, where a bankruptcy court has made a ruling which, if correct, will essentially determine the result of future litigation, the parties adversely affected by the ruling might very well fold up their tents if convinced that the ruling has the approval of the court of appeals, but will not give up until that becomes clear").

IV.   CONCLUSION

WHEREFORE, AHMIC respectfully requests that the Court grant its Certification Request and award AHMIC such further relief it considers appropriate.

Respectfully submitted,

Dated:  Wilmington, Delaware
        July 10, 2008

YOUNG, CONAWAY,
STARGATT & TAYLOR, LLP

John T. Dorsey (No. 2988)
Erin D. Edwards (No. 4392)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

-and-

QUINN, EMANUEL, URQUHART,
OLIVER & HEDGES, LLP
Susheel Kirpalani
James C. Tecce
Robert K. Dakis
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7199
Facsimile: (212) 849-7100

*Counsel to American Home
Mortgage Investment Corp.*

**EXHIBIT C2**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>AMERICAN HOME MORTGAGE HOLDINGS, INC., *et al.*,<br><br>               Debtors. | Chapter 11<br><br>Case No. 07-11047 (CSS)<br><br>(Jointly Administered) |
| AMERICAN HOME MORTGAGE INVESTMENT CORP.,<br><br>               Plaintiff,<br><br>               v.<br><br>LEHMAN BROTHERS INC. and LEHMAN COMMERCIAL PAPER INC.,<br><br>               Defendants. | Adversary Proceeding No.<br>07-51739 (CSS) |

**LEHMAN BROTHERS INC. AND
LEHMAN COMMERCIAL PAPER INC.'S OPPOSITION TO MOTION OF
AMERICAN HOME MORTGAGE INVESTMENT CORPORATION FOR
CERTIFICATION FOR DIRECT APPEAL TO UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT PURSUANT TO 11 U.S.C. § 105(a),
<u>28 U.S.C. § 158(d)(2) AND FED. R. BANKR. P. 8001(f).</u>**

      Lehman Brothers Inc. and Lehman Commercial Paper Inc. (together, "<u>Lehman</u>"),

by their undersigned counsel, hereby oppose the request of American Home Mortgage

Investment Corporation ("<u>AHMIC</u>") for certification for direct appeal to the United States Court

of Appeals for the Third Circuit pursuant to 28 U.S.C. §158(d)(2) (the "<u>Certification Request</u>").

<u>**PRELIMINARY STATEMENT**</u>

      By its motion, AHMIC seeks to leapfrog the normal appellate process and

proceed directly to the Third Circuit. But, this case does not involve a question of law that is appropriate for direct appeal to a circuit court of appeals under 28 U.S.C. § 158(d)(2)(A). In its Certification Request, AHMIC contends that this Court's opinion raised issues of public import as to which there is no controlling authority, and the resolution of which would materially advance this adversary proceeding and AHMIC's bankruptcy case as a whole. But the broad, vague, and fact dependent "issues of first impression" AHMIC posits are not the questions of law contemplated by section 158(d)(2)(A) to predicate a direct appeal. What is more, they do not implicate a sufficiently broad swath of debtors to merit immediate circuit court review. A truncated appellate process will not expedite this bankruptcy case – which is bound for liquidation – in any meaningful way. This Court should accordingly deny the Certification Request.

## FACTS

### I.    FACTUAL BASIS FOR MOTION TO DISMISS

AHMIC's Complaint, upon which Lehman based its motion to dismiss and this Court based its Opinion, alleged the following facts:

#### A.    Background with Respect to the AHMIC/Lehman Repurchase Agreement

On August 6, 2007, AHMIC and its affiliated debtors (collectively, the "American Home Parties") filed petitions in this Court pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). See Complaint at ¶ 40.[1]

Before their chapter 11 filings, the American Home Parties engaged in the

---

[1]    The American Home Parties no longer originate mortgage loans. The bankruptcy proceedings have largely involved winding up the American Home Parties affairs and marshalling the property of the estate for distribution. The American Home Parties' exclusive period for filing a plan of reorganization currently expires August 19, 2008. See Order (Docket No. 5174).

business of residential mortgage loan origination. <u>See</u> Complaint at ¶ 9. They funded a portion of that business by selling mortgage loans to special-purpose entities ("<u>SPEs</u>"). The SPEs, in turn, financed the purchases of those mortgages by issuing commercial paper and subordinated notes. <u>See</u> Complaint at ¶ 9. Broadhollow Funding, LLC ("<u>Broadhollow</u>"), one such SPE, acquired thousands of mortgage loans from American Home Mortgage Corp. Broadhollow used certain of these mortgages as collateral in issuing Series 2004-A Subordinated Notes under a Base Indenture dated May 27, 2004, and later Series 2005-A Subordinated Notes under a Supplement to the Base Indenture dated as of June 7, 2005. <u>See</u> Complaint at ¶ 10, 12.

On or about June 8, 2005, LBI sold $53,125,000 worth of Broadhollow Series 2005-A Subordinated Notes to AHMIC. On July 11, 2007, LBI sold $31 million worth of Series 2004-A Subordinated Notes to AHMIC. (All of the subordinated notes purchased by AHMIC from LBI in 2005 and 2007 are collectively referred to herein as the "<u>Subordinated Notes</u>"). <u>See</u> Complaint at ¶¶ 15, 18. In both the June 8, 2005 and July 11, 2007 transactions, AHMIC acquired the Subordinated Notes from LBI at a price equal to 97% of their face value.

On July 13, 2007, AHMIC sold the Subordinated Notes to LBI pursuant to a Master Repurchase Agreement (the "<u>MRA</u>"). <u>See</u> Complaint at ¶¶ 16, 17, 18; MRA at ¶ 1. The MRA is the September 1996 version of The Bond Market Association form Master Repurchase Agreement, along with two annexes thereto. The MRA includes an explicit acknowledgement by the parties that their agreement is "a 'repurchase agreement' as that term is defined in Section 101 of Title 11 of the United States Code, as amended" and "a 'securities contract' as that term is defined in Section 741 of Title 11 of the United States Code, as amended" subject to any limitations those definitions impose. <u>See</u> MRA at ¶ 19.

Pursuant to the MRA, LBI agreed to pay AHMIC $61,200,930 for the

Subordinated Notes, which is an amount equal to 75% of the price paid by LBI (or 75 % of 97% of face value). <u>See</u> Complaint at ¶ 17. Under the MRA, AHMIC was obligated to repurchase the Subordinated Notes from LBI at a date certain or on demand for a specified sum, known as the "Repurchase Price." <u>See</u> MRA at ¶¶ 1, 2(r). In the interim, as is typical in repurchase arrangements, LBI had the bargained-for right to monitor the "market value" of the Subordinated Notes and, if their value fell below a specified level, to demand that AHMIC make margin payments to LBI. <u>See</u> <u>id.</u> at ¶ 4. If AHMIC failed to make a margin payment, LBI was entitled to declare an Event of Default under the MRA, accelerate AHMIC's repurchase obligation, and either (a) sell the Subordinated Notes to cover AHMIC's repurchase obligation or (b) in its sole discretion, elect to mitigate against any damages LBI suffered as a result of the Event of Default. <u>See</u> <u>id.</u> at ¶ 11.

### B.    AHMIC's Events of Default

On July 23, 2007, in the midst of extreme turmoil in the credit markets, LBI issued a margin call to AHMIC in the amount of $3,785,625, asserting that the market value of the Subordinated Notes had dropped to 91% of their face value. AHMIC satisfied that margin call. <u>See</u> Complaint at ¶¶ 2, 25-28. On July 26, 2007, LBI issued another margin call in the amount of $6,940,313, advising AHMIC that the value of the Subordinated Notes had fallen to 80% of their face value. <u>See</u> <u>id.</u> at ¶ 30-32. AHMIC did not satisfy the July 26 margin call. <u>See</u> <u>id.</u> at ¶ 3, 33.

On August 1, 2007, as a result of AHMIC's failure to satisfy the July 26 margin call, LBI issued a notice of default to AHMIC under the MRA. <u>See</u> Complaint at ¶ 36. On August 6, 2007, AHMIC filed for bankruptcy protection in this Court, thereby triggering an independent Event of Default under the MRA. <u>See</u> MRA at ¶¶ 2(a), 11(v). The MRA provides

that "either party's right to liquidate Securities delivered to it in connection with Transactions

hereunder or to exercise any other remedies pursuant to Paragraph 11 hereof is a contractual

right to liquidate such Transaction as described in Sections 555 and 559 of Title 11 of the United

States Code, as amended." See id. at ¶ 19.

AHMIC alleges that on August 27, 2007, LBI notified AHMIC that it had

exercised its option under the MRA to terminate the agreement and that it either had foreclosed

or intended to foreclose on the Subordinated Notes. *See* Complaint at ¶ 41. AHMIC also alleges

that for the purposes of the foreclosure, LBI assigned a market value to the Subordinated Notes

of 68.25% of their face value. See id. at ¶ 42.

## II.    AHMIC'S CLAIMS AND LEHMAN'S MOTION TO DISMISS

On October 24, 2007, AHMIC filed its Complaint against Lehman seeking

recovery based on four causes of action (breach of contract, turnover, conversion, and unjust

enrichment) and also asserting a claim for a declaratory judgment with five subparts. Lehman

moved to dismiss the bulk of the Complaint, on the basis that Lehman was entitled to the

protections of the safe harbors of both section 555 and section 559 of the Bankruptcy Code.

Lehman also argued that AHMIC had failed to state a cause of action for breach of contract,

turnover, unjust enrichment and conversion.

After briefing and oral argument, the Court issued its Opinion on May 23, 2008

(the "Opinion"). In the Opinion, the Court found that the MRA was a "repurchase agreement" as

defined by the Bankruptcy Code, and held that Lehman's rights under the MRA's *ipso facto*

clause were protected  both sections 555 and 559 of the Bankruptcy Code. See Opinion at 2.

The Court held that *either* safe harbor allowed Lehman to enforce its contractual rights after

AHMIC's petition for bankruptcy, despite the automatic stay. See Opinion at 29-30. The Court

also held that turnover, conversion, and unjust enrichment are not applicable to this case and

rejected all but one of AHMIC's declaratory judgment subcounts (which AHMIC later requested

be dismissed for the purposes of obtaining a final judgment with respect to all of its claims in the

Complaint).  <u>See</u> Opinion at 52.

Specifically, the Court held in the Opinion that:

- Section 559 of the Bankruptcy Code applies to the MRA because the MRA is a "repurchase agreement," as defined in 11 U.S.C. 101(47).  <u>See</u> Opinion at 19.

- Section 555 of the Bankruptcy Code applies to the MRA because the MRA is a "securities contract" and LBI is a "stockbroker." <u>See</u> Opinion at 28-29.

- Because both "safe harbors" in section 555 and section 559 apply, Lehman did not violate the automatic stay when it exercised its rights under the MRA. <u>See</u> Opinion at 30.

- The unambiguous terms of the MRA show that it is a sale and purchase agreement and not a secured loan.  <u>See</u> Opinion at 36.

- Lehman's foreclosure and/or liquidation of the Subordinated Notes was not governed by Article 9 of the U.C.C.  <u>See</u> Opinion at 38.

- Because an Event of Default occurred under the MRA when AHMIC filed its bankruptcy petition, AHMIC failed to state a claim for breach of contract.  <u>See</u> Opinion at 40.

- AHMIC's turnover claim was premature.  <u>See</u> Opinion at 43.

- AHMIC's conversion claim was legally deficient because it merely restated AHMIC's breach of contract claim.  <u>See</u> Opinion at 47; and

- AHMIC's unjust enrichment claim must be dismissed because the MRA is a valid and enforceable contract and because AHMIC has not alleged any unjust enrichment other than the alleged wrongful foreclosure and/or liquidation.  <u>See</u> Opinion at 49.

In accordance with the Opinion, the Court issued an order dated May 23 (the

"<u>May 23 Order</u>") which dismissed with prejudice all but one subcount of the declaratory

judgment and AHMIC's breach of contract claim (which was dismissed without prejudice and

with leave to re-file). On June 3, 2008, AHMIC moved to amend that order as a final judgment

on the dismissed claims, requesting that the Court dismiss the remaining declaratory judgment

subcount and stating that it had no intention of re-pleading the breach of contract claim.

On June 30, 2008, the Court modified and entered the May 23 Order. On July 10,

2008, AHMIC appealed the May 23 Order and requested certification of the appeal directly to

the United States Court of Appeals for the Third Circuit.

## **ARGUMENT**

Under 28 U.S.C. § 158(d)(2)(A), added to the Bankruptcy Code by the

Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"), an otherwise

appealable judgment or order shall be taken directly to the governing circuit court of appeals if

either the parties jointly certify or the applicable court certifies that:

> (i) the judgment, order, or decree involves a question of law as to
> which there is no controlling decision of the court of appeals for
> the circuit or the Supreme Court of the United States, or involves a
> matter of public importance;
>
> (ii) the judgment, order, or decree involves a question of law
> requiring resolution of conflicting decisions; or
>
> (iii) an immediate appeal from the judgment, order, or decree may
> materially advance the progress of the case or proceeding in which
> the appeal is taken;
>
> and if the court of appeals authorizes the direct appeal of the
> judgment, order, or decree.

AHMIC argues that both prongs of factor (i), as well as factor (iii), are applicable

to this case. AHMIC asserts that the Opinion resolved numerous "issues of first impression" for

which there is no controlling precedent and that these "issues of first impression" involve matters

of public importance. AHMIC also argues that direct certification will materially advance both

this adversary proceeding (because an appeal to the Third Circuit is, in AHMIC's opinion,

inevitable) and the American Home bankruptcy as a whole (because AHMIC is considering bringing "numerous" similar claims against other repo partners).

There are two fundamental, and related, problems with AHMIC's request for certification. First, AHMIC has not complied with its obligation under interim Bankruptcy Rule 8001(f)(3)(C) to state the "question itself" that is being appealed. Instead, the certification motion states sweeping so-called "issues of first impression" that more closely resemble open-ended law school exam topics than discrete legal questions that are appropriate for appeal in this case. Without questions tailored to the Opinion itself, this Court's task of applying the standards that have developed under section 158(d)(2)(A) becomes a speculative exercise and a waste of time. Second, even if this Court on its own identified the appealable issues in this case, it is unlikely that they would be the type of questions contemplated by the statute for direct certification, that is, legal principles of general application. This Court's Opinion focused its application of legal principles on the specific facts alleged in AHMIC's complaint, and thus any appellate issue would be fact-dependent.

There are other problems with AHMIC's application. For example, AHMIC cannot satisfy the "public importance" test under section 158(d)(2)(A) because the significance of the "issues" AHMIC posits – even if generously read – do not rise to the level courts have recognized as necessary for certification. Indeed, because this Court's Opinion applied clear statutory language and precedent to reach its conclusions, and because AHMIC's arguments would frustrate settled expectations regarding the applicability of the Bankruptcy Code's safe harbor provisions to repurchase agreements, future actors will benefit from careful review at *each* appellate level. Likewise, as it is in the process of liquidating, AHMIC cannot show that resolution of its "issues" would materially advance its bankruptcy any more than would a normal

appeal to the district court. Finally, it is significant that AHMIC has not attempted to argue that its "issues," even stated as broadly and vaguely as they are, are the subject of conflicting decisions in other courts. The presence of a conflict is a hallmark of nearly all published opinions involving questions that have been certified for direct appeal.

## I.    AHMIC FAILED TO IDENTIFY A QUESTION OF LAW THAT WARRANTS DIRECT APPEAL

Under 28 U.S.C. § 158(d)(2)(A)(i), an appeal shall be certified to the circuit court of appeals if it involves a question of law "as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States." AHMIC bears the burden of stating such a question in its certification request and then demonstrating that the Opinion "involved" such a question. Id. AHMIC has done neither.

### A.    AHMIC Has Not Stated Questions For Appeal

The five "issues of first impression" on which AHMIC seeks certification, listed on pages 2 and 3 of the Certification Request and repeated in more general terms on pages 11 and 12, do not satisfy the very basic requirement that they be stated as legal questions appealing a specific issue decided in the Opinion. See Fed. R. Bankr. P. 8001(f)(3)(C) (interim rule). Indeed, the "issues" make no reference to this Court's Opinion, or to the facts alleged in AHMIC's complaint. They do not even suggest any particular answer that AHMIC will seek to have an appeals court reach. Instead, AHMIC's "issues" merely state broad legal topics that, according to AHMIC, were "involved" in this Court's Opinion. This Court is left to guess at what specific holding AHMIC intends to appeal, and how AHMIC believes the question should be resolved. That is plainly not a sufficient basis on which to base a decision to certify, and for that reason alone AHMIC's request for certification should be denied.

**B.    Section 158(d)(2)(A)(i) Applies Only To Pure Questions Of Federal Law**

The legislative history for section 158(d)(2)(A) "confirms that Congress intended [it] to facilitate … provision of guidance on *pure questions of law*." Weber v. United States Tr., 484 F.3d 154, 158 (2d Cir. 2007) (emphasis supplied). According to Weber, a case on which AHMIC's relies, a "pure" question of law is "discrete," "controlling," and "not heavily [fact] dependent," and "can often be decided based on an incomplete or ambiguous record." Id.; see also Davis v. Hildebrand (In re Davis), 512 F.3d 856 (6th Cir. 2008) (citing Weber approvingly); In re 15375 Memorial Corp., Case No. 08-313-SLR, 2008 U.S. Dist. LEXIS 50842 at * 4-5 (D. Del. July 3, 2008) (refusing to certify bankruptcy law-related questions where the inquiry required was "necessarily fact-intensive").

The fact that the circuit may not have published an opinion on the precise question as presented by the appellant is not dispositive. If there is no confusion within, or disputes among, the bankruptcy or district courts with respect to the relevant inquiry, then courts should be reluctant to certify the question directly to the circuit. In re Marrama, 345 B.R. 458, 474 (Bankr. D. Mass. 2006); see also In re Davis, 512 F.3d at 858 (refusing to hear certified direct appeal because material advancement and conflicting case law prongs of section 158(d)(2)(A) were not met, and ignoring apparent lack of circuit-level precedent on question presented). In In re Marrama, the Bankruptcy Court denied certification even though the First Circuit had not ruled on the issue, because there was "no significant dispute" regarding the issue sought to be certified. In re Marrama, 345 B.R. at 474.

Similarly, even when there is a lack of appellate precedent, where a question of law is "answered directly by . . . statutory provisions," courts have rejected requests for certification. In re Fields, 05-60595-JHW, 2006 Bankr. LEXIS 4090 at * 7 (Bankr. D. N.J.

October 24, 2006).    Finally, where state law provides the rule of decision on the question

presented, there is no legal issue requiring a direct appeal to the circuit court.  See In re 15375

Memorial Corp., 2008 U.S. Dist. LEXIS 50842 at * 6 (rejecting certification where some

questions presented for appeal involved state law, material advancement could not be shown, and

non-state-law questions presented were not pure questions of law because they involved the

application of clear standards to new facts presented and were thus "necessarily fact intensive").

        AHMIC apparently takes the opposite view: that so long as a party can state its

issue in a way that had not previously appeared in a previous appellate precedent, it is entitled to

appeal.  See Certification Request at 13.  Not even the cases cited by AHMIC stand for that

proposition.  Id. (citing Tidewater Finance Company v. Kenney, Case No. 07-1664, 2008 U.S.

App. LEXIS 13377 (4th Cir. June 25, 2008); In re Scotia Pac. Co. LLC, 508 F.3d 214, 220 (5th

Cir. 2007); In re Perlin, 497 F.3d 364 (3d Cir. 2007)).   In Tidewater, the Fourth Circuit accepted

the certified appeal because in addition to lacking direct controlling precedent, the question at

hand "requires the resolution of conflicting decisions among bankruptcy courts in various

circuits." 2008 U.S. App. LEXIS 13377 at *5.  In re Scotia Pac. Co. LLC dealt primarily with

procedural aspects of § 158(d)(2)(A), and the Fifth Circuit's ultimate acceptance of certification

was premised principally on the fact that "both the bankruptcy court and the district court sought

to certify [the judgment] to this court for appeal." 508 F.3d at 220.   In re Perlin contains no

discussion whatsoever explaining the Third Circuit's decision to accept direct certification other

than two passing references to the fact that the case was certified by the bankruptcy court.  497

F.3d 364 at 367-69.  In addition, each of these cases involved a "pure question of law" worthy of

direct appeal – a factor that is missing from AHMIC's Certification Request.

        For all of these reasons, AHMIC's request for certification fails.

### C.    AHMIC Has Failed To Demonstrate That The Opinion Involved A Pure Question Of Federal Law Meriting Certification

None of the five broad "issues" AHMIC has stated present pure, discrete issues of federal law that require an accelerated appellate process. Even if this Court were to decipher from the "issues" some discrete legal questions that bear on this Court's holdings in the Opinion, the answers to those questions would undoubtedly be heavily dependant on the facts that AHMIC has alleged in its complaint. None of the findings in the Opinion were independent of those facts. Any appellate decision on an issue that could be drawn from the Opinion would have to be stated in terms of the specific facts on which AHMIC bases its claim. As a result, all of the "issues" AHMIC cites are deficient and cannot satisfy the requirements of section 158(d)(2)(A)(i). See Weber, 484 F.3d at 158-59.

In addition, none of the "issues" AHMIC's states are "controlling." They do not identify any specific decision this Court made that they find objectionable, and it requires wholesale speculation to figure out what ruling of this Court would be reversed if they were decided in AHMIC's favor. See In re Advanced Mktg. Serv., Inc., Misc. Act. No. 07-28-JJF, 2008 U.S. Dist. LEXIS 27582 at * 4 (D. Del. April 3, 2008)(noting, in 28 U.S.C. 1292 context, that certification for appeal is only warranted when legal conclusion in question, if erroneous, would constitute reversible error). For this reason as well, AHMIC's request should be denied.

AHMIC's issues also fail to satisfy the statutory standard for the following specific reasons:

### Issue 1

**Whether any restrictions or standards apply to a repurchase-agreement lender in its performance of a repurchase agreement and in its exercising remedies under that agreement (e.g., foreclosing and liquidating the securities it purchased under the repurchase agreement following an ipso facto termination), including standards (a) expressly contained in the**

repurchase agreement (e.g., language requiring commercial reasonableness); (b) allegedly inherent in the repurchase agreement (e.g., an implied covenant of good faith and fair dealing) or (c) imposed under non-bankruptcy law (e.g., U.C.C. Article 9).

In addition to not being a pure, discrete, controlling question of law, Issue 1 does not require direct appeal because it rests entirely upon New York state contract and U.C.C. law. As we discussed above, questions of state law are not appropriate issues for direct appeal to the federal circuit courts of appeals. See In re 15375 Memorial Corp., 2008 U.S. Dist. LEXIS 50842 at * 6.

## Issue 2

**Whether the repurchase-agreement borrower can state a claim upon which relief can be granted for the lender's breach of that agreement when the agreement terminates after the borrower's bankruptcy filing.**

In addition to not being a pure, discrete, controlling question of law, Issue 2 does not require direct appeal because, like Issue 1, it is an issue that is answered primarily by the application of New York state contract law to the particular facts alleged in this case. To the extent Issue 2 refers to the application of Federal Rule of Civil Procedure 12(b)(6), there are countless cases in this Circuit giving guidance on the application of Rule 12(b)(6) to state-law contract actions, and therefore Issue 2 does not require direct certification. See In re Marrama, 345 B.R. at 474.

## Issue 3

**The entitlement of a repurchase-agreement borrower to its residual interest in securities it sold under a repurchase agreement (after repaying amounts the borrower owes thereunder) – including the debtor/borrower's entitlement under section 559 of the Bankruptcy Code to that residual interest – and whether an _ipso facto_ termination extinguishes that entitlement.**

In addition to not being a pure, discrete, controlling question of law, Issue 3 does

not require direct appeal (and indeed cannot be raised on appeal) because AHMIC did not raise either question stated in Issue 3 before this Court.  See generally, Holmes v. Pension Plan of Bethlehem Steel Corp., 213 F.3d 124, 139 (3d Cir. 2000) (refusing to examine legal issue not raised before the lower court).

The only issue argued below that touched upon AHMIC's alleged entitlement to any residual interest in the value of the securities foreclosed upon by Lehman was whether AHMIC had stated a claim for turnover of estate property pursuant to Bankruptcy Code section 542, or for unjust enrichment.  See Answering Brief of Plaintiff American Home Mortgage Investment Corp., dated December 10, 2007 (Docket No. 16), at 3, 24.  As AHMIC concedes in its Certification Request, the Court dismissed the turnover claim because it was premature, and the unjust enrichment claim because the MRA governed AHMIC's claims.  See Opinion at 41-43, 47-51; Certification Request at 8.  Even if the argument and decision on these claims could be deemed to have raised a pure question of law addressing AHMIC's alleged entitlement to residual interests, the questions depend either upon the application of settled bankruptcy law or of state law to the facts of this case, and are not appropriate for direct appeal.  See In re 15375 Memorial Corp., 2008 U.S. Dist. LEXIS 50842 at * 6; In re Marrama, 345 B.R. at 474.

### Issue 4

**Whether the residual interest of a repurchase-agreement borrower in securities it sold under a repurchase agreement (after repaying amounts the borrower owes thereunder) constitutes property of that borrower's bankruptcy estate pursuant to section 559 of the Bankruptcy Code that is subject to turnover.**

In addition to not being a pure, discrete, controlling question of law, Issue 4 does not require direct appeal because it turns on the settled law and statutes governing Bankruptcy Code section 542 turnover actions.  See, e.g., In re Fields, 2006 Bankr.

LEXIS 4090 at * 7 (denying certification of direct appeal where statute provides clear

rule of decision); In re Marrama, 345 B.R. at 474 (denying certification where there is

"no significant dispute regarding the applicable standard"). This Court relied on settled

case law when it held that turnover actions are only proper where the debtor's entitlement

to property is not in dispute. See Opinion at 41-43.

**Issue 5**

**The scope of the phrases "interests in mortgage loans" and "mortgage related securities" in the "repurchase agreement" definition found in section 101(47) of the Bankruptcy Code.**

   In addition to not being a pure, discrete, controlling question of law, Issue 5 does

not require direct appeal because even if Issue 5 were deemed to raise a satisfactorily pure and

discrete question, there would be no reversible error. This Court found that both the safe harbors

of sections 559 *and* 555 of the Bankruptcy Code permitted Lehman's termination of the contract

and foreclosure of the securities. See In re Advanced Mktg. Serv., Inc., 2008 U.S. Dist. LEXIS

27582 at * 4 (noting, in 28 U.S.C. 1292 context, that certification for appeal is only warranted

when legal conclusion in question, if erroneous, would constitute reversible error). Section 555

applies to the termination of the MRA because the MRA was a "securities contract" as defined in

section 741(7) of the Bankruptcy Code, that is, "a contract for the purchase, sale, or loan of a

security ...". As Lehman demonstrated in its briefing below, whether or not the Broadhollow

Notes were "interests in mortgage loans" or "mortgage related securities" pursuant to section

101(47) of the Bankruptcy Code, they were indisputably "securities" as defined in section

101(49) of the Bankruptcy Code. See Opening Brief in Support of Motion to Dismiss, dated

Nov. 26, 2007 (Docket No. 6), at 9.

## II.    THE MAY 23 ORDER DOES NOT IMPLICATE THE TYPE OF LEGAL QUESTIONS OF PUBLIC IMPORTANCE THAT WARRANT DIRECT APPEAL

28 U.S.C. § 158(d)(2)(A)(i) permits a direct appeal if the relevant judgment, order, or decree, "involves a matter of public importance." Here, however, considerations of public policy and the public interest actually weigh *against* direct appeal in this particular matter. Case law suggests that certification of issues of "public importance" for direct appeal should be granted only rarely, in cases in which numerous debtors may be immediately affected. Indeed, the two cases AHMIC cited in support of its argument for "public importance" certification both arise out of *consumer* bankruptcies where there is the potential for a single question of law to arise in a large number of bankruptcy cases. See In re Ransom, 380 B.R. 809 (9th Cir. BAP 2007) (certifying for direct appeal question relating to Chapter 13's "projected disposable income" requirement where "no less than fifty bankruptcy courts" had already addressed the issue); In re Virissimo, 332 B.R. 208 (Bankr. D. Nev. 2005) (certifying issue involving conflict between Nevada's "extremely liberal" homestead exemption and BAPCPA amendments to 11 U.S.C. §522(p) effecting homestead exemptions); see also In re Salazar, 339 B.R. 622, 634 (Bankr. S.D. Tex. 2006) (certifying for appeal question whether bankruptcy filing by debtor who is ineligible for Chapter 13 protection under BAPCA nevertheless creates a bankruptcy case and triggers automatic stay, citing the "importance of this matter for many consumer debtors and their creditors"). Here, by contrast, the reverse is true – very few cases have raised the issues AHMIC asserts. Those cases raising similar issues have reached similar conclusions. Certification of AHMIC's case for direct appeal would undermine this unanimity by suggesting that there is an open question on the validity of safe harbor protections for repurchase transactions.

Moreover, public policy favors setting a high bar for "public importance" appeal certifications, so as not to overwhelm the circuit courts. See, e.g., 1-5 COLLIER ON BANKRUPTCY

5.05[A] (15th ed. rev.) ("The bar for certification under [the public importance standard] should

be set high. A 'matter of public importance' should transcend the litigants and involve a legal

question the resolution of which will advance the cause of jurisprudence to a degree that is

usually not the case"). Pointing to its broad and vaguely-worded "issues of first impression,"

AHMIC argues that direct appeal is appropriate whenever a question of law "affects debtors

generally or creates the prospect of divergent authority." Certification Request at 14. This

reading is not supported by the case law that AHMIC cites, nor by any other precedent of which

Lehman is aware. Unless Congress intended the phrase "involves a matter of public

importance" to open the floodgates to direct appeals in an overwhelming number of settings, the

standard for appeals under this provision must be set much higher.

## III.   A DIRECT APPEAL WILL NOT MATERIALLY ADVANCE EITHER THE BANKRUPTCY OR THE ADVERSARY PROCEEDING

Resolution of AHMIC's "issues" also would not materially advance this proceeding. 28

U.S.C. § 158(d)(2)(A)(iii) permits this Court to certify a question for direct appeal if such an

appeal would "materially advance the case or proceeding in which the appeal is taken." AHMIC

argues that a direct appeal will materially advance this adversary proceeding because a later

appeal to the Third Circuit "may be inevitable," and an appeal to the district court would be

nothing more than "an intermediate step on the path to the [appeals court]." Certification

Request at 16. This facile argument has already been rejected by another bankruptcy court. In

In re Frye, Case No. LA 07-01150, 2008 Bankr. LEXIS 1319 (Bankr. C.D. Cal. Apr. 22, 2008),

the court denied certification even though it acknowledged that direct appeal would materially

advance the progress of the particular adversary proceeding involved because, "it is *always* the

case that skipping one level of appeal would make the appeals process shorter. If such a showing

were sufficient to entitle an appellant…to a certification under section 158(d)(2), every appeal

would be an appropriate candidate for certification under this section. Clearly, more must be required..." Id. at *3-4 (emphasis in original).

The same is true for this case. The "more" that Frye requires is a showing of why a direct appeal to the Third Circuit would materially advance this adversary proceeding or this bankruptcy case more than would a normal appeal to the district court. See In re Marrama, 345 B.R. at 474. AHMIC does not even attempt to make that showing as to this adversary proceeding, resting its entire argument on the premise rejected by Frye.

Direct appeal will also not advance the bankruptcy case as a whole. The plan in this case will be to liquidate the Debtor's assets, litigate any claims of the estate, and pay out the proceeds to creditors. That plan would not depend, in any way, on the speed with which AHMIC's appeal is tried. AHMIC ignores this, hinting instead that it has been "investigating possible claims and causes of action against its various lenders and repurchase-agreement counterparties," and that faster resolution of this appeal would aid the debtors' ability to maximize value. Certification Request at 16. Even this is specious. AHMIC has not pointed to any facts showing that the speed with which this bankruptcy case is resolved will have any bearing upon the size of any recovery it will be able to recover from putative "lenders" and repo "counterparties." There is no reason to believe – and no argument in AHMIC's brief suggesting – that any portion of the bankruptcy case will be "materially advanced" by shortcutting the normal appeals process.

## IV.    IT IS SIGNIFICANT THAT AHMIC DID NOT, AND CANNOT, POINT TO CONFLICTING CASE LAW IN SUPPORT OF ITS CERTIFICATION REQUEST

Finally, it is telling that AHMIC does not argue that the May 23 Order requires "resolution of conflicting decisions." Even though 28 U.S.C. § 158(d)(2)(A) allows direct appeals if any of the enumerated factors are present, the existence of conflicting opinion is particularly important for courts reviewing a certification decision. In In re Marrama court

noted, "*while there is no controlling case law in this circuit*, the case law above reflects that

there is no significant dispute regarding the applicable standard," 345 B.R. at 474 (emphasis

supplied). For the <u>Marrama</u> court, the lack of controlling precedent alone was not enough to

warrant direct certification, because the question presented lacked sufficient substantive weight

to warrant the appeals court's immediate attention.

The Opinion applied consistent precedent in line with settled expectations. The only

court to ever find that termination of a repo agreement *was* subject to the automatic stay is the

bench ruling of *Lombard-Wall Inc. v. Columbus Bank & Trust Co. (In re Lombard-Wall Inc.)*,

No. 82-8-11556 (Bankr.S.D.N.Y. Sept. 16, 1982). Reaction to the *Lombard-Wall* decision was

swift and fierce:

> "Congress, the Board of Governors of the Federal Reserve, the
> Public Securities Association, the Investment Company Institute
> and others, were concerned that if *Lombard-Wall* became the law
> governing repo transactions, the failure of one repo dealer, and the
> consequent inability of repo participants to promptly liquidate their
> investments to obtain cash to meet obligations, could have a ripple
> effect throughout the country's financial markets, causing an
> otherwise isolated financial problem to spread to many other
> entities."

*Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer S&L Ass'n. (In re Bevill, Bresler &*

*Schulman Asset Mgmt. Corp.)*, 878 F.2d 742, 748 (3d Cir. 1989). The Opinion was consistent

with more than 20 years of legislative action and precedent since *Lombard-Wall* that indicates

that repo participants can and should be able to liquidate their position in the even that the repo

counter-party files for bankruptcy. The fact that AHMIC cannot argue that there is any

conflicting opinion on this point is yet another reason why certification should be denied.

**-Remainder of Page Left Intentionally Blank-**

**WHEREFORE**, Lehman respectfully requests that this Court deny the Certification

Request.


Dated: Wilmington, Delaware
       August 1, 2008

                                     **ASHBY & GEDDES, P.A.**


By: _AMWinfree_____
                  William P. Bowden (I.D. #2553)
                  Amanda M. Winfree (I.D. #4615)
                  500 Delaware Avenue, 8th Floor
                  P.O. Box 1150
                  Wilmington, Delaware 19899
                  Telephone:  (302) 654-1888
                  Facsimile:  (302) 654-2067

                  and

                  **LATHAM & WATKINS LLP**

                  Robert J. Rosenberg
                  Noreen A. Kelly-Najah
                  George Royle
                  Michael J. Riela
                  Jason Sanjana
                  885 Third Avenue, Suite 1000
                  New York, New York 10022
                  Telephone:  (212) 906-1200
                  Facsimile:  (212)  751-4864

                  Attorneys for Defendants Lehman Brothers
                  Inc. and Lehman Commercial Paper Inc.

**EXHIBIT D**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERICAN HOME MORTGAGE, | ) Case No. 07-11047 (CSS) |
| HOLDINGS, INC., a Delaware Corporation, | ) Jointly Administered |
| et al., | ) |
| | ) |
| Debtors. | ) |
| | ) |
| AMERICAN HOME MORTGAGE | ) |
| INVESTMENT CORP., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Proc. No. 07-51739 (CSS) |
| | ) |
| LEHMAN BROTHERS INC., and LEHMAN | ) Re: 38 |
| COMMERCIAL PAPER INC., | ) |
| | ) |
| Defendants. | ) |

### ORDER

Upon consideration of the Request of American Mortgage Investment Corporation,

Pursuant to 11 U.S.C. § 105(a), 28 U.S.C. §158(d)(2) and Fed. R. Bankr. P. 8001(f), For

Certification For Direct Appeal to United States Court Of Appeals For Third Circuit of

Order Dismissing In Part With Prejudice And In Part Without Prejudice Complaint Against

Lehman Brothers Inc. And Lehman Commercial Paper Inc. (As Amended) filed on July 10,

2008 (the "Certification Request") [D.I. 38]; the Court having reviewed the Certification

Request and Lehman Brothers Inc. and Lehman Commercial Paper Inc.'s Opposition To

Motion Of American Home Mortgage Investment Corporation For Certification For Direct

Appeal To The United States Court Of Appeals For The Third Circuit Pursuant to 11 U.S.C.

§ 105(a), 28 U.S.C. §158(d)(2) and Fed. R. Bankr. P. 8001(f) ("Lehman Response") [D.I. 46]

filed on August 1, 2008; and the Court finding that:

(1)     The Court has jurisdiction over these matters, pursuant to 28 U.S.C. §1334;

(2)     This is a core proceeding, pursuant to 28 U.S.C. § 157(b);

(3)     Notice of the Certification Request was adequate under the circumstances;

(4)     On July 10, 2008, Plaintiff filed a Notice of Appeal [D.I. 36] from this Court's Order Granting Motion, Pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9023 and 11 U.S.C. §105(a), to Alter and Amend May 23 Order [D.I. 34];

(5)     Pursuant to a Stipulation and Consent Order Among American Home Mortgage Investment Corporation and Lehman Brother, Inc. And Lehman Commercial paper, Pursuant to 11 U.S.C. §105(a) and Fed. R. Bankr. P. 8006 and 9006 (B)(1), Extending Deadlines (I) for American Home to File Designation of Items To Be Included In Record on Appeal and Statement of Issues on Appeal and (II) for Lehman to file Response to Certification Request [D.I. 44] dated July 21, 2008, the time for Defendants to respond to the Certification Request and to designate items to include in the record on appeal was extended to August 1, 2008;

(6)     On August 1, 2008 Lehman filed the Lehman Response and the Designation of Appellant American Home Mortgage Investment Corporation, Pursuant to Fed. R. Bankr. P. 8006, of Items to be Included in the Record on Appeal and Statement of Issue on Appeal with Respect to Appeal from (I) Order Dismissing In Part With Prejudice and In Part Without Prejudice Complaint Against Lehman Brothers Inc. and Lehman Commercial Paper Inc. and (II) Order Granting motion to Alter and Amend Order Dismissing Complaint [D.I. 45];

(7)     On August 5, 2008, the Court transmitted the record on appeal to the United States District Court for the District of Delaware (the "District Court");

(8)     On August 5, 2008, the appeal was docketed at the District Court;

(9)     Rule 8001(f)(2) of the Federal Rules of Bankruptcy Procedure provides:

2

(2) <u>Court Where Made</u>. A certification that a circumstance specified in 28 U.S.C. §158(d)(2)(A)(i)-(iii) exists shall be filed in the court in which a matter is pending for purposes of 28 U.S.C. §158(d)(2) and this rule. A matter is pending in a bankruptcy court until the docketing, in accordance with Rule 8007(b), of an appeal taken under 28 U.S.C. §158(a)(1) or (2), or the grant of leave to appeal under 28 U.S.C. §158(a)(3). A matter is pending in a district court or bankruptcy appellate panel after the docketing, in accordance with Rule 8007(b), of an appeal taken under 28 U.S.C. §158(a)(1) or (2), or the grant of leave to appeal under 28 U.S.C. §158(a)(3).

(A)    <u>Certification by Court on Request or Court's Own Initiative</u>.

(i)    <u>Before Docketing or Grant of Leave to Appeal</u>. Only a bankruptcy court may make a certification on request or on its own initiative while the matter is pending in the bankruptcy court.

(ii)    <u>After Docketing or Grant of Leave to Appeal</u>. Only the district court or bankruptcy appellate panel involved may make a certification on request of the parties or on its own initiative while the matter is pending in the district court or bankruptcy appellate panel.

THEREFORE, IT IS HEREBY ORDERED that, pursuant to Bankruptcy 8001(f)(2)(A)(ii), this Court is divested of power to decide whether to make a certification that a circumstance specified in 28 U.S.C. §158(d)(2)(A)(i)-(iii) exists; the Certification Request before this Court is moot; and, thus, the Certification Request is denied without prejudice.

Christopher S. Sontchi
United States Bankruptcy Court Judge

Dated: August 6, 2008

3

**EXHIBIT E**

# Thacher Proffitt

Thacher Proffitt & Wood LLP

*BANKRUPTCY BULLETIN*

*JUNE 23, 2008*

> ## AMERICAN HOME MORTGAGE INVESTMENT CORP. V. LEHMAN BROS. INC.:
> ### BANKRUPTCY COURT BROADENS REPURCHASE AGREEMENT SAFE HARBORS TO INCLUDE SUBORDINATED NOTES SECURED BY MORTGAGE LOANS AND LIMITS THE APPLICATION OF ARTICLE 9 OF THE UCC

On May 23 2008, in American Home Mortgage Investment Corp. v. Lehman Brothers, Inc., the United States Bankruptcy Court for the District of Delaware held that a transaction involving the purchase and sale of subordinated notes secured by mortgage loans was a "repurchase agreement" and a "securities contract" entitled to the financial contract safe harbor protections of sections 559 and 555 under the Bankruptcy Code. In so deciding, the Court found that the subordinated notes were "interests in mortgage loans." In addition, the Court ruled that the "commercial reasonableness" standard of Article 9 of the New York Uniform Commercial Code did not apply to the foreclosure and liquidation of the subordinated notes subject to the repurchase agreement. *Am. Home Mortgage Inv. Corp. v. Lehman Bros. Inc., et al. (In re Am. Home Mortg. Holdings, Inc.),* No. 07-11047, Adv. Proc. No. 07-51739, 2008 WL 2156323 (Bankr. D. Del. May 23, 2008).

## I. BACKGROUND

In July 2007, American Home Mortgage Investment Corp. ("AHMIC") and Lehman Brothers Inc. entered into a repurchase transaction (the "Subordinated Notes Transaction") pursuant to a pre-existing master repurchase agreement (the "Repo Agreement") among AHMIC,

Lehman Brothers Inc. and Lehman Commercial Paper Inc. (together, "Lehman") for the purchase by Lehman Brothers Inc. and the sale by AHMIC of two separate series of subordinated notes rated "BBB" by Standard & Poor's and "Baa2" by Moody's (collectively, the "Subordinated Notes"). The Repo Agreement contained an *ipso facto* clause which permitted Lehman to terminate the Repo Agreement and dispose of the Subordinated Notes if AHMIC filed for bankruptcy.

Following the initial sale of the Subordinated Notes from AHMIC to Lehman, Lehman made two margin calls under the Repo Agreement, in each instance stating that the market value of the Subordinated Notes had decreased significantly. AHMIC, while disagreeing with the drop in market value, satisfied the first margin call, but failed to satisfy the second call, which occurred three days after the first. On August 1, 2007, Lehman sent a default notice to AHMIC asserting that AHMIC's failure to meet the second margin call constituted an event of default and that Lehman reserved all of its rights under the Repo Agreement. On August 6, 2007, AHMIC and its affiliated debtors filed for protection under the Bankruptcy Code. On August 27, 2007, Lehman notified AHMIC that "it had terminated the Repo Agreement

ATTORNEY ADVERTISING

and that it either had foreclosed or intended to foreclose on the Subordinated Notes in lieu of selling them to a third party."

AHMIC responded to Lehman's deemed sale of the Subordinated Notes by commencing an adversary proceeding in the Bankruptcy Court seeking declaratory judgments that (i) the Repo Agreement was not a "repurchase agreement" as defined in section 101(47) of the Bankruptcy Code and therefore, the section 559 safe harbor under the Bankruptcy Code did not apply, (ii) Lehman was not entitled to the "securities contract" safe harbor of section 555 of the Bankruptcy Code, (iii) Lehman had violated the automatic stay imposed under section 362(a) of the Bankruptcy Code by terminating the Repo Agreement and foreclosing on and liquidating the Subordinated Notes, and (iv) Lehman's disposition of the Subordinated Notes was governed by Article 9 of the New York Uniform Commercial Code and therefore, Lehman was required to comply with the "commercial reasonableness" standard imposed by Article 9. In addition, AHMIC's complaint included claims for breach of contract, turnover of property of the estate, conversion and unjust enrichment, all of which were dismissed by the Court (notably, the breach of contract claim was dismissed without prejudice). In response, Lehman filed a motion to dismiss the bulk of the complaint, which was the subject of the Court's opinion.

## II.   THE LAW

The Court noted that the Bankruptcy Code provides special protections to non-debtor counterparties in order to preserve the liquidity of repurchase agreements. The Court stated that "without these special protections, or safe harbors as they are known, the bankruptcy of a counterparty to a repurchase agreement would impair the liquidity of the repurchase agreement and possibly lead to the bankruptcy of the non-

debtor counterparties [to such agreements]." Certain of these "special protections" permit a non-debtor counterparty to a "repurchase agreement" or "securities contract" to terminate, liquidate or accelerate the contract upon the event of a bankruptcy filing. Although clauses that permit the termination of a contract upon the occurrence of a bankruptcy filing (known as *ipso facto* clauses) are generally unenforceable under section 365(e)(1) of the Bankruptcy Code, sections 559 and 555 of the Bankruptcy Code provide exceptions to the general rule and allow the non-debtor party to exercise its rights under a repurchase agreement free from the automatic stay upon a bankruptcy filing by the counterparty.

## III.   THE COURT'S DECISION

### Section 559 of the Bankruptcy Code

In determining that section 559 of the Bankruptcy Code applied to the Repo Agreement, the Court examined whether the Subordinated Notes qualified under one of the four categories of assets set forth in the definition of "repurchase agreement" as either (i) mortgage related securities, (ii) mortgage loans, (iii) interests in mortgage related securities or (iv) interests in mortgage loans. In order to qualify as "mortgage related securities," as defined under the Securities Exchange Act of 1934, or "interests in mortgage related securities," the Subordinated Notes would have to be "rated in one of the two highest rating categories by at least one nationally recognized statistical rating organizations." Since the Subordinated Notes were rated in the fourth highest rating category by Standard & Poor's and Moody's, the Subordinated Notes failed to meet the definition of "mortgage related securities" and "interests in mortgage related securities." Rather, the Court found that the Subordinated Notes were "interests in mortgage loans" because the Subordinated Notes were secured by mortgage loans owned by the issuer of the Subordinated

Notes and accordingly, the holder of a Subordinated Note has a lien on such mortgage loans. The Court reasoned that a "lien" is defined under the Bankruptcy Code as "a charge against or <u>interest in property</u> to secure payment of a debt or performance of an obligation" and therefore, a holder of a Subordinated Note holds an "interest in mortgage loans" owned by the issuer of the Subordinated Notes. Oddly, the Court did not reach the arguably easier issue of whether the Subordinated Notes were "securities." In addition, since the structure of the Repo Agreement satisfied the required criteria of a "repurchase agreement" under the Bankruptcy Code, the Court determined that the Repo Agreement was a "repurchase agreement," and that section 559 of the Bankruptcy Code was applicable to the deemed sale transaction.

*Section 555 of the Bankruptcy Code*

Since the definition of "securities contract" under section 741 of the Bankruptcy Code includes "a contract for the purchase, sale or loan of…any interest in a mortgage loan" and because the Court had already determined that the Subordinated Notes were "interests in mortgage loans" based on its analysis of the applicability of section 559, the Court held that the Repo Agreement was a "securities contract" and met the first requirement for section 555 safe harbor protection. The second element of section 555 requires the non-debtor entity seeking protection under the safe harbor to be a "stockbroker, financial institution, financial participant or securities clearing agency." After concluding that Lehman Brothers Inc. was the sole Lehman counterparty to the Subordinated Notes Transaction (even though Lehman Commercial Paper Inc. was also a party to the Repo Agreement), the Court found that Lehman Brothers Inc. was a "stockbroker" within the meaning of the Bankruptcy Code because as a broker-dealer, it is "in the business of effecting transactions in securities

for the account of others, with members of the general public and for its own account" and has investors, which qualify as "customers."

*Section 362(a) of the Bankruptcy Code*

Since the Subordinated Notes Transaction under the Repo Agreement was a "repurchase agreement" and Lehman Brothers Inc. was a "stockbroker," the Court held that sections 559 and 555 of the Bankruptcy Code were applicable, and Lehman was entitled to enforce its rights under the Repo Agreement upon the occurrence of AHMIC's bankruptcy filing without violating the automatic stay imposed by Section 362(a) of the Bankruptcy Code.

*Applicability of Article 9 of the NYUCC*

AHMIC argued that the Repo Agreement created a security interest in the Subordinated Notes and therefore, the "commercial reasonableness" standard of Article 9 of the New York Uniform Commercial Code ("NYUCC") applied to Lehman's foreclosure and liquidation of the Subordinated Notes. The Court examined the intent of the parties in order to determine whether the Subordinated Notes Transaction under the Repo Agreement was a purchase and sale of the Subordinated Notes or merely a loan transaction in which AHMIC had granted a security interest in the Subordinated Notes[1]. After analyzing the terms of the Repo Agreement and the terminology used by the parties (e.g., "Buyer and Seller" rather than "lender" and "borrower," "Purchased Securities,"

_____

[1] Notably, in its discussion on this issue, the Bankruptcy Court did not cite to the U.S. District Court of the Southern District of New York's seminal ruling in Granite Partners, L.P. v. Bear, Stearns & Co. Inc. regarding the applicability of Article 9 to securities repurchase transactions. However, the AHMIC Court's analysis was consistent with the analysis of the District Court in Granite Partners on this issue. See *Granite Partners, et al. v. Bear, Stearns & Co. Inc., et al.,* 17 F.Supp.2d 275 (S.D.N.Y. 1998).

"Purchase Date," "Purchase Price," etc.), the Court held that the parties clearly intended that the Subordinated Notes Transaction be a purchase and sale, and not a loan. As a secondary argument, AHMIC asserted that if the Repo Agreement was found to be a purchase and sale agreement, the Subordinated Notes qualified as "promissory notes" and "payment intangibles" under the NYUCC, and that NYUCC Article 9 applied to the purchase and sale of those instruments. In ruling against AHMIC on this count, the Court cited Section 9-601(g) of the NYUCC, which states that "the duties imposed on secured parties do not apply to buyers of . . . payment intangibles or promissory notes. . . . [T]hese buyers own the entire interest in the property sold and so may enforce their rights without regarding to the seller ('debtor') or the seller's creditors." The Court concluded that even if the Subordinated Notes were considered promissory notes or payment intangibles and Article 9 applied to the purchase and sale of the Subordinated Notes, the commercial reasonableness standard of Article 9 would not apply since purchasers are not held to the same standards as secured parties.

Despite the Court's conclusion that the commercial reasonableness standard of Article 9 did not apply, it left open the possibility that Lehman's pre-petition valuation of the Subordinated Notes could be tested against the remedies provisions in the Repo Agreement ("the non-defaulting party may 'immediately sell. . . in a recognized market (or otherwise in a commercially reasonable manner) . . .'") in connection with a re-pleading of AHMIC's breach of contract claim.

As a result, we continue to recommend that non-debtor repo buyers party to similar repurchase facilities attempt to obtain third-party market values for assets when pursuing remedies after the occurrence of an event of default.

* * * *

Lana J. Deharveng, an associate in our Structured Finance practice group, authored this article. To learn more about this case and the potential affects it may have on your transactions, please contact Jeffrey Murphy or Lana Deharveng in our New York office or one of the attorneys listed on the back of this article.

Published by

THACHER PROFFITT & WOOD LLP

COMMERCIAL FINANCE AND
DISTRESSED SITUATIONS GROUP

| | |
|---|---|
| Kenneth F. Addeo | Thomas M. Leslie |
| Charles R. Berman | Christopher H. Lewis |
| Stephen J. Cerniglia | Robert E. McCarthy |
| Aimee M. Cummo | Hugh McDonald |
| Jerome J. Dano | Michael C. McGrath |
| John P. Doherty | Peter S. Morgan |
| Louis A. Evans | Jeffrey J. Murphy |
| Jonathan D. Forstot | Donald F. Simone |
| Salvatore O. Franco | E. Lee Smith |
| David S. Hall | Patrick J. Smith |
| Richard F. Hans | Trisha L. Smith |
| Thomas J. Infurna | George R. Talarivo |
| Erik D. Klingenberg | Michael J. Vitolo |
| Kenneth E. Lee | Stephen T. Whelan |
| Samuel S. Lee | Mitchell G. Williams |

© 2008 Thacher Proffitt & Wood LLP
NYLEGAL 765813v5

*********************************

The newsletter is published to alert readers to developments in the
law and not to provide substantive legal advice. Readers are urged to
consult competent counsel before acting on information contained
herein. Readers are welcome to copy articles for educational
purposes. We request only that full credit be given to Thacher
Proffitt & Wood LLP. Please email *marketing@tpw.com* for address
changes, questions or comments.

| New York, NY | Washington, DC | White Plains, NY | Summit, NJ |
|---|---|---|---|
| Two World Financial Center | 1700 Pennsylvania Ave, NW | 50 Main Street | 25 DeForest Ave |
| New York, NY 10281 | Washington, DC 20006 | White Plains, NY 10606 | Summit, NJ 07901 |
| Tel  212.912.7400 | Tel  202.347.8400 | Tel  914.421.4100 | Tel  908.598.5700 |
| Fax 212.912.7751 | Fax 202.626.1930 | Fax 914.421.4150 | Fax 908.598.5710 |

www.tpw.com

# CADWALADER

Cadwalader, Wickersham & Taft LLP
New York  London  Charlotte  Washington  Beijing

One World Financial Center, New York, NY 10281
Tel 212 504 6000  Fax 212 504 6666
www.cadwalader.com

# Clients&FriendsMemo

## *American Home* Court Expands Scope of Repo Safe Harbor

May 29, 2008

In a May 23, 2008 decision, the United States Bankruptcy Court for the District of Delaware ruled that BBB-rated mortgage-backed notes are eligible for the Bankruptcy Code's repurchase agreement safe harbor as "interests in mortgage loans".  The court also held that a repurchase agreement constituted a sale, as opposed to a financing governed by UCC Article 9 --  the first decision on this topic since the financial contract safe harbors were expanded under the 2005 amendments to the Bankruptcy Code.  The court thereby allowed the non-debtor counterparty to terminate the repo upon a bankruptcy event of default and liquidate its collateral free from the "commercial reasonableness" strictures of UCC Article 9. Judge Sontchi's decision thus confirms the breadth of the safe harbors of sections 559 (repurchase agreement) and 555 (securities contract) of the Bankruptcy Code and further clarifies the manner in which remedies may be exercised under safe harbored contracts.  The decision is *American Home Mortgage Investment Corp. v. Lehman Bros. Inc., et al. (In re American Home Mortgage Corp.)*, Bankr. Case No. 07-11047, Adv. Proc. No. 07-51739 (CSS) (Bankr. D. Del. May 23, 2008).

### Facts

Prior to American Home's bankruptcy, Lehman Brothers Inc. ("LBI") and Lehman Brothers Commercial Paper Inc. ("LBCPI"; alternatively with LBI, "Lehman") and American Home Mortgage Investment Corp. ("AHMIC") entered into a structured financing arrangement.  To finance its operations, AHMIC sold mortgage loans to a special purpose entity, Broadhollow Funding LLC ("Broadhollow"), that issued secured liquidity notes and subordinated notes to investors.  The subordinated notes in question ("Notes") were rated BBB and Baa2 by Standard & Poor's and Moody's at the time they were issued by the mortgage loan commercial paper conduit.  Subsequently, the Notes were acquired by AHMIC.  After that LBI, as buyer, and AHMIC, as seller, entered into a Master Repurchase Agreement (MRA) with respect to the Notes. The MRA documentation was based on standard agreements that are widely accepted in the industry.  AHMIC was required to post margin under the MRA and to meet margin calls with cash or additional securities.  AHMIC allegedly failed to meet at least one margin call that was issued prior its bankruptcy filing on August 6, 2007.  Upon such failure, Lehman issued a notice of default to AHMIC.  AHMIC filed a petition for relief under the Bankruptcy Code five days later. Post petition, Lehman sent a foreclosure notice to AHMIC under which it terminated the repo and stated that it "either had foreclosed or intended to foreclose on the [Notes] in lieu of selling them to a third party".  The post-petition foreclosure notice also advised the debtor that the market value of the Notes was 68.25 percent of par.

This memorandum has been prepared by Cadwalader, Wickersham & Taft LLP for informational purposes only and does not constitute advertising or solicitation and should not be used or taken as legal advice for specific situations, which depends on the evaluation of precise factual circumstances.  Those seeking legal advice should contact a member of the Firm or legal counsel licensed in their state. Transmission of this information is not intended to create, and receipt does not constitute, an attorney-client relationship. Confidential information should not be sent to Cadwalader, Wickersham & Taft LLP without first communicating directly with a member of the Firm about establishing an attorney-client relationship.

# C A D W A L A D E R

AHMIC subsequently filed an adversary complaint against Lehman alleging breaches of contract (both pre- and post-petition), turnover of property of the estate, conversion, unjust enrichment, and five requests for declaratory judgment. Lehman moved to dismiss virtually all counts of the complaint, and the bankruptcy court dismissed all but one count with prejudice. The court preserved AMHIC'S claim for pre-petition breach of contract to allow AHMIC an opportunity to plead with more specificity its claim of damages.

**The Decision**

**Section 559**

The court ruled that the Notes constituted "interests in mortgage loans" that were eligible for the safe harbor contained in Bankruptcy Code section 559, notwithstanding that their low rating rendered them ineligible as "mortgage-related securities".

The Bankruptcy Code's repurchase agreement safe harbor provision encompasses four categories of instruments relevant to the mortgage-backed securitization market: "mortgage loans", "mortgage-related securities", "interests in mortgage loans", and "interests in mortgage-related securities". The statute requires that "mortgage-related securities" fall into one of the two highest rating categories. While the Notes clearly did not meet that definition (and also did not meet the definition of "mortgage loans" or "interests in mortgage-related securities"), the court found that the Notes were "interests in mortgage loans" for purposes of the section 559 safe harbor because the Notes were secured by mortgage loans. Noting that a lien is an interest in the collateral to which it applies, the Court concluded that the Notes therefore represented a financial interest in the underlying loans. In reaching this result, the court rejected the debtor's argument that such an expansive interpretation of "interests in mortgage loans" effectively reads out of the statute the rating-based restriction in the definition of "mortgage-related securities".

**Section 555**

As an alternative holding, the court ruled that the MRA also fell within the section 555 safe harbor for securities contracts. As a repurchase agreement, the MRA constituted one type of contract that qualified for this safe harbor but this safe harbor also requires that the non-debtor counterparty be a "stockbroker", "financial institution", "financial participant" or "securities clearing agency" eligible for its protection. Here, the court's conclusion turned on whether Lehman's broker dealer was a "stockbroker" within the meaning of the safe harbor. Applying the definition as written, the court concluded that the Lehman broker dealer was a stockbroker because it was engaged in the business of effecting transactions in securities for the account of others and had customers. The court did not consider whether AHMIC, as the MRA counterparty, was a customer or whether the customer required by the stockbroker definition had to be related to the transaction at issue (and did not reach the issue of whether the Lehman counterparty would qualify for section 555's protection as a "financial participant").

**UCC Article 9**

The court also allowed Lehman Brothers unilaterally to establish the value of the Notes without following marketing procedures typically required under UCC Article 9.

# C A D W A L A D E R

At issue was a provision of the MRA that permitted Lehman to sell its collateral in a commercially reasonable manner -- as is typically required under UCC Article 9 -- *or* "to elect...to give the defaulting party credit for such Purchase Securities in an amount equal to the price therefore on such date, obtained from a generally recognized source...against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party" under the MRA.

AHMIC argued that the MRA created a security interest in the Notes that was governed by NY UCC Article 9, and that Lehman had violated Article 9 by not conducting a "commercially reasonable" sale of its collateral. Confirming that the parties' intent controls the interpretation of their contract under the UCC, the court found that the plain language of the MRA evidenced the parties' intention to effect a purchase and sale of the Notes as opposed to a secured financing. The MRA's "backup" security interest language was disregarded by the court.

Moreover, the court determined that even if the Notes constituted "promissory notes" or "payment intangibles" under Article 9, the commercial reasonableness standard did not apply to them because they had been sold. The court pointed out that UCC section 9-610, which governs post-default dispositions of collateral, did not impose a duty upon a "secured party that is a … buyer of accounts, chattel paper, payment intangibles, or promissory notes." Citing the Official Comment to section 9-610, the court clarified that "although denominated 'secured parties' these buyers own the entire interest in the property sold and so may enforce their rights without regard to the seller (debtor) or the seller's creditors."

## Surviving Claim

Finally, the court dismissed without prejudice AHMIC's pre-petition breach of contract claim against Lehman. It thereby preserved AHMIC's ability to plead with more specificity that it had been damaged by Lehman's improperly assigning to the securities an abnormally low market value for the purposes of its margin call. Thus, it left open the possibility that by acting as its own "generally recognized source" and valuing the Notes in the absence of a sale, auction or other arm's length procedure, Lehman had damaged the debtor.

If you have any questions regarding the foregoing, please contact:

Mark Ellenberg          202-862-2238          mark.ellenberg@cwt.com

Leslie W. Chervokas     212-504-6835          leslie.chervokas@cwt.com

# MAYER·BROWN

# RESTRUCTURING, BANKRUPTCY & INSOLVENCY/ SECURITIZATION UPDATE
## Another Victory for the Mortgage Loan Repo Market

*June 4, 2008*

In a decision issued on May 23, 2008, the mortgage loan repo market scored its second important victory in the American Home Mortgage bankruptcy case.[1] In its first victory, a prior decision[2] in the case, the Delaware Bankruptcy Court affirmed that the mortgage loan repos at issue were entitled to the benefits of the Bankruptcy Code's "safe harbor" provisions. The May 23 decision (hereafter, "*American Home Two*") dismissed the debtor's law suit against two Lehman entities (collectively, "Lehman") that were involved in a different pre-petition repo.

The suit challenged the safe harbors from multiple angles, but without success. Among the court's important holdings:

- A repo of subordinated notes secured by mortgage loans is entitled to the benefit of the repo and securities contract safe harbors; and

- Commercial reasonableness standards imposed on secured lenders by Article 9 of the Uniform Commercial Code (the "UCC") do not apply to the exercise of remedies by a repo lender in closing out a repo after default.

While the application of the repo and securities contract safe harbors to transactions involving mortgage loans has not yet been tested at the appellate level, the two *American Home* decisions from the Delaware Bankruptcy Court could hardly have been more supportive of the safe harbors.

## Brief Background on the Safe Harbors

Although they are economically similar to short-term secured loans, repurchase agreements (commonly referred to as "repos") involving specified types of financial collateral enjoy a panoply of safe harbors that protect and enhance a repo lender's access to the collateral upon the bankruptcy of the repo seller, as compared to the rights of a conventional secured lender against similar collateral. Most importantly, a repo lender:

- May exercise its contractual rights to liquidate, terminate or accelerate the repo (and the repo'd collateral) upon its counterparty's bankruptcy filing, without violating the automatic stay and regardless of the fact that remedies triggered by the filing might otherwise by unenforceable as "*ipso facto*" clauses; and

- Is broadly protected from the Bankruptcy Code's provisions allowing recovery of fraudulent conveyances (assuming no actual fraud) and voidable preferences.

Mortgage loans were added to the list of qualifying financial collateral by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, as were "mortgage related securities" and "interests in mortgage related securities or mortgage loans." We refer to these various types of mortgage-related assets below as "mortgage collateral." The Bankruptcy Code limits the repo safe harbors to repurchase agreements that involve mortgage collateral (and a few other qualifying assets such as US government securities) and that meet other specified terms (including a maturity of not more than one year, or on demand).

Repos of mortgage collateral may also qualify as "securities contracts," as the definition of "securities contract" includes any contract "for the purchase or sale" of mortgage collateral. Securities contracts also expressly include "repurchase or reverse repurchase transactions," without subjecting those transactions to the maturity limit and other terms in the Bankruptcy Code's definition of repurchase agreement. However, for securities contracts, the Bankruptcy Code limits the universe of protected counterparties to stockbrokers, financial institutions, financial participants (essentially large players in the financial markets) or securities clearing agencies, which is a more limited set than the "repo participants" (essentially anyone who is party to a repo) that benefit from the repo safe harbors.

## American Home Two

The repo'd securities involved in the repo at issue in *American Home Two* were subordinated notes issued by a special purpose entity, which notes were secured by mortgage loans.[3] One way the debtor attacked the transaction was by arguing that the subordinated notes were not qualifying collateral for the repo safe harbor. The court disagreed, holding that the subordinated notes were "interests in mortgage loans" (one of the qualifying categories), because they were secured by mortgage loans. As a result of this finding and a further finding that the Lehman entity involved was a "stockbroker," the court also held that the subject repurchase agreement was a securities contract.

Because the repo was a repurchase agreement and a securities contract, the court held that Lehman's action in exercising its contractual right to liquidate and close out the repo (by retaining the subordinated notes) was not subject to the automatic stay and survived the Code's general provision rendering *ipso facto* clauses unenforceable. Importantly, the repo did not have to be both a repurchase agreement and a securities contract in order for Lehman's actions to be permitted. Either one would have been enough without the other, but this particular repo fell within both protected categories.

The debtor also claimed that Lehman's exercise of remedies had violated a commercial reasonableness requirement that Article 9 of the UCC imposes on secured parties. The court disagreed. Although some sales of receivables are treated like security interests for parts of Article 9, the commercial reasonableness requirement in the remedies section of the Article does not apply to "true buyers."[4] Based on expressions of intent in the master repurchase agreement governing the Lehman repo, the court held that the

master repurchase agreement was "a purchase and sale agreement," and, therefore, the commercial reasonableness requirement did not apply. As a result, according to the court, Lehman was entitled to exercise the default remedies set out in the contract (in particular, the right to retain the repo'd securities free of the debtor's interests), and Lehman was not required to conduct a UCC-type foreclosure sale or otherwise to comply with the UCC's commercially reasonable standard.

The debtor made several other claims, including that Lehman had breached contractual obligations, was guilty of conversion[5] or had been unjustly enriched through the transaction. However, all of the counts of the complaint were dismissed, although the court left room for the debtor to refile its claim that Lehman's actions breached the terms of the master repurchase agreement.

## Endnotes

[1]  *Am. Home Mortgage Inv. Corp. v. Lehman Bros. Inc.* (*In re Am. Home Mortgage Holdings, Inc.*), Adv. No. 07-51739 (CSS), -- B.R. --, 2008 WL 2156323, *__ (Bankr. D. Del. May 23, 2008).

[2]  In *re American Home Mortgage Inc.*, 379 B.R. 503 (Bankr. D. Del. 2008) (hereinafter referred to as "*American Home One*"). For more detail about *American Home One*, mortgage loan repos and the repo safe harbors, see Curry & Tougas, *The Mortgage Loan Repo Survives its First Big Test (With One Hitch)*, BNA BANKRUPTCY LAW REPORTER, Vol. 20., No. 16 (April 17, 2008), available at http://mayerbrown.com/publications/article.asp?id=4452&nid=6.

[3]  The secured notes were not "mortgage related securities" (another qualifying category) because they did not meet a minimum credit rating requirement applicable to that category.

[4]  See Official Comment 9 to N.Y. UCC Section 9-601, which the court cited in *American Home Two*.

[5]  As the court noted, under New York law, the tort of conversion is the "exercise of unauthorized dominion over the property of another in interference with a plaintiff's legal title or superior right of possession." (*citing Briarpatch LTD. L.P. v. Geisler Roberdeau, Inc.*, 148 F.Supp.2d 321, 328 (S.D.N.Y. 2001) (quoting *Lopresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997)).

*If you have any questions relating to the* American Home *decisions or repo or securities contract safe harbors, please feel free to contact any of the following attorneys, or the member of the Restructuring, Bankruptcy & Insolvency practice or Securitization practice with whom you regularly work.*

**David S. Curry**
312 701 7245
dcurry@mayerbrown.com

**Paul A. Jorissen**
212 506 2555
pjorissen@mayerbrown.com

**Jeffrey G. Tougas**
212 506 2557
jtougas@mayerbrown.com

**Jon D. Van Gorp**
312 701 7091
jdvangorp@mayerbrown.com

Mayer Brown is a leading global law firm with offices in key business centers across the Americas, Asia and Europe. We have approximately 1,000 lawyers in the Americas, 300 in Asia and 500 in Europe. The firm serves many of the world's largest companies, including a significant proportion of the Fortune 100, FTSE 100 and DAX companies and more than half of the world's largest investment banks. Mayer Brown is particularly renowned for its Supreme Court and appellate, litigation, corporate and securities, finance, real estate and tax practices.

OFFICE LOCATIONS  AMERICAS: Charlotte, Chicago, Houston, Los Angeles, New York, Palo Alto, São Paulo, Washington
ASIA: Bangkok, Beijing, Guangzhou, Hanoi, Ho Chi Minh City, Hong Kong, Shanghai
EUROPE: Berlin, Brussels, Cologne, Frankfurt, London, Paris

ALLIANCE LAW FIRMS Mexico City (Jáuregui, Navarrete y Nader); Madrid, (Ramón & Cajal); Italy and Eastern Europe (Tonucci & Partners)

Please visit our web site for comprehensive contact information for all Mayer Brown offices.

www.mayerbrown.com

This Mayer Brown LLP publication provides information and comments on legal issues and developments of interest to our clients and friends. The foregoing is not a comprehensive treatment of the subject matter covered and is not intended to provide legal advice. Readers should seek specific legal advice before taking any action with respect to the matters discussed herein.

IRS CIRCULAR 230 NOTICE. Any advice expressed herein as to tax matters was neither written nor intended by Mayer Brown LLP to be used and cannot be used by any taxpayer for the purpose of avoiding tax penalties that may be imposed under US tax law. If any person uses or refers to any such tax advice in promoting, marketing or recommending a partnership or other entity, investment plan or arrangement to any taxpayer, then (i) the advice was written to support the promotion or marketing (by a person other than Mayer Brown LLP) of that transaction or matter, and (ii) such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

Copyright 2008. Mayer Brown LLP, Mayer Brown International LLP, and/or JSM. All rights reserved.

Mayer Brown is a global legal services organization comprising legal practices that are separate entities ("Mayer Brown Practices"). The Mayer Brown Practices are: Mayer Brown LLP, a limited liability partnership established in the United States; Mayer Brown International LLP, a limited liability partnership incorporated in England and Wales; and JSM, a Hong Kong partnership, and its associated entities in Asia. The Mayer Brown Practices are known as Mayer Brown JSM in Asia.

0608

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMERICAN HOME MORTGAGE<br>INVESTMENT CORPORATION,<br><br>           Appellant,<br><br>    v.<br><br>LEHMAN BROTHERS INC. and LEHMAN<br>COMMERCIAL PAPER INC.,<br><br>           Appellees. | Civil Action No. 08-484 (JJF) |

### CERTIFICATE OF SERVICE

       I hereby certify that on August 18, 2008, I caused a true and correct copy of the **BRIEF OF AMERICAN HOME MORTGAGE INVESTMENT CORPORATION IN SUPPORT OF ITS REQUEST, PURSUANT TO 11 U.S.C. § 105(a), 28 U.S.C. § 158(d)(2) AND FED. R. BANKR. P. 8001(f), FOR CERTIFICATION FOR DIRECT APPEAL TO UNITED STATES COURT OF APPEALS FOR THIRD CIRCUIT OF ORDER DISMISSING IN PART WITH PREJUDICE AND IN PART WITHOUT PREJUDICE COMPLAINT AGAINST LEHMAN BROTHERS INC. AND LEHMAN COMMERCIAL PAPER INC. (AS AMENDED), AND AHMIC'S MOTION TO STAY ACTION PENDING ADJUDICATION OF CERTIFICATION REQUEST** to be filed with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Amanda Maria Winfree (awinfree@ashby-geddes.com)

       I further certify that on August 18, 2008, I caused a true and correct copy of the **BRIEF OF AMERICAN HOME MORTGAGE INVESTMENT CORPORATION IN SUPPORT OF ITS REQUEST, PURSUANT TO 11 U.S.C. § 105(a), 28 U.S.C. § 158(d)(2) AND FED. R. BANKR. P. 8001(f), FOR CERTIFICATION FOR DIRECT APPEAL TO UNITED STATES COURT OF APPEALS FOR THIRD CIRCUIT OF ORDER DISMISSING IN PART WITH PREJUDICE AND IN PART WITHOUT PREJUDICE COMPLAINT AGAINST LEHMAN BROTHERS INC. AND LEHMAN COMMERCIAL PAPER INC. (AS AMENDED), AND AHMIC'S MOTION TO STAY ACTION PENDING ADJUDICATION OF CERTIFICATION REQUEST** to be served as indicated upon the following parties:

William P. Bowden, Esq.
Amanda M. Winfree, Esq.
Don Beskrone, Esq.
Benjamin W. Keenan, Esq.
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(Lehman Bros.)
*Hand Delivery*

Mark Indelicato, Esq.
Mark Power, Esq.
Jeffrey L. Schwartz, Esq.
Edward L. Schnitzer, Esq.
Hahn & Hessen LLP
488 Madison Avenue, 14th and 15th Floor
New York, NY 10022
(Official Committee of Unsecured Creditors)
*First Class Mail*

Robert J. Rosenberg, Esq.
Noreen A. Kelly-Najah, Esq.
George Royle, Esq.
Michael J. Riela, Esq.
Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, NY 10022
(Lehman Bros.)
*First Class Mail*

Bonnie Glantz Fatell, Esq.
David W. Carickhoff, Esq.
Blank Rome LLP
1201 Market Street, Suite 800
Wilmington, DE 19801
(Official Committee of Unsecured Creditors)
*Hand Delivery*

Joseph M. McMahon, Esq.
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207 - Lockbox #35
Wilmington, DE 19801
*Hand Delivery*

Erin Edwards (No. 4392)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: eedwards@ycst.com
*Counsel to American Home Mortgage*
*Investment Corporation*